# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        . CRIMINAL NO. 10-01732-TSH
                                .
         V.                     . BOSTON, MASSACHUSETTS
                                . AUGUST 10, 2010
JOSE L. BAEZ                    .
   Defendant                    .
. . . . . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF PROBABLE CAUSE
### AND DETENTION HEARING
### BEFORE THE HONORABLE TIMOTHY S. HILLMAN
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:     UNITED STATES ATTORNEY'S OFFICE
                        BY:  David Tobin, Esq.
                        One Courthouse Way, Suite 9200
                        Boston, MA  02210
                        617-748-3392
                        david.tobin@usdoj.gov


For the defendant:      William W. Fick, Esq.
                        Federal Public Defender Office
                        District of Massachusetts
                        51 Sleeper Street, 5th Floor
                        Boston, MA 02210
                        617-223-8061
                        william_fick@fd.org




Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1

**I N D E X**

2

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

3

**Government's:**

4

Brian Oppedisano     3        37        73

5

| EXHIBITS | DESCRIPTION | IN EVIDENCE |
|---|---|---|

6

None

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1               **P R O C E E D I N G S**

2        CASE CALLED INTO SESSION

3            THE CLERK:  The Honorable Timothy S. Hillman

4   presiding.  Today's date is August 10, 2010.  You all may be

5   seated.  The matter before the Court is United States v. Jose

6   Baez; Criminal Action No. 10-1732-TSH.  Would counsel please

7   identify themselves for the record?

8            MR. TOBIN:  Good afternoon, Your Honor, David Tobin

9   on behalf of the United States.

10           THE COURT:  Good afternoon, Mr. Tobin.

11           MR. FICK:  Good afternoon, Your Honor, William Fick

12   on behalf of Mr. Baez.

13           THE COURT:  Good afternoon to you, Mr. Fick.  Okay we

14   are on for probable cause and detention.  Is that everybody

15   else's understanding as well?

16           MR. FICK:  Yes, Your Honor.

17           MR. TOBIN:  It is, Your Honor.  The government is

18   ready with its first witness.

19           THE COURT:  You may proceed.

20           MR. TOBIN:  Your Honor, the United States calls ATF

21   Special Agent Brian Oppedisano.

22        GOVERNMENT WITNESS BRIAN OPPEDISANO, SWORN

23           THE OFFICER:  Thank you.  Could you please state your

24   name, spelling your last name for the record?

25           THE WITNESS:  Brian Oppedisano, O-P-P-E-D-I-S-A-N-O.

4

1    DIRECT EXAMINATION

2    BY MR. TOBIN:

3    Q.    Good afternoon, Sir.

4    A.    Good afternoon.

5    Q.    Please tell the Court how you are employed.

6    A.    I am a Special Agent with the Bureau of Alcohol, Tobacco,

7    Firearms and Explosives.

8    Q.    How long have you served as a special agent?

9    A.    Approximately eight years.

10    Q.    To which unit of the ATF are you currently assigned?

11    A.    I'm assigned to the Boston Group 2.

12    Q.    What are your primary duties and responsibilities as an

13    agent in Group 2 in Boston?

14    A.    As an ATF agent in Boston I'm assigned to investigate

15    violations of the Federal Firearm laws and the Federal

16    Explosives and Arson laws.

17    Q.    I'm going to direct your attention, if I might, to just

18    the other day, the other night, August 9, 2010 at approximately

19    3:21 in the morning.  Would you please tell the Court what

20    happened at that time with regard to you?

21    A.    At approximately 3:21 in the morning I was alerted via a

22    text message on a, on a GPS tracking device had left that

23    particular area of the city.

24    Q.    And had you had something to do previously with the

25    placement of a GPS for a global positioning system tracker, if

5

1  you will, on a vehicle?

2  A.   Yes.

3  Q.   And whose vehicle and what kind of vehicle have you been

4  involved in placing the tracker on?

5  A.   The vehicle was a 1989 Chevrolet Caprice registered to

6  Jose L. Baez.

7  Q.   And have you later or have you learned who Jose L. Baez

8  is?

9  A.   Yes.

10  Q.   Do you see him in the courtroom today?

11  A.   Yes.

12  Q.   Sir, would you please point him out?

13  A.   He's the gentleman sitting in the green colored--

14        MR. TOBIN:  May the record reflect that the witness

15  has indicated and pointed to the defendant in this matter, Your

16  Honor.

17        MR. FICK:  No objection.

18        THE COURT:  Shall, it shall so reflect.

19  BY MR. TOBIN:

20  Q.   Tell us then approximately when was the GPS put on the

21  defendant's Caprice?

22  A.   It was put on the Chevy Caprice approximately the, the end

23  of August of 2009.

24  Q.   And can you tell us briefly why a GPS tracker was placed

25  on the defendant's Caprice?

6

1   A.    He was a suspect in an arson investigation.

2   Q.    Now again directing your attention more recently to August

3   9th, just the other night at 3:21 in the morning, is it your

4   testimony that you were alerted that the GPS had essentially

5   kicked on or it kicked in?

6   A.    Yes.

7   Q.    And that indicated what?  What, what was happening with

8   regard to the vehicle to which the GPS was affixed?

9   A.    It was alerting me that it had departed from the area of

10  Mr. Baez's residence.

11  Q.    And what was the area?  Where did Mr. Baez live?

12  A.    He resided at 156 Columbia Road in Dorchester.

13  Q.    Do you know what apartment number in that building?

14  A.    Yes, No. 5.

15  Q.    And can you tell us whether or not based on your

16  observations and through the course of this investigation if

17  that Caprice was regularly and usually parked in the vicinity

18  of that residence?

19  A.    Yes, it was.

20  Q.    Now early in the morning on August 9th when you were

21  alerted that the vehicle was moving what did you do next?

22  A.    What I did next was I logged onto the internet based

23  application that was able to, I was able to view where the

24  tracker was.

25  Q.    What information about the vehicle, the Caprice, did you

1   learn?

2   A.   I learned that the vehicle was traveling towards the

3   Roslindale area of Boston.

4   Q.   From Columbia Road in Dorchester?

5   A.   Yes.

6   Q.   When you became aware through the GPS tracker that the

7   vehicle in question, Mr., the defendant's Caprice was moving,

8   what did you next do?

9   A.   I next started calling other investigators that were

10  involved in the investigation, specifically Lieutenant Thomas

11  Murray and Detective James Freeman.

12  Q.   They are officers of which departments?

13  A.   Lieutenant Murray is an investigator with the Boston Fire

14  Department, and Detective Freeman is a detective of the Boston

15  Police Department.

16  Q.   What was the purpose of calling those two officers, sir?

17  A.   To inform them of the movement of Mr. Baez's vehicle.

18  Q.   What happened next?

19  A.   Detective Freeman started to travel to the area that Mr.

20  Baez's vehicle was traveling to.

21  Q.   At this point was Mr. Baez's Caprice still in movement or

22  had it come to a parking, resting stop?

23  A.   It, it became stationary somewhere at the time of one of

24  the phone calls.

25  Q.   And were you able to determine where it had parked or

8

1  where it became stationary?

2  A.    Yes.

3  Q.    Where was that?

4  A.    It became stationary in the area of 5 Bexley Road in

5  Roslindale.

6  Q.    And knowing that what game plan or what orders were given

7  by you; what was, what happened next, I should say?

8  A.    We made a decision to send Detective Freeman to that area

9  to make any observations that he could.

10  Q.    And was he, in fact, dispatched to the area where the car

11  had parked in Roslindale?

12  A.    Yes.

13  Q.    What happened next?

14  A.    As he was traveling to the area of Bexley Road, he

15  received a transmission over his radio that a, a fire was

16  reported on, in the area of 11 Firth Road in Roslindale.

17  Q.    Now have you subsequently learned in the Bexley Road to

18  which you just made reference and the location of the fire on,

19  on Firth, where are they in relation to each other?

20  A.    Bexley Road and Firth Road run parallel to each other off

21  of Washington Street in Roslindale, a very short distance in

22  between each other.

23  Q.    Have you been able to determine the approximate distance

24  from the location where the Caprice parked and where this fire

25  was located at 11 Firth; how much, how much space?

1 A.   The area of 5 Bexley Road in relation to 11 Firth is

2 approximately 100 yards at the most.

3 Q.   You are telling us then an officer was on his way to the

4 stopped vehicle?  He received word of a fire nearby on Firth;

5 is that accurate?

6 A.   Yes.

7 Q.   What happened next?

8 A.   After he received information that there was a fire, fire

9 apparatus started to go in that area of 11 Firth and Detective

10 Freeman diverted to 156, the area of 156 Columbia Road.

11 Q.   Did he, in fact, go by and as you understand it, view the

12 building engulfed or at least on fire?

13 A.   He viewed fire coming from the building.

14 Q.   He then went where?

15 A.   He diverted to the area of 156 Columbia Road in

16 Dorchester.

17 Q.   And that was the location where the car had been parked or

18 the defendant resided?

19 A.   That's correct.

20 Q.   What happened next?

21 A.   As Detective Freeman was arriving in the area of Columbia

22 Road he observed the Chevy Caprice at the intersection of

23 Columbia Road and Geneva Ave.

24 Q.   What observations, if any, could you make as you know or

25 understand?

1  A.    Detective Freeman observed the Chevy Caprice do a U-turn

2  at the Geneva intersection and park his vehicle, Columbia Road,

3  park his vehicle in the area of 140, 150 Columbia Road.

4  Q.    And again the defendant's residence was what number?

5  A.    No. 156.

6  Q.    What happened next as you understand it?

7  A.    Detective Freeman pulled up along or just behind the

8  vehicle that was now parked.  Mr. Baez was still seated in the,

9  at that point Mr. Baez was seated in the vehicle.

10 Q.    As you understand it, anybody else in the vehicle other

11 than Mr. Baez?

12 A.    No, he was alone.

13 Q.    What, what happened then with Detective Freeman?

14 A.    Detective Freeman, at that point, waited for another unit

15 for assistance.  He walked up to the vehicle and identified

16 himself as a police officer.

17 Q.    What happened next?

18 A.    He informed him; he informed Mr. Baez that he was

19 investigating a call for a fight and asked Mr. Baez where he

20 was coming from.

21 Q.    Just so it's clear, that was not an actual statement.

22 There was no fight.  He was not there for that reason?

23 A.    That's correct.

24 Q.    All right.  He asked him where; he asked Mr. Baez where he

25 was coming from.  Where was Mr. Baez when that question was

1  asked?

2  A.   Mr. Baez replied that he was coming from Dunkin' Donuts in

3  the Jamaica Plain area.

4  Q.   Where was Mr. Baez when he gave that response to the

5  question?  Was he in the car, outside the car, where was he?

6  A.   I think he was still seated in the vehicle.

7  Q.   And again, okay, so he said he was coming from a Dunkin'

8  Donuts where?

9  A.   In Jamaica Plain.

10  Q.   What happened next?

11  A.   At that point a, a uniformed or marked police unit had

12  arrived with assistance.  Detective Freeman asks Mr. Baez to

13  exit the vehicle.

14  Q.   Did Mr. Baez, as you understand it, comply?

15  A.   Yes, he did.

16  Q.   What, by the way let me ask you, when he was communicating

17  with Mr. Baez in the vehicle, did he make any observations?

18  Did he smell anything as you've been told or informed?

19  A.   He'd made, when Mr. Baez exited the vehicle he did.

20  Q.   What was it?

21  A.   As he exited the vehicle he did.

22  Q.   What did he smell?

23  A.   He smelled an odor consistent of with that of gasoline.

24  Q.   So when Mr. Baez exits the vehicle and the detective

25  smells gasoline, at that point what does the detective do?

12

1   A.   He places Mr. Baez in handcuffs.

2   Q.   And what happens after that?

3   A.   He informs him of his arrest and places him in the

4   backseat of a marked unit.

5   Q.   At some point is the person of Mr. Baez, this defendant,

6   searched?

7   A.   Yes.

8   Q.   When is he searched?

9   A.   He is ultimately searched at Boston, at the Boston Police

10  Headquarters.

11  Q.   What, if anything, was found on his person during that

12  search?

13  A.   A book, a book of matches was found in his front pants

14  pocket.

15  Q.   Sir, when you say a book of matches, do you mean a

16  traditional 12 or do you mean a box?

17  A.   A box, I'm sorry, a box, the wooden type.

18  Q.   At some point did you arrive at the Boston Police Station

19  where the defendant was being held in custody?

20  A.   Yes.

21  Q.   Did you have contact with him?

22  A.   Yes.

23  Q.   Explain to the Court, if you would, the contact you had

24  with the defendant.  At this point he's under arrest?

25  A.   Yes.

13

1    Q.    In custody at the Boston Police?

2    A.    Yes.

3    Q.    What happened?

4    A.    The limited contact was we; we identified ourself,

5    explained why Mr. Baez was there and just got basic

6    biographical information from Mr. Baez.

7    Q.    Did he indicate where he lived?

8    A.    Yes.

9    Q.    Where did he say he lived?

10   A.    He indicated he lived at 156 Columbia Road, Apartment 5 in

11   Dorchester.

12   Q.    Did he indicate whether or not, did he make any reference

13   to the Caprice?

14   A.    Yes.

15   Q.    What did he tell you about the Caprice?

16   A.    Mr. Baez indicated that he has owned the Chevy Caprice for

17   approximately eight to 10 years.

18   Q.    Now this conversation took place in the wee hours of

19   August 9, 2010; is that accurate?

20   A.    Yes.

21   Q.    Later that day did you have occasion to obtain search

22   warrants in relation to this investigation?

23   A.    Yes.

24   Q.    And you received warrants for which locations?

25   A.    The first location was 156 Columbia Road, Apartment 5 in

14

1    Dorchester.  And the second search warrant was for the 1989

2    Chevy Caprice registered to Mr. Baez.

3    Q.   At the time, and did you participate in the search of both

4    the car and the residence?

5    A.   Yes.

6    Q.   Focusing now on the search of the car, where did that

7    search take place?

8    A.   The search of the vehicle took place at the Boston Police

9    Headquarters.

10   Q.   Does that mean that the vehicle had been moved from where

11   Mr. Baez had parked it near his residence to Boston Police?

12   A.   Yes.

13   Q.   What, please tell the Court, what, if anything, was found

14   during the search of the vehicle.

15   A.   Pursuant to the search warrant we located two gallons, two

16   full gallons of what was suspected at the point was gasoline.

17   Q.   Why was it suspected to be gasoline?

18   A.   Fire investigators just from the scent of the liquid that

19   contained in Poland Spring gallon jugs was consistent with that

20   of gasoline.

21   Q.   You perhaps anticipated my next question.  What kind of

22   containers was this suspected gasoline, what were these

23   containers?

24   A.   They were gallon jugs, the Poland Spring gallon jugs.

25   Q.   Where were they found in the vehicle?

1   A.    In the trunk area.

2   Q.    Anything else found during the search of the vehicle?

3   A.    There was another half gallon, half full, jug in the trunk

4   also.

5   Q.    Just so that it's clear, there are now three bottles or

6   three containers of gasoline; is that accurate?

7   A.    Yes, and a approximately five to six gallon red canister

8   of gasoline in the trunk.

9   Q.    I'm sorry; I may be more confused than I need to be.  Does

10   that mean there were four containers of gasoline or three?

11   A.    Four.

12   Q.    There were four.  How many of them were Poland Spring or

13   that type of bottle, non-traditional container?

14   A.    Three.

15   Q.    And then there was one in a more traditional container for

16   gasoline; is that accurate?

17   A.    Correct.

18          THE COURT:  And the, they, the, what was the location

19   where these four were found again, please?

20          THE WITNESS:  That was the trunk of the Chevy

21   Caprice.

22   BY MR. TOBIN:

23   Q.    All four?

24   A.    Yes.

25   Q.    Now at some point was a canine, a police dog, trained at

1   the detection of accelerants employed or used on or near the

2   car?

3   A.   Yes.

4   Q.   That was done as well after the search warrant had been

5   obtained?

6   A.   Correct.

7   Q.   As part of the search?

8   A.   Correct.

9   Q.   Tell the Court, if you would, about the response, if any,

10  of the canine training to detect accelerants.

11  A.   The canine had positive detections for ignitable liquid on

12  the area of the front seat of the Chevy Caprice.

13  Q.   Were samples taken of the upholstery of the seat by the

14  police for further testing?

15  A.   Yes.

16  Q.   Those obviously have not yet been, those tests have not

17  been conducted this quickly?

18  A.   Correct.

19  Q.   But the dog did alert the interior front area of the

20  vehicle?

21  A.   Yes.

22  Q.   Now if I may go back, was there any conversation that

23  you're aware of about the defendant talking about matches or

24  the presence of matches in his pocket that were found during

25  the search?

1  A.   Yes.

2  Q.   What, when was, well what did he say and when did he say

3  it?

4  A.   When Lieutenant Murray retrieved the matches from his

5  front pocket, Mr. Baez responded that he smoked cigarettes.

6  Q.   Now you had the opportunity, were there any cigarettes

7  found in the automobile during the search?

8  A.   No.

9  Q.   Were there any cigarettes found on his person during the

10  search of his person subsequent to the arrest?

11  A.   No.

12  Q.   You had the opportunity to participate in the search of

13  his residence on Columbia Road in Dorchester; is that accurate?

14  A.   Yes.

15  Q.   Did you make a point to look for ashtrays, cigarettes or

16  other things associated with smoking?

17  A.   Yes.

18  Q.   Did you find anything like an ashtray or a container with

19  ashes or cigarettes or butts or anything like that?

20  A.   No.

21  Q.   Did you smell or make any note of the smell of tobacco or

22  burnt cigarettes in the house?

23  A.   No.

24  Q.   Were any matches found in the house?

25  A.   Yes.

1  Q.   Tell us about that, if you would.

2  A.   We found two of the same, of the similar type small boxes

3  of the wooden matches in the, one of the kitchen cabinets.

4  Q.   Was his computer seized pursuant to the search warrant?

5  A.   Yes.

6  Q.   Had you had the opportunity to forensically look into the

7  computer to see whatever, whatever might be on there?

8  A.   No.

9  Q.   Now were fire investigators dispatched to the Firth

10  location, the location of the fire?

11  A.   Yes.

12  Q.   And why were they dispatched, in the sense, what were they

13  looking for?  What do they examine for?

14  A.   To conduct an origin and cause investigation.

15  Q.   Origin and cause?

16  A.   Correct.

17  Q.   Are you aware if that was conducted at the scene?

18  A.   Yes.

19  Q.   What were the results of that as you understand it?

20  A.   The fire was ruled incendiary nature.

21  Q.   What does that mean?

22  A.   It was ruled an arson.

23  Q.   Why was it ruled an arson as you understand it?

24  A.   Based on the investigation the presence of the, that

25  strong odor of gasoline current investigators have ruled it an

1   arson.

2   Q.   Were the investigators were able to determine the situs or

3   the location as to where the fire began?

4   A.   Yes.

5   Q.   At the residence?

6   A.   Yes.

7   Q.   Where was that location?

8   A.   The location, the origin of, of the fire was determined to

9   be the front porch of, on the first floor of the residence.

10   Q.   Now, Special Agent, have you learned from the

11   investigation some of the characteristics about 11 Firth, what

12   kind of building it was?

13   A.   Yes.

14   Q.   Well explain to us then to the Court, what is 11 Firth?

15   Is it road?

16   A.   Road.

17   Q.   Road.  What kind of building is there?

18   A.   It's a residential neighborhood.  Eleven Firth Road is, is

19   just a regular residence, a two-and-a-half story wooden

20   structure, a rental unit on the first floor, a rental unit on

21   the third floor and owner-occupied on the second floor.

22   Q.   Can you tell us that in the early morning hours of August

23   9th when the home was torched, lit on fire in an arson fire, how

24   many people were in the structure, in those three apartments

25   that you've identified?

1  A.    I believe it was approximately 12 people.

2  Q.    Can you tell us if as a result of the fire any injuries

3  were sustained by the 12 occupants or firefighters fighting or

4  battling the blaze?

5  A.    My understanding is at least one occupant was injured,

6  taken to the hospital and released.  And at least two

7  firefighters were injured, taken to the hospital and released.

8  Q.    With regard to the occupant who was injured, is that the

9  same occupant who was forced to evacuate the house by jumping

10  from a second story window?

11  A.    Yes.

12  Q.    Of the 12 occupants in the home were any of them

13  handicapped or in a wheelchair?

14  A.    Yes.

15  Q.    How many?

16  A.    One.

17  Q.    That individual was able to successfully get out of the

18  place?

19  A.    Yes.

20  Q.    Do you have any indication based on talking to the arson

21  investigators from the city as to the approximate value or the,

22  the cost of the damage?

23  A.    It was estimated at $100,000.

24  Q.    Is the structure, the three apartments, habitable, livable

25  right now?

21

1   A.    My understanding is no.

2   Q.    Now I would like to go back to another fire.  I'd like to

3   direct your attention to April 29, 2009.  Was there a fire at

4   that time on that date that you came to investigate?

5   A.    Yes.

6   Q.    Where was that fire?

7   A.    That fire was at 12-18 Rock Hill Road in a Jamaica Plain

8   neighborhood in Boston.

9   Q.    And this April 29, 2009 fire, at what time was the first

10  alarm rung?  Essentially, when was the fire set?

11  A.    I believe it was at 3:52 a.m.

12  Q.    And what kind of building is that at that location?  What

13  was torched?

14  A.    It was Jamaica Plain Auto Body.

15  Q.    And was a cause of origin done for the Jamaica Plain Auto

16  Body fire of April 29, 2009?

17  A.    Yes.

18  Q.    You're aware of those results?

19  A.    Yes.

20  Q.    Tell the Court then as to whether or not it was determined

21  if it was an arson fire and the characteristics of how the set,

22  how the fire was set.

23  A.    It was ruled incendiary nature, an arson.

24  Q.    And where was the origin of that fire at the Jamaica Plain

25  Auto Body?

22

1  A.   At that fire there were multiple points of origin.  There

2  was, it was a, an auto body shop.  It was; I believe three

3  points of origin, one in front of each bay door.

4  Q.   And can you tell the Court what type of damage the

5  building sustained at Rock Hill Road at that Jamaica Plain Auto

6  Body as a result of the fire?

7  A.   It sustained some heavy damage, both fire, smoke and

8  water.

9  Q.   You investigated that April 29, 2009 fire, correct?

10 A.   Yes.

11 Q.   Sir, in the course of your investigation were you able to

12 obtain a surveillance video of that area at the time

13 approximately 3:52 in the morning?

14 A.   I did.

15 Q.   Tell the Court where the surveillance camera was located.

16 A.   The surveillance camera was located at an adjacent

17 business located at the corner of Centre and Paul Gore (ph)

18 Street.

19 Q.   Now were you, did you have the opportunity to review the

20 video approximately the time when the fire was set 3:52?

21 A.   Yes.

22 Q.   Tell us then what the video from 352 or thereabouts on

23 April 29th revealed.

24 A.   Approximately 20 minutes to a half an hour before the

25 first fire alarm came in the surveillance camera, you were, I

1    was able to observe a black four-door Chevy Caprice with

2    silver accented trim travel down Paul Gore Street to the area

3    of Rock Hill Road.

4    Q.    Just so that it's complete, did that camera reveal

5    anything else either before the fire until after the fire?

6    A.    Nothing of, of significance other than--

7    Q.    Now by, okay, by examining the video were you able to

8    determine more or specific characteristics about the vehicle

9    that was spotted in close proximity to the fire at that time in

10   the middle of the night or early morning?

11   A.    Yes.

12   Q.    Again, if you'd just explain to the Court what you were

13   able to determine.  You watched this video repeatedly and

14   closely?

15   A.    Yes.

16   Q.    So you determined based on other research and looking at

17   the video with the vehicle what kind of car was it?

18   A.    I determined it was a Chevy Caprice.

19   Q.    Approximate year?

20   A.    At that time I believe the approximate years were mid-late

21   80s.

22   Q.    And were you able to determine whether or not it was a

23   two-door or a four-door?

24   A.    It was a four-door.

25   Q.    Were you able to determine whether or not it had a silver

24

1    accent package?

2    A.    It had silver accented trim.

3    Q.    On the vehicle and on the trim?

4    A.    Yes.

5    Q.    Okay.  By the way, the Caprice that is registered to the

6    defendant, the Caprice where he was arrested after being taken

7    out or after removing from it, how does his car match the car

8    that was on the video on the April 29th fire?

9    A.    It's extremely similar; it looks the same.

10   Q.    And what year is his vehicle?

11   A.    1989.

12   Q.    1989 four-door, dark-colored, Chevy Caprice with metal,

13   silver accents?

14   A.    Yes.

15   Q.    Now, again, focusing on this April 29th fire, as the lead

16   investigator did you do additional investigation?

17   A.    Yes.

18   Q.    At some point did you seek to see whether or not there was

19   a tie in to this incident to Jamaica Plain Auto Body with this

20   defendant?

21   A.    Yes.

22   Q.    Mr. Baez?

23   A.    Yes.

24   Q.    Tell the Court what you discovered about Mr. Baez's

25   relationship prior to April 29, 2009 with Jamaica Plain Auto

1  Body.

2  A.   I discovered that Mr. Baez was a customer at the Jamaica

3  Plain Auto Body, approximately 10 to 12 months prior to the

4  fire.

5  Q.   And was he as, as your investigation revealed was he a

6  pleased and happy customer?

7  A.   No.

8  Q.   Was he a disgruntled customer?

9  A.   Yes.

10  Q.   Did you speak to the folks who work at the Jamaica Plain

11  Auto Body to determine the nature of his business relationship

12  with them?

13  A.   Yes.

14  Q.   Tell us about what you learned.

15  A.   I learned that Mr. Baez came in for some auto repairs.  He

16  was--

17  Q.   Specifically, what kind?

18  A.   --specifically Mr. Baez had a, a leak in his trunk and

19  asked if their Auto Body could evaluate and repair the leak.

20  Q.   And when was this when he brought his vehicle in for more

21  work?

22  A.   I believe it was the summer of 2008; I don't remember the

23  exact month.

24  Q.   Could it be October 3rd or thereabouts of 2008?

25  A.   I believe the repairs were done prior to that but that,

1  that would be late summer.

2  Q.   Okay so your understanding and recollection is

3  approximately summer of 2008 Mr. Baez brings the vehicle in?

4  A.   Yes.

5  Q.   What work does he have done again?

6  A.   A repair, I believe the trunk.

7  Q.   How much does he pay; do you recall, for the repair?

8  A.   Approximately $200.

9  Q.   Okay fast forward sometime in the future.  Does Mr. Baez

10  come back to the business?

11  A.   Yes.

12  Q.   When did he do that?

13  A.   Not too long after the original repair was done.

14  Q.   And that was still in 2008?

15  A.   Yes.

16  Q.   And you talked with folks who worked there at the

17  automotive place?

18  A.   I spoke with the owner.

19  Q.   They recall this episode?  He recalled this episode?

20  A.   Yes.

21  Q.   When Mr. Baez came back what was his complaint, if any?

22  A.   His complaint was that the trunk was still leaking.

23  Q.   So what did he ask them to do?

24  A.   To evaluate and to look at the, the same issue, the same

25  problem is the trunk.

1  Q.   And what happened?

2  A.   The, they did and they discovered that the leak was also

3  coming from the rear window area of the vehicle.

4  Q.   So what did they tell them?

5  A.   The owner had suggested that he bring it to a shop that

6  specializes in the type, the type of roof and rear window that

7  Mr. Baez's vehicle has.

8  Q.   And what did Mr. Baez say about that?

9  A.   According to the owner, he became disgruntled and wanted

10  his money back.

11  Q.   He wanted the $200 back that he had given him?

12  A.   Correct.

13  Q.   Would the owner give him back the $200?

14  A.   No.

15  Q.   Ultimately, well not ultimately, but does Mr. Baez sue

16  Jamaica Plain Auto Body in the courts of the Commonwealth for a

17  value of $200?

18  A.   Yes.

19  Q.   What court does he do that in?

20  A.   In West Roxbury District Court.

21  Q.   As you understand it, what's the result of his lawsuit for

22  that $200?

23  A.   The result was that he lost his suit in small claims.

24  Q.   So this, this work was done in the summer and/or fall of

25  October, pardon me, in 2008?

28

1   A.   Correct.

2   Q.   This building was then torched on April 29, 2009?

3   A.   Correct.

4   Q.   Oh, and by the way just so it's clear, did you have an

5   opportunity to look at the court paperwork, the suit if you

6   will, filed by the defendant?

7   A.   Yes.

8   Q.   And is it in the name of Jose Baez?

9   A.   Yes.

10  Q.   Does that paperwork require Jose Baez to list his

11  residential address?

12  A.   Yes.

13  Q.   What address did he list?

14  A.   156 Columbia Road, Apartment 5 in Dorchester.

15  Q.   Okay.  I'm going to ask you some questions now and focus

16  on July 31st, oh of 2009.  Was there another fire on that date

17  on or about July 31, 2009 that you came to investigate?

18  A.   Yes.

19  Q.   Where was that fire, sir?

20  A.   That was at 21 Bay State Road in the Back Bay area of

21  Boston.

22  Q.   Is that a residential or a business address?

23  A.   Both.

24  Q.   What is the business that's at 21 Bay State Road in the

25  Kenmore Square section of Boston?

1    A.    At the basement level it was Back Bay Dental Care.

2    Q.    That fire was on July 31st; is that correct?

3    A.    Correct.

4    Q.    Approximately what time of day or night was that fire set?

5    A.    It was between 3:30 and 4 a.m.

6    Q.    And did fire investigators do a cause and origin

7    investigation into that fire?

8    A.    Yes.

9    Q.    What did they determine with regard to the cause and

10   origin of, what I'll call the Back Bay Dental fire?

11   A.    They determined that the fire was an incendiary nature,

12   was an arson.

13   Q.    Arson.  Where was it set?

14   A.    It was set in the front vestibule area of the building.

15   Q.    Damage to the building?

16   A.    Excessive.

17   Q.    How much, do you recall approximate?

18   A.    I believe it was approximately $1.5 million.

19   Q.    Now was, you investigated this fire?

20   A.    Correct.

21   Q.    Did you come to obtain a surveillance film of the area, of

22   the general area of 21 Bay State Road?  Was it, did you come to

23   get a surveillance of that, a film of that?

24   A.    Yes.

25   Q.    Was that from July 31, 2009 in the wee hours of the

1  morning at approximately the time that the fire was set?

2  A.    Yes.

3  Q.    And where was that surveillance camera mounted?  Where was

4  that film taken of, where?

5  A.    It was mounted on the rear side of 21 Bay State Road.

6  Q.    It's like a back alley?

7  A.    Yes.

8  Q.    And you had the opportunity to review the film that was

9  shot at, of the early morning hours 3 to 4, if you will,

10 shortly thereafter or July 31st?

11 A.    Yes.

12 Q.    What was shown in that film?

13 A.    What was shown was a black, four-door Chevy, older style

14 Chevy with silver accented trim.

15 Q.    Were you able to identify it as appearing to be a Capri or

16 a Caprice?

17 A.    Yes.

18 Q.    And what, what did the video show?

19 A.    It showed that the vehicle was traveling behind the

20 building just getting, it was running parallel to Storrow

21 Drive.

22 Q.    And approximately when was that in relation to the fire

23 which was reported at 3:58 a.m. at that location?

24 A.    Immediately after the report of the fire.

25 Q.    Now again as the investigator investigating this July 31st

1  fire, were you able to determine whether or not this

2  defendant, Mr. Baez, had a relationship with anyone or any

3  business at 21 Bay State Road in Kenmore Square section of

4  Boston?

5  A.   Yes, I did.

6  Q.   What did your investigation reveal, sir?

7  A.   It revealed that Mr. Baez was a patient at Back Bay Dental

8  Care.

9  Q.   And was he a happy patient as you understand it or a

10 disgruntled patient?

11 A.   He became a disgruntled patient.

12 Q.   Explain to the Court what your investigation revealed

13 about his relationship with the dental office at that location.

14 A.   The investigation revealed that Mr. Baez had come in for

15 some dental work.

16 Q.   When, if you recall?

17 A.   He came in several times, but the last time was June 6th of

18 2009.

19 Q.   What was the nature of the dental work Mr. Baez had done?

20 A.   Mr. Baez had come in to have veneers re-cemented.

21 Q.   On his teeth, clearly?

22 A.   On his teeth.

23 Q.   Did they, in fact, re-cement them?

24 A.   Yes, they did.

25 Q.   What did they tell him at the time they re-cemented his

1  veneers?

2  A.   They had told him that he'd have to have them replaced.

3  Q.   Did he pay for the re-cement job?

4  A.   Yes.

5  Q.   Did he come back sometime thereafter?

6  A.   After June 6th, no.

7  Q.   Literally, you say he went; he had his teeth worked on by

8  the dental office?

9  A.   Correct.

10  Q.   How do you know he became disgruntled; what do you know

11  about that?

12  A.   He came back on June 6th, I believe.

13  Q.   So he came in to get them cemented before June 6th?

14  A.    I don't recall how many times he came in to have them re-

15  cemented.  I know he was there June 6th to have them re-

16  cemented.

17  Q.   And what was the nature of the discussion he ultimately

18  had with the dental folks there?

19  A.   He was disgruntled that he had to pay $138 to have them

20  re-strengthened.

21  Q.   Why did they make him pay?

22  A.   They weren't the original office that had put the veneers

23  in.

24  Q.   Where had they, according to what Mr. Baez told the dental

25  staff, where had these originally been done?

33

1  A.   He had told them that they were done at a dentist in the

2  Houston, Texas area.

3  Q.   And you had an opportunity to talk to the individuals at

4  Back Bay Dental?

5  A.   Yes.

6  Q.   Do they recall Mr. Baez?

7  A.   Yes.

8  Q.   And when you have characterized that he was disgruntled,

9  by my suggestion perhaps, that he was disgruntled, what did

10  they tell you?  What was his position?  What was his attitude?

11  What was he telling them about having to pay for these re-

12  cementing?

13  A.   He was upset and she was adamant that he didn't want to

14  have to pay.

15  Q.   Did he ultimately pay?

16  A.   He ultimately paid.

17  Q.   And this, this disagreement or he was upset approximately

18  what date was that?

19  A.   June 6, 2009.

20  Q.   And the fire at that location was when?

21  A.   July 31st of 2009.

22  Q.   Now so you well had the opportunity with regard to the

23  April 29th fire at Jamaica Plain Auto Body and the July 31, 2009

24  fire at Back Bay Dental, you had the opportunity in both of

25  those instances to look at the surveillance films?

1  A.   Yes.

2  Q.   You had the opportunity in looking at those films as you

3  testified to see this vehicle?

4  A.   Yes.

5  Q.   That you've described?

6  A.   Yes.

7  Q.   And comparing the vehicle you saw in the surveillance from

8  April 29th to the vehicle you saw on the video from July 31st do

9  they appear to be the same vehicle?

10  A.   Yes.

11  Q.   And again you've had the opportunity on many occasions to

12  surveill this defendant's vehicle that he kept at Columbia

13  Road; is that accurate?

14  A.   Yes.

15  Q.   Do his, does his vehicle have the same characteristics,

16  make, model, color, four-doors, silver trim as the two revealed

17  in those two surveillance films?

18  A.   Yes.

19  Q.   Now have you had the opportunity to check how many of

20  these late model Capris are in the Boston area?

21  A.   Yes.

22  Q.   How many, approximately, have you determined from a check

23  at the Registry of Motor Vehicles how many vehicles are like

24  that?

25  A.   A check through the Registry of Motor Vehicles indicated

1    that there were 38 registered Caprices between the years mid-

2    80s to late-80s of dark color black or blue.

3    Q.   When you say 38 Chevy Caprices with that, those

4    characteristics that's in Mass, in Boston area?

5    A.   Boston and surrounding towns.

6    Q.   Have you eye-balled each of those?

7    A.   Each and every one.

8    Q.   And is the defendant's car in any way sort of unique, or

9    does it, strike that question.

10   What can you tell us about these other 38s in relation to

11   the way the vehicle appeared on the two videos?

12   A.   The ones that we, the 38 that we looked at did not match

13   Mr. Baez's vehicle.

14   Q.   Did they match the vehicles on the two surveillance?

15   A.   No.

16   Q.   Did Mr. Baez's vehicle match, in your opinion, looking at

17   the tapes and his car the vehicle on the surveillance?

18   A.   Yes.

19   Q.   And again why did his, what was there unique about his

20   vehicle that the other 37 or 38 didn't have that matched him

21   with what you saw in the video camera film?

22   A.   Unique to his vehicle was the, the, the dark color, the

23   silver accented trim.  It appeared to be in good shape for that

24   late of a vehicle.  The silver hubcaps, they were both there,

25   nothing missing, no, no bumper sticker, stickers on Mr. Baez's

1  vehicle.  Mr. Baez's vehicle had a, in the surveillance films,

2  what appeared to be either a white or silver wheel, steering

3  wheel, distinct, it was an aftermarket where there wasn't

4  black; it was silver.

5  Q.   Now moving back perhaps, with regard to the fire that took

6  place in the early morning of August 9th of this year, just a

7  few nights or days ago, have you or other investigators had the

8  opportunity to speak to all, most or at least some of the 12

9  occupants of that residence, those three residences in that

10 building?

11 A.   Yes.

12 Q.   And were any of them able to identify in a photo array

13 type format this defendant?

14 A.   Yes.

15 Q.   How many of them?

16 A.   Three positively identified Mr. Baez.

17 Q.   And they did so in what manner?  Explain to me the method

18 used, as you understand it, with the photo array.

19 A.   Well the photo array shown is, is eight single photos, one

20 shown at a time.  The person that's shown is told that he may

21 or may not recognize anybody in the photo array.

22 Q.   And is--

23 A.   And if they do, you, we pick up the person and you sign

24 and date it.

25 Q.   --and is, just so it's clear, you didn't actually conduct

1    the photo array for these three individuals; is that correct?

2    A.   That's correct.

3    Q.   It's your understanding that these photo arrays were shown

4    to at least these three individuals who had resided or been at

5    the building the night of the fire and they identified the

6    picture of Mr. Baez?

7    A.   Yes.

8    Q.   Were the agents and the officers able to determine the

9    relationship between these three individuals who identified the

10   defendant and Mr. Baez?

11   A.   Yes.

12   Q.   What was the nature of that relationship?

13   A.   The nature of the relationship was, as described to me,

14   that Mr. Baez took bets from these occupants is what--

15   Q.   Was he essentially described as their bookie?

16   A.   Yes.

17   Q.   And as you understand it from talking to the agents and

18   the officers or whomever it is that talked with these three

19   people, when was the last time that they placed bets with the

20   defendant?

21   A.   Approximately one year ago.

22        MR. TOBIN:  If I may have just a moment, Your Honor?

23   I have no further questions at this time.  Please remain

24   seated.

25                        CROSS EXAMINATION

38

1   BY MR. FICK:

2   Q.   Good afternoon, Special Agent Oppedisano.

3   A.   Good afternoon.

4   Q.   Did I say that right?  I apologize.  You were the, the

5   case agent for this investigation; is that correct?

6   A.   Yes.

7   Q.   And as, sorry, as the case agent you're essentially the,

8   the lead investigator; is that fair to say?

9   A.   A lead investigator for the ATF side, yes.

10  Q.   And so as the lead investigator you make it your business

11  to sort of keep abreast of what's going on in the investigation

12  both among your federal colleagues and at the state or local

13  level, correct?

14  A.   That's correct.

15  Q.   So you, you talked to other officers and agents that were

16  involved in the investigation, right?

17  A.   Yes.

18  Q.   And, and you review reports that they make over the course

19  of the investigation; also fair to say?

20  A.   I have reviewed reports.

21  Q.   And, in fact, you compile the reports that everyone makes

22  in connection with the investigation because you are the sort

23  of clearinghouse, the center of the investigation?

24  A.   I don't; I have, I do have some of the reports.  I don't

25  have all of the reports involved in this investigation.

39

1  Q.   And your testimony today was based both on observations

2  or interactions you had personally as well as information

3  conveyed to you by other law enforcement, right?

4  A.   Yes.

5  Q.   Okay.  Now you began talking about the placement of a GPS

6  tracking device on the Chevrolet Caprice registered to Mr.

7  Baez; do you recall that?

8  A.   Yes.

9  Q.   And that device was placed back in August of 2009, almost

10  a year ago, right?

11  A.   Yes.

12  Q.   Was that then pursuant to a warrant or was that done

13  without a warrant?

14  A.   Without a warrant.

15  Q.   And so this GPS device has been on the car continuously

16  for almost a year, right?

17  A.   Yes.

18  Q.   And the device essentially keeps track of where the

19  vehicle is or translates, transmits the vehicle's position

20  24/7, correct?

21  A.   Yes.

22  Q.   And the, the system that you can log into to view where

23  the vehicle is essentially keeps a log of the vehicle's

24  location throughout the presence or the operation of the

25  device, right?

40

1   A.   Yes.

2   Q.   And you can access that essentially whenever you want by

3   an internet application, correct?

4   A.   Yes.

5   Q.   And you can also set that application to send you certain

6   or to give you certain notice when things happen, like they

7   describe, you received a text message when the vehicle departed

8   the house on August 9th, right?

9   A.   Yes.

10  Q.   Okay.  Now you also or you and other agents have also

11  placed a tracking device on another vehicle associated with Mr.

12  Baez, correct?

13  A.   Yes.

14  Q.   He leases an Acura MDX from the year 2008; is that right?

15  A.   I believe it's a 2008.

16  Q.   And you had placed another tracking device on that vehicle

17  in January of this year, correct?

18  A.   Yes.

19  Q.   So you and the other agents investigating in the search

20  essentially tracking two vehicles associated with Mr. Baez 24/7

21  for the, essentially for all of this year; is that right?

22  A.   The GPS on the MDX was taken off a few months after it was

23  put on.  I don't, believe it was taken off there a couple

24  months ago, three or four months ago.

25  Q.   Okay.  So but the other Caprice it stayed on?

41

1   A.    Yes, it stayed on the Caprice.

2   Q.    And fair to say that having surveilled Mr. Baez's vehicles

3   for as long as you have, it's not uncommon for him to go out

4   late at night?

5   A.    He has gone out late at night.

6   Q.    And do you remember roughly how many times in the, in the

7   year and the almost a year the tracking device has been on the

8   Caprice?

9   A.    No, I don't recall how many times.

10  Q.    Are we talking dozens or what times?

11  A.    In the Caprice?

12  Q.    Yeah?

13  A.    Could you, how late at night were you, 11:00?

14  Q.    Well let's just talk about after 11:00 and before 5:00 in

15  the morning?

16  A.    Not many times between 2 a.m. and 5 a.m.  The time, there

17  are several time prior to midnight.

18  Q.    Okay.  So in any event there have been multiple occasions

19  in the last year when his vehicle went out either late at night

20  or early in the morning?

21  A.    Not, not early in the morning, but there are several times

22  prior to midnight.  I don't have all the data in front of me,--

23  Q.    Right.

24  A.    --sir, but in the Chevy Caprice the times were typically

25  prior to midnight in my recollection.

42

1   Q.   Do you recall any times after midnight in which the

2   Caprice had been tracked in the last year?

3   A.   Not off the top of my head, sir.

4   Q.   But it may have been, you just don't know?

5   A.   Exactly, yes.

6   Q.   And how about the Acura, did that vehicle often go out

7   later at night?

8   A.   It did go out late at night.  I don't recall exactly what

9   times it went out.

10  Q.   And why was the tracking device taken off the Acura?

11  A.   The tracking device was taken off for two reasons.  The

12  first reason was that the, there was a 50% chance that he'd

13  leave the car but the evidence that I had there was the Chevy

14  Caprice and just other groups needed to use the GPS.

15  Q.   Okay and do you, are you aware of the technical

16  characteristics of the GPS?  How accurate is it?  Are we

17  talking about a meter, 10 meters, 100?  Do you know if it's got

18  an error specification built into it?

19  A.   That's a good question.  Based on my observations when I

20  would, if I had logged on looking at the vehicle at where it

21  was telling me where it was it was, it usually was within a few

22  yards.  I don't know the exact specification, sir.

23  Q.   Okay and over the, the course of this almost a year

24  surveilling Mr. Baez in the various vehicles via the GPS were

25  there any other occasions on which he happened to be in

43

1   proximity to a fire that you're aware of?

2   A.   No.

3   Q.   Now at, oh, and just to make sure I'm clear, the, you also

4   did not obtain a warrant to put the GPS device on the Acura; is

5   that correct?

6   A.   That's correct.

7   Q.   Okay.  Now you talked about getting the text message

8   notice at 3:21 in the morning on August 9th that the Caprice had

9   left the area of 156 Columbia Road, right?

10  A.   Yes.

11  Q.   And is it your understanding that the systems sends that

12  text message pretty much instantaneously when the vehicle

13  starts to move?

14  A.   That's my understanding, yes.

15  Q.   Okay.  So to the best of your knowledge that would be, the

16  time of departure would have been 3:21 a.m.?

17  A.   Or thereabouts, correct.

18  Q.   Okay.  And you talked about how the vehicle went to 5

19  Bexley Road and then stopped there for a while, correct?

20  A.   Yes.

21  Q.   And from 156 Columbia to 5 Bexley is about four miles or

22  so; is that right?

23  A.   I don't know what the exact mileage is; it's a short

24  distance.

25  Q.   We're talking about certainly more than a mile anyway,

44

1   right?

2   A.   Right, yes.

3   Q.   So it's not easily walkable distance.  It is a

4   relatively--

5   A.   That's correct.

6   Q.   --okay.

7        MR. FICK:  And, Ms. Belpedio, is the, is this, this

8   is supposed to be working I think; is that right?  Oh yes,

9   there it is.

10  BY MR. FICK:

11  Q.   I'm going to put up a map that I'm going to mark as

12  Exhibit A.  I unfortunately don't have a sticker so I'm just

13  going to write A on the document.  I'm going to ask, if I can

14  get this to focus, if I can get you to identify the area we're

15  talking about.  Now just to orient you, is it fair to say that

16  this, this map, which I've marked as Exhibit A, depicts the

17  area of Washington Street, Bexley Road and Firth Road?

18  A.   That's correct.

19  Q.   Okay, and so 5 Bexley, can you point on the screen to

20  roughly where you think 5 Bexley is?

21  A.   5 Bexley would be in the area up by Washington Street.

22  Q.   So it's somewhere up near the intersection of Washington,

23  like where I have the pen maybe?

24  A.   I don't; I need to actually observe No. 5, I'm going off

25  what I observed on the GPS and it was in the area of Washington

45

1  by Bexley.

2  Q.   So somewhere up, up by this intersection?

3  A.   Closer to Washington Street, that's correct, sir.

4  Q.   And 11 Firth Road, can you point out where that is?

5  A.   11 Firth is, I'm not sure exactly how many in, but it's

6  about the second or third house in,--

7  Q.   Okay so it's on, it's on the parallel street and it's a

8  few houses in?

9  A.   Correct.

10  Q.   So--

11  A.   You're, you're about right, right there.

12  Q.   --okay so the fire happens roughly at 11 Firth Road where

13  that dot is.  But the car isn't recorded on the GPS as being at

14  5 Bexley, which is near that intersection, correct?

15  A.   That's correct.

16  Q.   Now there's a number of commercial establishments along

17  Washington Street here, correct?

18  A.   That's correct.

19  Q.   And there's, in fact, a 24-hour Dunkin' Donuts right in

20  this, this area also; is that fair to say?

21  A.   That's fair to say.

22  Q.   Okay.  Now what time, if you know, was the fire, excuse

23  me, on Firth actually reported?

24  A.   I believe it was reported at 3:45, 3:47.

25  Q.   Okay, so and so, so, so your, your understanding then is

1   that or at least as far as the GPS information told you, the

2   car arrive, had left the Bexley Road area at just before the,

3   the fire was reported on Firth Street?

4   A.   Yes.

5   Q.   And I think you had talked about alerting other law

6   enforcement to go check out what Mr. Baez was up to sometime

7   between when the car stopped and when it started moving again?

8   A.   Yes.

9   Q.   Now, did your investigation reveal any information about

10  Mr. Baez actually purchasing any gasoline or other accelerants

11  in the recent past?

12  A.   It has not to, to this point.

13  Q.   And in addition to monitoring the vehicles moves by GPS,

14  have you been conducting or can you or other officers been

15  conducting other surveillance in person, so to speak, of

16  Mr. Baez in the recent past?

17  A.   We have conducted surveillance in the past, yes.

18  Q.   Anything in the recent past saying the last month or so?

19  A.   Not that I recall.

20  Q.   And you talked a little bit about the, the cause and

21  origin investigation that was done at 11 Firth Street, right?

22  A.   Yes.

23  Q.   Did you actually participate in that or was that a Boston

24  Fire Department and Boston Police investigation?

25  A.   I did not participate in that.

47

1   Q.   And your understanding, though, is that after the fire

2   was already put out that investigation happens and they make a

3   determination that it's suspicious and there was an accelerant

4   used, right?

5   A.   It was determined an arson, yes.

6   Q.   Okay.  Now at the time the fire is, is burning at 11 Firth

7   Street and people are going to put it out, at that time there's

8   no information about what may have started it or why the fire

9   happened, right?

10  A.   That's correct.

11  Q.   The investigation only reveals later that it's, it's

12  suspected to be an arson?

13  A.   That's correct.

14  Q.   Now you talked a few minutes ago about the three residents

15  of 11 Firth Street who identified Mr. Baez in a photo array,

16  right?

17  A.   Yes.

18  Q.   And their identification was in relation to interactions

19  they say they had with Mr. Baez in the past, correct?

20  A.   That's correct.

21  Q.   So they did not make any identification of him being in

22  the vicinity of 11 Firth Road on the night of the fire?

23  A.   That's correct.

24  Q.   And had you encountered any other information in the

25  investigation prior to talking to these folks at 11 Firth that

48

1   Mr. Baez was allegedly involved in gambling activities?

2   A.    No.

3   Q.    That was the first you had heard--

4   A.    That--

5   Q.    --anything like that?

6   A.    --was the first I'd heard of it, yes.

7   Q.    Okay.  And in the course of surveilling Mr. Baez over the

8   course of a year, you didn't see anything that appeared to be,

9   that was consistent with a bookie retrieving money or anything

10  like that?

11  A.    No.

12  Q.    Now you talked about how Detective Freeman was diverted

13  back to 156 Columbia after the fire report came in, right?

14  A.    Correct.

15  Q.    And initially he went there alone, right?  He's alone in a

16  single vehicle, right?

17  A.    Correct.

18  Q.    And his vehicle, is that an unmarked vehicle?

19  A.    It's an unmarked vehicle, yes.

20  Q.    But does that vehicle actually have police lights on them?

21  A.    I don't know.

22  Q.    When he pulled up behind Mr. Baez's Caprice, do you know

23  if he turned on any police lights to make him stop or not?

24  A.    Mr. Baez was already stopped; he was parked.

25  Q.    He was already stopped, okay.  And so, but do you know if,

1    if Detective Freeman turned on any kind of emergency lights

2    when he pulled up behind him?

3    A.   I don't.

4    Q.   And have you spoken with Detective Freeman about what his

5    observations were on that night?

6    A.   Yes.

7    Q.   And has Detective Freeman also completed a report about

8    what happened on anything?

9    A.   He has not completed a report yet.

10   Q.   Okay.  So you haven't reviewed any draft or any report

11   that he might have done?

12   A.   That's correct, I have not reviewed.

13   Q.   So what you're testifying and what was in your affidavit

14   was based on your personal conversation with Detective Freeman?

15   A.   That's correct.

16   Q.   Did you take any notes of that conversation, by the way?

17   A.   No, it was in person.

18   Q.   Okay.  And so then I think you testified that your

19   understanding is Detective Freeman approached the car, right?

20   A.   Yes.

21   Q.   And spoke to Mr. Baez through the open window?

22   A.   Yes.

23   Q.   And Mr. Baez was cooperative?

24   A.   Yes.

25   Q.   Answered the questions that were posed to him?

1  A.   Yes.

2  Q.   He, other than saying that he had come from Dunkin' Donuts

3  or the area of Dunkin' Donuts or whatever it was in regard to

4  Dunkin' Donuts, are you aware of anything else being said by

5  Mr. Baez to Detective Freeman at that point?

6  A.   No.

7  Q.   And at that point Detective Freeman orders Mr. Baez to get

8  out of the vehicle, right?

9  A.   He asks; my understanding is another unit had showed up,

10  and he asked Mr. Baez to exit the vehicle.

11  Q.   So the other unit shows up and then the order is made to

12  get out of the car?

13  A.   Yes.

14  Q.   And Mr. Baez was polite and compliant with that request,

15  right?

16  A.   That's my understanding, yes.

17  Q.   And it's at that point when he gets out of the car that

18  Detective Freeman told you they could smell what they thought

19  was gasoline?

20  A.   That's correct.

21  Q.   And so Mr. Baez is arrested, right?

22  A.   Yes.

23  Q.   Ultimately his clothing is seized?

24  A.   Yes.

25  Q.   Do you know if there's been any kind of analysis of the

1   clothing done?

2   A.    We don't have results yet.

3   Q.    Do you know if, if the canine was, was offered to sniff

4   the clothing?

5   A.    It was not.

6   Q.    And the car was impounded, right?

7   A.    Yes.

8   Q.    And you talked about the search warrant for the car?

9   A.    Yes.

10  Q.    In the course of your surveillance over the course of a

11  year had you ever observed or are you aware of anyone ever

12  observing Mr. Baez to smoke?

13  A.    No.

14  Q.    Now in your affidavit submitted to the Court in connection

15  with the arrest of Mr. Baez, you mentioned that there are a

16  total of six other fires that, that investigators believe may

17  be connected, right?

18  A.    Yes.

19  Q.    And all six of those fires, well the suggestion anyway in

20  the affidavit was that all six of those fires may be connected

21  to Mr. Baez, if I understand what you are saying, right?

22  A.    Yes.

23  Q.    And you talked about some common factors among those

24  fires, right?

25  A.    Yes.

1  Q.    Including the fact that they were started with tires?

2  A.    Yes.

3  Q.    So that's, that's kind of a, a unique MO for an arsonist;

4  fair to say?

5  A.    Very unique.

6  Q.    Not something you see very often?

7  A.    Correct.

8  Q.    There was an incident or a series of incidents in Boston

9  in the early 80's where several hundred fires were set in

10 tires; are you aware of that?

11 A.    No.

12 Q.    You've never heard of that before?

13 A.    No.

14 Q.    And then all the fires happened at night, right?

15 A.    They all happened in the morning, early morning.

16 Q.    Early morning hours, yes, okay.  They happened in the

17 front area of whatever the target was?

18 A.    Yes.

19 Q.    Any other common factors that you're aware of?

20 A.    They were stuffed with clothing or rags and gasoline was

21 used.

22 Q.    In the tires?

23 A.    Inside the tires.

24 Q.    They, at 11 Firth Street, though, you didn't say anything

25 about a tire.  Was a tire recovered there as being part of the

53

1   fire?

2   A.   No.

3   Q.   So that would be a sort of anomaly among, among the seven

4   that we're talking about here.

5   A.   It's not similar to those, the prior six.

6   Q.   The method of setting the fire is not similar?

7   A.   Correct.

8   Q.   Okay.  Now are you aware of any known connection between

9   Mr. Baez and the four other fires that you didn't go into

10  detail about in your affidavit?

11  A.   No.

12  Q.   And one of those fires was back in 2009 on Sigourney

13  Street in Jamaica Plain; is that right?

14  A.   That's correct.

15  Q.   And in that fire there was surveillance footage of a guy

16  actually going up to the porch where the fire was started

17  carrying the tires, right?

18  A.   Yes.

19  Q.   Several different surveillance shots were taken of that

20  person doing that?

21  A.   That's correct.

22  Q.   And that surveillance footage could not be positively

23  linked to, to Mr. Baez; could it?

24  A.   Positively linked, no.

25  Q.   And in the other four fires that you don't talk about in

1    the affidavit, the night of Mr. Baez's Caprice nor a similar

2    Caprice nor a similar MDX make an appearance in, in the

3    vicinity around the time of the fire, did they?

4    A.    There was no surveillance footage captured with a Chevy

5    Caprice, correct.

6    Q.    And there was no surveillance footage captured with an

7    Acura MDX of that 2008 or so either?

8    A.    No.

9    Q.    One of the other things you talked about in your affidavit

10   is how all the fires were about or within three miles of

11   Mr. Baez's home; remember that--

12   A.    Yes.

13   Q.    --in your affidavit?  I'm going to put up a map that I've

14   marked as Exhibit B just again to orient the Court about the

15   geography we're talking about here.  Roughly speaking, is it

16   fair to say that the map accurately depicts the locations of

17   the four addresses that are listed there, 11 Firth,

18   156 Columbia, 18 Rock Hill and 21 Bay State?

19   A.    Yep.

20   Q.    So as a matter of miles all these locations are relatively

21   close, so to speak, to Columbia Road, right?

22   A.    Yeah, relatively, yes.

23   Q.    But it's, it's also fair to say this is sort of spread out

24   fairly extensively in the areas of Boston South of the Charles

25   River?  It's not like it's not clustered in one neighborhood, I

1    guess?

2    A.    Yeah, that's correct; that's fair to say.

3    Q.    Now talking about the April 2009 fire at Jamaica Plain

4    Auto Body, in that fire multiple tires were stacked up against

5    multiple bay doors or entrances to the property, correct?

6    A.    That's correct.

7    Q.    Something like nine or more tires were used?

8    A.    There were numerous tires.

9    Q.    So and there's no indication those tires came from Jamaica

10   Plain Auto Body, right?

11   A.    According to the owner, he didn't have spare tires there.

12   Q.    So presumably the tires had to have been brought to the

13   scene by whoever set the fire?

14   A.    That's correct.

15   Q.    And nine tires, that that takes up a lot of space?

16   A.    A lot of space.

17   Q.    Okay.  And you talked about how there was a surveillance;

18   a business surveillance camera that captured a dark-colored

19   Caprice going by just prior to the fire; remember that?

20   A.    Yes.

21   Q.    Do you recall at what time the surveillance camera

22   actually caught the Caprice going by?

23   A.    Approximately 20 to 30 minutes prior, right before the

24   fire.

25   Q.    And, and what is that based on?  Is that based on an

56

1   embedded time stamp in the surveillance camera?

2   A.   Yes.

3   Q.   And did you or to your knowledge, did anyone ever check to

4   make sure that the time stamp in the surveillance camera was

5   accurate?

6   A.   Yes.

7   Q.   And it was accurate?

8   A.   Yes.

9   Q.   So about 20 minutes prior to the fire, well actually I'm

10  going to put up another map just to orient us a little bit

11  here.  I'm going to mark this as Exhibit C and ask you if this

12  fairly depicts the area of Rock Hill Road that we're talking

13  about; do you recognize what's depicted on the map?

14  A.   Yes, I do.

15  Q.   Can you point out where Jamaica Plain Auto Body is?

16  A.   Yeah, sure.  Jamaica Plain Auto Body is this building

17  here.

18  Q.   The large, white building?  I'm going to put a circle

19  around it just so we're all, if my pen worked, there we go.

20  That's, that's the building?

21  A.   Yes.

22  Q.   Okay.  And can you then show us with your, with your

23  finger where the surveillance camera depicted the, the Caprice

24  traveling prior to the fire?

25  A.   Sure.  The surveillance camera was up by the main street

1   here.  I can't reach; Yellow and Paul Gore Street.  The camera

2   was facing down Paul Gore Street.

3   Q.   Okay.  So in other words, the camera depicted the Caprice

4   going down Paul Gore Street?

5   A.   That's correct.

6   Q.   About 20 minutes prior to the fire and then the Caprice

7   sort of left, left view?

8   A.   Yes.

9   Q.   Okay.  So there was, there was no, no footage of the

10  Caprice actually stopping?

11  A.   The Caprice is seen driving down Paul Gore Street, Sir,

12  and exiting, uh entering Paul Gore at the, the furthest most

13  entrance.

14  Q.   So--

15  A.   You can see the taillights drive and turn.

16  Q.   --all right so what you're saying is you can see the

17  taillights go into--

18  A.   Correct.

19  Q.   --the Rock Hill area and that's all 20 minutes prior?

20  A.   20 to 30 minutes prior--

21  Q.   Prior to the fire.

22  A.   --I don't know exactly, sir.

23  Q.   Right.  And was this; was the surveillance video black-

24  and-white or color?

25  A.   It was at night; it looks like it was a night vision type

1   of camera.  But I believe it was all in, during the day it

2   would probably be in color.

3   Q.   Okay but as far as, in terms of it being nighttime, you

4   couldn't really tell one color from another?  You could just

5   tell dark from white?

6   A.   You, you could tell dark.  You couldn't tell shades, if

7   that's what you're asking.

8   Q.   So in other words you observed, the Caprice observed on

9   the surveillance was dark in color but you couldn't say

10  precisely what color, whether it were black or dark green or

11  maroon or whatever?

12  A.   That's fair to say.

13  Q.   Okay.  And just to orient us about what an `89 Caprice

14  looks like I just have a, a stock photo I want to put up, I

15  marked it as Exhibit D, is that fair to say that's the kind of

16  car we're talking about?

17  A.   That's similar.

18  Q.   And fair to say the `89 Caprice is, is a very, very large

19  Sedan, right?

20  A.   It's large, yes.

21  Q.   Certainly probably one of the largest Sedans in production

22  even in the late 80s when cars were bigger?

23  A.   It's large.

24  Q.   It's a big car?

25  A.   Yes.

1  Q.    All right.  And, and so when you talk about there being

2  silver trim, is that the kind of trim that's visible in this

3  picture also there along the door and along the bottom?

4  A.    That's similar, yes.

5  Q.    Uh-huh, and there's like a vinyl area around the rear

6  window?

7  A.    On Mr. Baez's car, the landau with after-market roof, yes.

8  Q.    Okay, so in terms of the trim and, and the appearance of

9  the car this is also a similar kind of vehicle to what you saw

10  on the surveillance camera and what Mr. Baez's car looks like?

11  A.    That's similar.

12  Q.    Okay.

13  A.    That's fair to say.

14  Q.    All right.  Now there were, it was not possible, I take

15  it, from the surveillance camera to observe any features of the

16  person operating the vehicle?

17  A.    That's correct.

18  Q.    And it was not possible to discern any license plate on

19  the vehicle?

20  A.    That's correct.

21  Q.    All right.  But apparently I guess you could discern that

22  there were no bumper stickers on the vehicle; is that right?

23  A.    On the side or the windows, we typically would, people

24  would keep bumper stickers the rear bumper, the rear window.  I

25  didn't observe any bumper stickers.

1  Q.    Okay and all those things were visible on the

2  surveillance tape?

3  A.    Yes, they were.

4  Q.    And I guess I'm just, I'm looking at your affidavit and I

5  guess I if I understood your testimony a minute ago correctly,

6  what I think you were saying is that, was there a continuous

7  view in the surveillance camera of the car going down Paul Gore

8  and then turning left onto Rock Hill?

9  A.    That's fair to, yes, that's correct.

10 Q.    Because in the affidavit if I can just read to you what,

11 what's here maybe this will, I've been trying to get through,

12 clarify what my, maybe I'm misunderstanding your language, I'm

13 looking at paragraph 11 of your affidavit.  A review of

14 surveillance camera footage from an adjoining business revealed

15 that just prior to the fire a four-door, dark-colored, older

16 model Chevrolet Caprice with silver accent trim drove down Paul

17 Gore and turned onto Rock Hill Road which leads to the front of

18 Jamaica Plain Auto Body.  I observed the vehicle in the video

19 to have a silver or light-colored steering wheel cover, et

20 cetera, et cetera.  I observed in the video footage that prior

21 to the BPD Fire arriving to the fire a vehicle's taillights

22 exit from Rock Hill Road drive down Paul Gore Street and out of

23 view from the surveillance camera.  So I guess maybe I

24 misunderstood that to mean that there were sort of two separate

25 sightings of the vehicle.  But I guess what you're saying here

1  is that it's one continuous traverse?

2  A.   Correct.  If I may?

3  Q.   Sure.

4  A.   Twenty to 30 minutes prior to the report of fire--

5       MR. TOBIN:  Your Honor, can he step out of the jury

6  box just so he has better access to point?

7       THE COURT:  Uh-huh, he may.

8  BY MR. FICK:

9  Q.   That's fine, thank you really; I appreciate that.  Ready?

10 A.   Sure, approximately 20 to 30 minutes prior to the fire--

11      THE COURT:  All right let's do this.  Why don't we

12 just take a quick break here?

13                        RECESS

14 CASE CALLED BACK INTO SESSION

15      THE CLERK:  Please be seated.

16      THE COURT:  I'm sorry; go ahead.

17 BY MR. FICK:

18 Q.   I guess--

19      MR. FICK:  Thank you.

20 BY MR. FICK:

21 Q.   I'm just trying to clarify, special agent, your

22 observations from the security camera in terms of where you

23 viewed the Chevy Caprice moving on that footage.

24 A.   Okay.  I observed prior to the fire, approximately 20 to

25 30 minutes, a Chevy Caprice drive down Paul Gore Street; take a

62

1  left onto Rock Hill Road at the furthest entrance or exit.  In

2  minutes just prior, less than five minutes from the report of

3  the fire, I observed taillights leaving from this exit and

4  going out of view of the camera.

5  Q.   Okay so in other words you, you saw the car go down Paul

6  Gore up into Rock Hill.  Then you saw a car depart the area.

7  You could only see the taillights however when that happened?

8  So there was two separate observations.

9  A.   That's fair to say, yes.

10  Q.   And, and how long between those two observations; how much

11  time elapsed?

12  A.   Approximately 20 to 30 minutes.  It was only, yes, 20 to

13  30 minutes.

14  Q.   Okay.  And then did you further observe on that security

15  footage the Boston Fire Equipment arriving?

16  A.   I did.

17  Q.   And when was that in relation to the departure of the

18  taillights?

19  A.   Minutes after the departure of the taillights.  I believe

20  it was less than five minutes.

21  Q.   Okay, thanks, and if you're more comfortable you can take

22  a seat again.  I may have other picture questions, but that was

23  most of them.

24  A.   (Inaudible - #3:50:41).

25  Q.   Thank you; I appreciate that.  Now you also then talked

63

1  about interviews that were done with the proprietor of JP Auto

2  Body, correct?

3  A.   Yes.

4  Q.   And you talked about, well I guess in your affidavit

5  there's a discussion of initially there was mention of a, I

6  guess it was a different Jose Baez having worked on a 2005

7  Corolla in October of `08?

8  A.   That's correct.

9  Q.   And so as far as you're aware that's a different Jose

10 Baez?

11 A.   The owner told me it was a different Baez, yes.

12 Q.   Okay.  And then the owner identified Mr., this Mr. Baez as

13 being someone who had worked on the trunk of his Chevy in the

14 summer of `08?

15 A.   Sometime, yes, I don't remember the exact dates.

16 Q.   And the owner actually identified the car as a Chevy

17 Impala which would be an error on his part if we're talking

18 about the same car, right?

19 A.   He mentioned a large, black, Chevrolet, late model 80s,

20 and he recalled it as an Impala.  He told me, I observed it, I

21 see a lot of cars.

22 Q.   Okay.

23 A.   That car's an Impala.

24 Q.   And so he talked about the Mr., how he believed Mr. Baez

25 was dissatisfied with the work, and then there was the lawsuit

64

1   in small claims court, right?

2   A.   That's correct.

3   Q.   And the lawsuits resolved in September of 2008?

4   A.   It was resolved after the work was done.  I don't know

5   what exactly when, sir.

6   Q.   And you also had occasion to obtain phone records from

7   Mr. Baez's cellular telephone, correct?

8   A.   Yes, I did.

9   Q.   And those phone records showed various calls to the auto

10  body shop in June and July of 2008, right?

11  A.   I believe they do, yes.

12  Q.   But no further calls to the auto body shop anytime after

13  that?

14  A.   That's correct.

15  Q.   And other than the threat to sue, to bring a suit in small

16  claims court, the proprietor did not say anything about

17  Mr. Baez threatening him in any way; did he?

18  A.   No.

19  Q.   And you also talked to the proprietor about other

20  potential people who might have some ill-will toward the, the,

21  the company, right?

22  A.   I, yes.

23  Q.   Or you, you or other agents had that conversation?

24  A.   I don't recall specifically all of it because we asked if

25  they had any ill, exactly what had mentioned.

1   Q.   And so among other things the owner of the auto body shop

2   mentioned that some neighbors were upset that he was expanding

3   or doing something with his--

4   A.   I recall it was part of it, yes.

5   Q.   --establishment.  And there was another issue where like

6   there, there was a, a disgruntled worker with an outstanding

7   worker's comp claim at the time?

8   A.   He described as a, as a worker's comp that was, that was

9   taken care of, not disgruntled.  Maybe it was, I don't recall,

10  but he did have a worker's comp issue maybe the year prior.

11  Q.   Let me just show you, your report to refresh your

12  recollection.  Or maybe this isn't your report, but it's an ATF

13  report, which I'll ask if you've seen.  On the second page

14  there's a discussion of the worker's comp claim.

15          MR. TOBIN:  Could I ask; what do you show the

16  witness?

17          MR. FICK:  One of the documents you gave me which

18  is--

19          MR. TOBIN:  Report--

20          MR. FICK:  --an ATF report No. 2--

21          MR. TOBIN:  Thank you.

22          MR. FICK:  --dated May--

23          MR. TOBIN:  That, that's fine.

24          MR. FICK:  --4, 2009.

25  A.   Paragraph 9, yes.

1   BY MR. FICK:

2   Q.   There it reflects the information being conveyed to you

3   that the, the worker's comp claim is still unresolved, right?

4   A.   Yes, that's correct.

5   Q.   Okay.  Now moving on to the fire at 21 Bay State Road you

6   talked about this, there being surveillance footage there as

7   well from behind 21 Bay State Road that also showed a dark-

8   colored Chevy Caprice with the trim in close time proximity to

9   the fire, right?

10  A.   Yes.

11  Q.   And do you recall what time that security footage was?

12  A.   After the, after the report of the fire.

13  Q.   And did it depict the vehicle moving at any particular

14  rate of speed?

15  A.   I don't recall.

16  Q.   Do you recall whether there's a time stamp on that video

17  and whether that time stamp was verified for accuracy?

18  A.   There was a time, time stamp on it, sir, and I don't

19  recall if it was.

20  Q.   Now is there any, was there, did the surveillance footage

21  show the car stopped or anyone getting in or out of the

22  vehicle?

23  A.   No.

24  Q.   Now there was an eye-witness to someone fleeing 21 Bay

25  State Road, correct?

1  A.   Yes.

2  Q.   And that eye-witness reported seeing a Caucasian male get

3  into a mid-size Sedan and flee at a high rate of speed, right?

4  A.   I believe that, yes.

5  Q.   And that eyewitness was subsequently also shown a photo

6  array, correct?

7  A.   No, I didn't show him a photo array?

8  Q.   Do you know whether anyone else showed that eyewitness the

9  photo array?

10  A.   Nobody showed that eyewitness a photo array.

11  Q.   Okay.  To the best of, to the best of your knowledge that

12  eyewitness has never been shown a photo array?

13  A.   That's correct.

14  Q.   Now somebody was shown a photo array in connection with

15  the Bay State Road fire, though, correct?

16  A.   No.

17  Q.   I want to show you ATF report No. 19 dated July 6th of 2010

18  and see if that refreshes your recollection.

19  A.   This photo array was for a different fire, not JP Auto

20  Body.

21  Q.   Oh, I'm sorry; we're talking about Bay State Road.

22  A.   Or Bay State Road.

23  Q.   Okay.  If I could just direct your attention to the top

24  corner of the document, it says arson fire, 21 Bay State Road?

25  A.   Several photo arrays were shown and recorded under this

68

1    investigation – (inaudible – #3:55:54)--

2    Q.    Okay.

3    A.    --unrelated to the, to the specifically the JP Auto Body

4    and 21 Bay State Road.

5    Q.    All right let me, I don't want to sort of jump the gun

6    here, and I don't want you to necessarily identify the witness,

7    but can you explain to me in general terms the circumstances

8    under which the photo array, described in that report, was

9    done?

10   A.    At another, this photo array was shown to a victim of

11   another location that was burned and recorded under this

12   investigation.

13   Q.    So there was an eyewitness to potentially a suspect being

14   at another location?

15   A.    This was not an eyewitness.  This was a victim, a

16   resident, an occupant of a place that was burned

17   un, in captioned of this investigation title.

18   Q.    To your knowledge was Mr. Baez's photo included in that

19   photo array?

20   A.    Yes.

21   Q.    And this witness could not pick Mr. Baez out of the

22   photo--

23   A.    That's correct.

24   Q.    --array; fair to say?  All right and could not pick

25   anybody out of the photo array?

69

1   A.    That's correct.

2   Q.    And so getting back to Bay State Road the eyewitness at

3   that location was never showed a photo array to your knowledge?

4   A.    Correct.

5   Q.    And you testified a little bit about what Bay State Dental

6   told you about some dissatisfaction Mr. Baez allegedly had with

7   the service there?

8   A.    Correct.

9   Q.    And there was no suggestion that Mr. Baez made any

10  threats, correct?

11  A.    That's correct.

12  Q.    And he ultimately paid for the dental services, right?

13  A.    That's correct.

14  Q.    And, in fact, even after the fire Mr. Baez has been back

15  to have further dental services at Bay State Dental, correct?

16  A.    He was there in March, yes.

17  Q.    In March of 2010?

18  A.    Yes.

19  Q.    Now you talked a little bit about your research into the

20  registration of Chevrolet Caprices here in the Commonwealth?

21  A.    Yes.

22  Q.    And I wasn't quite sure what, what your testimony was.

23  What exactly was the class of 38 vehicles that you narrowed

24  down?

25  A.    We had asked the Registry for a list of active

70

1   registrations of Chevy Caprices between a certain date range,

2   and I believe it was `86 through 1989 that were dark-color,

3   blue or black, and that's the list that you, that we had.

4   Q.   So there were 38 Caprices; is that for the entire

5   Commonwealth or just for the Boston area?

6   A.   Boston.

7   Q.   Okay.

8   A.   Boston area.

9   Q.   So, so this is Caprices for `86, `89, right, blue or

10  black, Boston area only?

11  A.   Correct.

12  Q.   Okay.  So do you know how many dark-colored Caprices are

13  registered elsewhere in the Commonwealth?

14  A.   No.

15  Q.   Do you know how many dark-colored Caprices - well strike

16  that question.

17      And your search was limited to just blue or black and not

18  other colors?

19  A.   Correct.

20  Q.   Okay.  So did you have occasion to even learn how many say

21  maroon or dark green Caprices may be out there?

22  A.   No.

23  Q.   Okay.  And you say you located each one of the 38 that

24  were identified, right?

25  A.   Yes.

1  Q.   And in your affidavit what you said was that most of them

2  were ruled out, right?

3  A.   Correct.

4  Q.   So were some not ruled out?

5  A.   My recollection was there was a similar, it, it was a

6  two-tone.  We ruled out after the, the registered owner was an

7  elderly gentleman.  It was a lighter blue up top and a darker

8  blue on the bottom, and it didn't have that silver-colored

9  steering wheel color.  When we first observed it it was in the

10  driveway, and we didn't walk in the driveway up to walk out and

11  to actually view it.

12  Q.   So, in other words, you ruled out all but one other car is

13  what you're saying of those 38?

14  A.   Yes.

15  Q.   And Bay State Dental that or that 21 Bay State Road

16  address where Bay State Dental is located in the basement

17  that's actually a condo with other units in it as well,

18  correct?

19  A.   That's correct.

20  Q.   And the fire happened in sort of the entry way which is

21  common to both the dental practice and the, and the

22  condominiums?

23  A.   Yes, that's correct.

24  Q.   So it's not like the fire was actually in the dental

25  office itself, right?

72

1  A.    It was in the front vestibule, that's correct.

2  Q.    And the vestibule is common to both the dentist and the

3  other parts of the building?

4  A.    That's correct.

5  Q.    And you also spoke to Bay State Dental, or you and other

6  agents spoke to Bay State Dental, about other folks who

7  potentially could have a problem with Bay State Dental,

8  correct?

9  A.    That's correct.

10 Q.    And certain, certain information was conveyed to you about

11 various people who may have had this or that kind of dispute?

12 A.    Correct.

13 Q.    You mentioned, going back to the three individuals who you

14 say identified Mr. Baez in the photo array from Firth Road, do

15 you know whether those individuals were interviewed at greater

16 length about their gambling history?

17 A.    I don't know.

18 Q.    Do you know whether they indicated having any kind of debt

19 to Mr. Baez?

20 A.    I don't know.

21 Q.    Did they say anything, to your knowledge, about why

22 Mr. Baez might want to hurt them or scare them?

23 A.    I don't know.

24         MR. FICK:  I have no further questions.

25         MR. TOBIN:  Very briefly, Your Honor, if I might?

73

REDIRECT EXAMINATION

1

2   BY MR. TOBIN:

3   Q.   I want to go back to some of the cross examination that

4   dealt with the 38 Chevy Caprices between 1986 and 1989.  You

5   indicated there was one owned by an elderly individual?

6   A.   I recall it was an elderly individual.

7   Q.   During the course of your investigation did you rule out

8   that vehicle as having been the one on the video surveillance

9   films, the two you testified to?  Ultimately did you rule that

10  one out?

11  A.   Yes.

12  Q.   How and why?

13  A.   It was, again, it was two-toned.  It had, from what I

14  recall, it had similar, not all of the traits that Mr. Baez's

15  vehicle had.

16  Q.   You say it was two-toned.  You mean the body of the

17  vehicle was more than one color or at least more than one hue

18  or tint?

19  A.   Yeah, yes.

20  Q.   And the car on the vehicles depicted or shown in the two

21  surveillance films did it appear to have one solid color?

22  A.   It did.

23  Q.   The defendant's vehicle, one solid color or two?

24  A.   One.

25  Q.   Now there's been some question about your report No. 19.

74

1    The photographic array was shown to an individual, and is it

2    accurate that the report of the investigation, the title of the

3    investigation is Arson Fire 21 Bay State Road?

4    A.   Yes.

5    Q.   But the actual narrative, the showing of this array or

6    these photographs, of which Mr. Baez was one of them, that had

7    to do with an entirely different photo?  Strike that.

8         An entirely different fire?

9    A.   Yes.

10   Q.   Just so that it's, we understand, if it had to do with a

11   different fire, not the one at 21 Bay State Road, then why does

12   the report that talks about showing this array, why is it

13   captioned 21 Bay State Road?

14   A.   It started to include other reports in that investigation.

15   Q.   And again, maybe just so you can clear up for us, the

16   individual to whom this, these photos or photo array were

17   shown, you said you'd describe that person as a victim,

18   correct?

19   A.   Correct.

20   Q.   Was that person; did that person see anyone suspected of

21   starting the fire?

22   A.   No.

23   Q.   You essentially showed the pictures to see if they

24   recognized someone just in general?

25   A.   Correct.

1  Q.   Because this individual never saw the person starting the

2  fire?

3  A.   That's correct.

4  Q.   Just so it's clear, this individual did not identify a

5  photograph of this defendant?

6  A.   That's correct.

7  Q.   Were there other victims or other people living at the

8  location with this person you've described this victim with?

9  A.   Yes.

10 Q.   Now with regard to the dental office fire, you've been

11 asked some questions about the vestibule?

12 A.   Correct.

13 Q.   That's where the fire began; is that accurate?

14 A.   Yes.

15 Q.   That vestibule an individual would walk into there and

16 from there, where would they be able to access further into the

17 building?

18 A.   The entire building.

19 Q.   Meaning on that vestibule from there could you go into the

20 dental office itself?

21 A.   You could, yes, you could gain access through to the

22 building and the dental office.

23 Q.   Could you also gain access to the apartments or the

24 residences that were in that building from the vestibule?

25 A.   Yes.

76

1   Q.   Okay, and this fire at the dental office for Bay State

2   Road it was the wee hours of the morning?

3   A.   Yes.

4   Q.   The dental office was closed?

5   A.   Yes.

6   Q.   Could you get any closer to the dental office than the

7   vestibule?

8   A.   No.

9   Q.   Because of the hour of the night and the locks that the

10  dental office would have had?

11  A.   Correct.

12         MR. TOBIN:  If I may have just a moment, Your Honor?

13  BY MR. TOBIN:

14  Q.   Oh, you've identified that in this location it's depicted

15  on the map.  And again just so the record reflects what

16  location is this?

17  A.   That is the Jamaica Plain Auto Body--

18  Q.   Okay.

19  A.   --located on Rock Hill Road.

20  Q.   I'm sorry; strike that.

21      Wrong picture in my mind.  The location of Firth Street is

22  the Dunkin' Donuts in the general vicinity?

23  A.   Yes.

24  Q.   Firth Street is in what section of the city?

25  A.   Roslindale.

1  Q.   And that is a separate neighborhood from Jamaica Plain?

2  A.   Yes.

3  Q.   When the defendant was stopped and questioned outside of

4  his residence shortly after the fire on Firth Street he

5  indicated he had been where?

6  A.   At the Dunkin' Donuts in Jamaica Plain.

7  Q.   In Jamaica Plain, not in Roslindale?

8  A.   Correct.

9  Q.   Now are Dunkin' Donuts fairly ubiquitous?  Meaning, are

10 there lots of them in the city of Boston?

11 A.   Yes.

12 Q.   Are you aware whether or not there are Dunkin' Donuts or a

13 Dunkin' Donuts closer to Columbia Road than Jamaica Plain or

14 Roslindale?  Do you, I mean do you know?  You may not be an

15 expert on the locations of Dunkin' Donuts.

16 A.   I don't know.

17 Q.   Okay.

18          MR. TOBIN:  I have no further questions; thank you.

19          THE COURT:  Any clean up on that, Mr. Fick?

20          MR. FICK:  No, Your Honor.

21          THE COURT:  Thank you, Agent Oppedisano.

22      WITNESS EXCUSED

23          THE COURT:  Any further evidence with respect to

24 either probable cause or detention?

25          MR. TOBIN:  No, Your Honor.

78

1          THE COURT:  Any evidence with respect to probable

2   cause or detention?

3          MR. FICK:  No, Your Honor.  I think we, we'd argue

4   the question obviously but no evidence.

5          THE COURT:  Okay let me hear you first.

6          MR. FICK:  So there's certainly a peculiar

7   accumulation of circumstantial evidence here, but, you know, I

8   think it's striking that the one eyewitness to a person

9   actually fleeing the scene of this of one of these arsons is

10   never asked to identify anybody or look at a photo array.  The

11   fire that happens on Firth Street is missing the signature

12   element of all the other fires they're talking about, that

13   being the tire as the main article that begins it.  And they've

14   been surveilling Mr. Baez including, you know, 24/7 GPS

15   tracking on his car for almost a year and really have nothing

16   to show for it except this, this unfortunate co-location of him

17   being a block away from a fire that happened two nights ago.

18   And you know whether that adds up to probable cause well I

19   mean, you know, it's a standard that I guess becomes so lone

20   that it ceases to have meaning.  But, but almost, you know it's

21   really I think at, at the, at the borderline of what

22   circumstantial evidence ought to be permitted to allow a case

23   to go forward.  And so that's, that's what I would say on the

24   probable cause question.  On the detention question where I

25   think the weight of the evidence is certainly one of the

1  factors to consider, you have Mr. Baez who has lived in this

2  country since he was 16 years old.  He's a naturalized citizen.

3  He's lived in the same apartment building for the past 12

4  years.  He's got a job.  His only criminal record are motor

5  vehicle offenses.  The most recent one is in 1995.  And so I

6  would suggest that the Court absolutely should, could and

7  should entertain conditions of release that would assure both

8  his appearance and the safety of the community.

9          To the extent there's any concern about something

10  strange happening at night, I would suggest that could be

11  addressed by an electronic monitoring condition so that

12  everyone would know immediately, not only if his car moves but

13  if he steps foot outside his apartment at night.  And I think

14  under the circumstances that would be, you know, a fair way to

15  proceed here.  And that is essentially the key element of the

16  release conditions I would suggest.  Now I, I don't want to

17  sort of shadowbox and second guess what else might give the

18  Court additional comfort.  But I think Mr. Baez and his family

19  are both prepared to make other such accommodations that the

20  Court might see fit whether that means some kind of financial

21  security or whether that means other conditions.  Or even if it

22  means he should live, you know, with one of his relatives while

23  this is pending.  All of those things could be entertained and

24  arranged, but, you know, in the first instance what I would

25  suggest is simply that he be allowed to go back to the house

1   where he's lived for 12 years, go back to the job where he's

2   working today, and to satisfy any concern about flight or

3   danger with electronic monitoring.

4           THE COURT:  And I have no idea what I'm going to do.

5   I want to digest all this stuff, but are you saying that he

6   does have a third party custodian?

7           MR. FICK:  He could.  I mean, I think; I have to talk

8   about this in more detail with his family.  But both his mother

9   and multiple of his siblings are U.S. citizens with

10  longstanding ties in the community who could, you know, come

11  sign an unsecured bond, perhaps put up some additional form of

12  security if that were necessary.  I'd have to talk to them

13  about the details, but I think if, if that's something that

14  would give the Court comfort, in particular, it's something we

15  could certainly work out.  His, his mother lives in a

16  subsidized unit which may not be an appropriate place for

17  someone on bail to be.  But his sister owns her residence, and

18  I believe he has a brother who rents a residence that is not

19  subsidized in any way.  So if the Court were concerned about

20  him not living alone, those are both options that we could

21  investigate.  We can have, we can investigate and have pretrial

22  investigate to the extent the Court wishes further.

23          THE COURT:  And, and I, and again have no idea what

24  I'm going to do.  How much would, is available to be posted?

25          MR. FICK:  I, I do not know the answer to that

1    question right now.  I mean the only, what I would only

2    suggest by way of argument is that I think, you know, secure

3    that the financial security is typically, I think, composed

4    primarily to address flight risk issues rather than danger.

5    And as I sort of--

6              THE COURT:  This would be a, in this if, if, if I

7    were to entertain it, it would be to adhere to conditions of

8    release.

9              MR. FICK:  I can certainly address that issue with

10   his family and report back to the Court about what could be

11   immediately available versus what, you know, might be sort of

12   heavier load security, but yes.

13             THE COURT:  Okay.  Attorney Tobin?

14             MR. TOBIN:  Your Honor, briefly, with regard to

15   probable cause, we have three separate fires over a lengthy

16   period of time.  And this defendant is connected--

17             THE COURT:  I'll, I'll save you; I'll save you some

18   time on that one.

19             MR. TOBIN:  Okay.

20             THE COURT:  I am going to find probable cause at

21   least with respect to the Firth Ave.--

22             MR. TOBIN:  Uh-huh.

23             THE COURT:  --fires.  So let's move on from there.

24             MR. TOBIN:  Sure.  Your Honor, this defendant poses a

25   significant risk to the community if released.  He also poses a

1  significant risk to the other potential witnesses in this

2  case, many of whom have been eluded to today on direct and

3  cross examination.  This is an individual who I would

4  respectfully suggest can be shown, and it can be demonstrated

5  for our purposes at least probable cause, that on two previous

6  occasions he had difficulty.  He had difficulty with the dental

7  office.  He had difficulty with the automotive shop.  One of

8  those individuals he brought suit, and he lost.  The

9  government's contention is that in both instances when he was

10  disgruntled and unhappy with the dental office and the fees

11  they assessed him and would not give back and with the charges

12  assessed to him and not given back at the, at the garage that

13  he retaliated against these individuals in the middle of the

14  night, in the wee hours of the morning, by torching their

15  business.  I'm going to suggest this is clear and unequivocal

16  evidence that he is capable of and willing to engage in

17  retaliation.  The other potential witnesses in this case to

18  include the victims that could have died on the early morning

19  of October 9th would be imperiled if he were released into the

20  community.  On a larger scale issue, if you will, he is a

21  threat to society.  The government often stands and says that

22  drug dealers are a threat to society, and we mean it, and I

23  mean it when I say it.  But this individual, there's probable

24  cause to believe, as the Court has indicated, went to a

25  residence after 3:00 in the morning when one could assume that

1   everyone, in this instance 12 people, are sleeping in a house,

2   and there's PC and the government believes, what the government

3   evidence shows, ignited the house on fire.  One of the

4   residents was in a wheelchair.  Another resident was forced to

5   flee the burning home by jumping out of a second-story window,

6   very, very, very dangerous act to set a fire in the middle of

7   the night on a residence.  There but for great fate and

8   fortitude and luck no one was more seriously hurt or killed.

9   This defendant is a danger.  I would also suggest that the

10  defendant poses a flight risk.  He is a U.S. citizen.  That

11  doesn't mean he's not a flight risk.  He has, as I understand

12  it from the pretrial report, there are contacts and family

13  presumably in the Dominican Republic.  He has been to the

14  Dominican Republic.  There's a place for him there in the sense

15  he lived there until he was 16.  He recently went back.  There

16  are contacts there.  The evidence in this case I would suggest

17  is exceedingly strong.  As was pointed out to the defendant

18  yesterday, there is a minimum mandatory in this case of between

19  five and most likely seven years.  I would suggest the evidence

20  is strong.  There is every incentive for him to flee.  His

21  contacts here, although he has family, he has a small job,

22  doesn't make a lot of money.  He has no wife.  He has no

23  children.  He has no one that he cohabitates with.  Better is

24  it not to be in the Dominican Republic than to face the

25  prospects of at least five or seven years in prison.  He's a

1  flight risk.  He's a danger to the other witnesses.  He's, to

2  the witnesses he's demonstrated that he's willing to retaliate

3  at any individual who will torch a building.  But particularly

4  a house in the middle of the night with 12 or more people

5  living there is a threat to society.  Most respectfully we

6  would ask--

7          THE COURT:  Is, is this a presumption case?

8          MR. TOBIN:  You know, I don't think it's a

9  presumption case.

10          THE COURT:  Mr. Fick, do you know?

11          MR. FICK:  I don't believe so.  I mean certainly it's

12  a crime of violence so that's one of the potential triggers.

13  But probable cause notwithstanding, it is just an accusation.

14  And of course what I often find myself in the position of, of

15  suggesting is that, you know, it cannot be the simply the fact

16  that the charge is serious would trigger an automatic detention

17  order.  I mean I think--

18          THE COURT:  No, no I--

19          MR. FICK:  --and I--

20          THE COURT:  --I agree.  But I--

21          MR. TOBIN:  I agree.

22          THE COURT:  --I know there's a certain class under

23  the statutes that--

24          MR. FICK:  --and that's usually triggered by

25  an issue with the record.  And this defendant, unlike many of

1   the folks who are before Your Honor has, doesn't have a record

2   that triggers that which is to his credit.

3          MR. TOBIN:  Your Honor, that may be the case but

4   we're talking an issue of danger and retaliation.  Whether or

5   not--

6          THE COURT:  I understand.  I just want to know

7   where--        MR. TOBIN:  --I'm sorry; I don't believe that

8   this is one of those triggering offenses; thank you.

9          THE COURT:  All right nice job.  We're in recess.

10         MR. FICK:  Thank you, Your Honor.

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

86

CERTIFICATION

1

2        I, Maryann V. Young, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   digital sound recording of the proceedings in the

5   above-entitled matter.

6

7   /s/ Maryann V. Young                August 24, 2010

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**