UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Criminal No: 10CR10275DPW |
| JOSE BAEZ | ) | |

DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT’S MOTION TO SUPPRESS EVIDENCE

STATEMENT OF FACTS[1]

The Defendant, Jose Baez, maintains that Bureau of Alcohol, Tobacco, Firearms, and Explosives (“ATF”) Agent Brian Oppedisano subjected him to an illegal, warrantless search through covertly installing a Global Positioning Satellite, (“GPS”), onto the undercarriage of two vehicles, which belonged to him.

On August 27, 2009, at 3:37 a.m., Agent Oppedisano installed a GPS device on the Defendant’s 1989 Chevrolet Caprice (“Caprice”). At the time, the Caprice was parked on a public way in the area of 150 Columbia Road, Dorchester, Massachusetts.

On or about January 8, 2010, ATF agents installed a GPS device onto the undercarriage of Baez’ Acura MDX.

ATF agents installed both GPS devices without a warrant or any prior judicial approval.

[1] The Defendant submits the same Statement of Facts that he submitted in support of his Motion to Suppress with the exception of some corrected dates, which the Defendant supplemented through separate footnotes to the instant Supplemental Memorandum.

The GPS devices recorded each and every movement of these vehicles twenty-four hours per day for three hundred and forty seven (347) days.

On August 9, 2010, a text message from the GPS device, which Agent Oppedisano covertly installed onto the Defendant's Chevrolet Caprice, alerted Agent Oppedisano that the Caprice had left the Columbia Road, Dorchester, Massachusetts residence. Agent Oppedisano logged onto an internet application that tracked the Defendant's whereabouts. The GPS device transmitted the Defendant's movements to 5 Bexley Road, Roslindale, Massachusetts. Baez' Caprice was stationary at that address from 3:27 a.m. to 3:44 a.m.

While en route to Bexley Road, Agent Oppedisano received a dispatch that a residence located at 11 Firth Road was on fire.

Bexley Road runs parallel to Firth Road. Agent Oppedisano dispatched Boston Police to the Defendant's residence at Columbia Road, Dorchester, Massachusetts.

Boston Police Detective James Freeman observed the Defendant return to 140 Columbia Road, Dorchester, Massachusetts in the Caprice. He engaged the Defendant in conversation. He smelled gasoline on the Defendant. He placed the Defendant under arrest. He found matches on the Defendant. He seized the Defendant's clothes.

During an audio-recorded interview, the Defendant claimed that he smoked cigarettes to explain the presence of matches.[2] The Defendant admitted that he had owned the Caprice for eight to ten years.

On August 9, 2010, police executed a search warrant upon the Defendant's Chevy Caprice. They located gas cans, traces of accelerant, and other evidence linking the Defendant to arson in the vehicle.

On August 9, 2010, police also executed a search warrant at the Defendant's residence. Pursuant to this warrant, police found matches in a towel, computers, notebooks, maps, and an index card linking him to the Fresh Pond, Cambridge Whole Foods market. The United States Attorney's Office subsequently indicted the Defendant for an incendiary fire of the Whole Foods market that occurred on December 26, 2008.

Additionally, police located a small claims trial notice referencing a dispute with JP Autobody in Jamaica Plain, Massachusetts. The United States Attorney's Office later charged the Defendant for an incendiary fire at JP Autobody which occurred on April 29, 2009.

---

[2] In all subsequent searches, police were careful to note that they did not find materials associated with the Defendant smoking cigarettes.

On August 9, 2010, the United States Attorney’s Office filed a complaint against the Defendant charging him with the Firth Street fire.

On August 13, 2010, police executed a search warrant at a garage which the Defendant rented at 21 Ivory Street, West Roxbury, Massachusetts. Police found tires, plastic bottles, and other materials consistent with arson. They also located a Whole Foods apron in the garage. Additionally, police seized a car repair invoice further linking the Defendant to the JP Autobody fire.

On September 16, 2010, police conducted a “consent” search at another garage rented by the Defendant at Iffley Road in Jamaica Plain. They located gas cans and tires in the garage. Police judged these items to be consistent with the referenced incendiary fires.

On or about November 10, 2010, the United States Attorney’s Office filed a superseding indictment against the Defendant charging him with the August 9, 2010 Firth Road fire as well as a December 26, 2008 Whole Foods fire, an April 29, 2009 JP Autobody fire, and a July 31, 2009 fire at Back Bay Dental in Boston, Massachusetts.

In his Memorandum of Law in Support of his Motion to Suppress, the Defendant respectfully requests that this

Honorable Court suppress as evidence at trial and all court proceedings in this matter:

1. Any fruits of the illegal search and seizure. See Wong Sun v. United States, 371 U.S. 471, 488 (1963) including but not limited to:

a. Any and all items seized from the Defendant pursuant to his arrest on August 9, 2010 including, but not limited to, his clothing, matches, gas cans, liquids, and carpet samples, the smell of gasoline in the Defendant's car, and any statements which the Defendant allegedly made;

b. All data and observations of the movements of the Defendant's Chevy Caprice and Acura MDX[3] from August 27, 2009 forward[4];

c. Any and all items seized as a result of the search of the Defendant's vehicle(s) including but not limited to, gas cans, towels, liquids, bottles, and carpet samples;

d. Any and all items seized as a result of the search of the Defendant's residence on Columbia Road, Dorchester, Massachusetts and the Defendant's garages located at Ivory Street and Iffley Road, including but not limited to gas cans,

---

[3] The Defendant mistakenly referred to the vehicle as a Honda Accord in his initial Memorandum of Law, which he submitted in support of his Motion to Suppress.

[4] Also, the Defendant mistakenly listed the dates of January 8, 2010 (when ATF agents attached a GPS device to the Defendant's Acura MDX) forward rather than August 27, 2009 (when ATF agents attached a GPS device to the Defendant's Chevrolet Caprice) forward when computing the total time that ATF agents monitored the Defendant's vehicle through GPS tracking.

matches, incendiary liquids, keys, maps, documents, such as an index card linking the Defendant to Whole Foods, and a receipt and small claims notice linking the Defendant to JP Autobody;

e. Any evidence including tangible objects, documents, witnesses, statements or observations which police discovered as a result of the unlawful search and seizure.

SUPPLEMENTAL ARGUMENT

On January 27, 2012, the Honorable Justice Douglas P. Woodlock requested that the Defendant submit the instant Supplemental Memorandum of Law addressing the following four arguments upon which the United States government now relies in opposing the Defendant's Motion to Suppress after the Supreme Court case of United States v. Jones summarily rejected the exact position it had raised in its Opposition to the Defendant's Motion to Suppress:

1. Whether the exclusionary rule should apply where the Government proceeded with a warrantless search despite the absence of binding appellate precedent authorizing the same. United States v. Davis, 564 U.S. __ (2011).

2. Whether the so-called "automobile exception" to the Fourth Amendment's warrant requirement rendered the warrantless GPS monitoring of the Defendant's vehicles reasonable under the Fourth Amendment, pursuant to United States v. Moore, 562 F.2d 106 (1977).

3. Whether police would have inevitably arrested the Defendant and obtained a series of search warrants where the sole impetus behind the Defendant's arrest and the subsequent searches was an alert provided by an illegally installed tracking device.

4. Whether the evidence obtained during the searches following Defendant's arrest is sufficiently attenuated from the primary illegality of the warrantless installation of GPS tracking devices to Defendant's vehicles to justify its admission.

## 1. THE EXCLUSIONARY RULE SHOULD APPLY WHERE POLICE DECLINED TO OBTAIN A SEARCH WARRANT IN THE ABSENCE OF BINDING APPELLATE PRECEDENT WHICH PERMITTED A WARRANTLESS GPS INSTALLATION

The exclusionary rule is not a personal constitutional right. The rule's sole purpose is to deter law enforcement from committing misconduct. Herring v. United States, 555 U.S. 135, 141 (2009). In light of the "heavy toll" that exclusion exacts on the Court's truth-finding function, the Court must balance the deterrence benefit of exclusion against its social cost. Davis v. United States, 131 S.Ct. 2419 (2011).

As a result, where the Court has found that the police acted in "good faith," it has declined to apply the exclusionary rule because punishing constitutional errors committed in "good faith" does not serve the deterrent effect of the rule. Society should not bear the heavy cost of exclusion where the police are not to blame.

The Court first described the "good faith" iteration of this balancing principle in United States v. Leon, 468 U.S. 897 (1984). In Leon, police acted in "objectively reasonable reliance" on a warrant, which the court later held invalid. 468 U.S. at 922. Because the magistrate bore the blame for the

constitutional error in Leon, applying the exclusionary rule did not serve the goal of deterring police misconduct. Id. at 916.

Since Leon, the Supreme Court has applied the good faith principle to a variety of contexts. See, e.g., Illinois v. Krull, 480 U.S. 340 (1987) (good faith exception saved a search conducted in reasonable reliance on a statute that was later overruled); Arizona v. Evans, 514 U.S. 1 (1995) (same, court database erroneously reported existence of warrant).

Most recently, in Davis v. United States, the Court applied the Leon "good faith" exception to a search, which police conducted in strict compliance with binding precedent that was later overruled. 131 S.Ct. at 2423.

Davis presented a unique and narrow fact pattern. The Middle District of Alabama denied the defendant's motion to suppress and convicted him of possession of a firearm as a convicted felon.

At the time of the suppression hearing, the Eleventh Circuit, like most other courts, viewed New York v. Belton, 453 U.S. 454 (1981) as providing a bright line rule "authorizing substantially contemporaneous vehicle searches incident to arrests of recent occupants." Davis at 2426. See United States v. Gonzalez, 71 F.3d 819, 822, 824-827 (1996).

Fortuitously for Davis, or so it seemed at the time, the Supreme Court decided Arizona v. Gant 552 U.S. 1230 (2008) while

his appeal was pending before the Eleventh Circuit. The Eleventh Circuit held that while the search in Davis violated the Fourth Amendment, it declined to order suppression where, it observed, suppression would not further the goals of the exclusionary rule. Davis at 2426.

The Supreme Court affirmed. The majority noted:

> "the search incident to Davis' arrest in this case followed the Eleventh Circuit's Gonzalez precedent to the letter. Although the search turned out to be unconstitutional under Gant, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way ... Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim." Id. at 2422.

The government's attempt to rely on Davis as a means of salvaging its prosecution in the instant case is doomed for all the reasons that the case against Davis was not.

In April, 2007, the officer in Davis placed the defendant under arrest after a routine motor vehicle stop. Id. at 2425. There was nothing novel about the fact pattern confronting the officer in Davis nor was there any question about the decade old rule of law which applied to the search.

An unusual set of facts or an unsettled question of law did not confront the officer in Davis in consideration of which he decided to resort to clever analogy or hopeful divination of what a court might decide about his conduct. At the time of his

car stop, he made a routine search based on what he fairly viewed to be black letter law.

Nothing of the sort occurred in this case. The government's reliance on Davis here is grossly misplaced.

The rule gleaned from Davis is that "searches conducted in objectively reasonable reliance on binding precedent are not subject to the exclusionary rule." Id. at 2423-2424 (emphasis added).

The most obvious flaw in the government's reliance on Davis in this matter is that there existed no binding precedent to support the installation and use of a GPS device to automatically record the movements of Jose Baez's vehicle, for almost a year, with no judicial approval.

The government points to United States v. Knotts, 406 U.S. 276 (1983), as the "binding precedent" upon which its agents "reasonably relied." Government's Response to Defendant's Motion to Suppress at 35.

Knotts is entirely different from this case. The police did not place the beeper on Knotts' car. 460 U.S. at 278. In this case they did. As a result, the Knotts decision did not address the fundamental issue in this case - whether the installation of a device on the defendant's property, for the purpose of gathering information, constituted a search.

Because Knotts provided no guidance to the Government with respect to the initial surreptitious installation of the GPS device on the Defendant's car, the Government's reliance on Knotts as "binding precedent" is wrong.

As Justice Scalia pointed out in Jones, an intrusion such as the GPS installation here went to the heart of the Fourth Amendment as originally conceived. United States v. Jones, No. 10-1259 (January 23, 2012), slip op. at 4.

The interrelationship between the Fourth Amendment and common law trespass principles — though the Katz "reasonable expectation of privacy" analysis has overshadowed it in recent years — was and continues to be a vital aspect of Fourth Amendment jurisprudence. See, e.g., Soldal v. Cook County, 506 U.S. 56 (1992) (an interference with an individual's possessory interests in their property implicates the Fourth amendment, despite the fact that law enforcement did not "invade" the person's privacy).

The Court's declaration that "the Fourth Amendment protects people not places," Katz v. United States, 389 U.S. 347, 351 (1967), was an amplification of, not a limitation on, the potency of the Fourth Amendment. The Katz reasonable expectation of privacy test "has been added to, not substituted for, the common-law trespassory principle." Jones at 8. The Government here chose to ignore this basic principle. As a

result, it cannot now claim good faith obedience to "binding precedent."

The Government did not rely on any "binding precedent" to support its decision to proceed without a warrant here. To the contrary, as the Jones majority points out, the binding precedent, which controls this case and which has been the law of the land since the inception of the Fourth Amendment, counseled against the warrantless installation of a beeper.

As a rule, if a defendant is presumed to know the law, we must expect as much from law enforcement." U.S. v. Orduna-Martinez, 561 F.3d 1134, 1137 (10th Cir. 2009).

Similarly, even under the Katz reasonable expectation of privacy framework, the Government's assertion that Knotts served as clear, binding precedent is also wrong.

Although the government may have convinced itself of the aptness of its comparison of the GPS used here to the quarter century old beeper in Knotts, hopeful analogies do not equate to the "objective reliance on binding precedent," which the Supreme Court requires.

In Knotts, the Supreme Court determined that using a beeper to enhance active surveillance over a discrete journey did not intrude on an expectation of privacy that society was prepared to recognize as reasonable.

The GPS device here and the beeper device in Knotts represent a quantum difference in both the sophistication of the technology and the enormity of the intrusion on an individual's private life.

Police used the beeper in Knotts to assist them in visual surveillance of a vehicle. Without visual surveillance, the beeper was useless.

The GPS technology here, in contrast, allowed police to attach a device to a vehicle which allowed them to passively and automatically monitor and record each and every movement of a vehicle, continuously, and indefinitely--twenty-four hours a day, seven days a week.

And while Knotts' discrete journey from one location to another may not have assailed the hypothetical reasonable person's privacy expectation, the Government should have at least recognized the inevitability that the relentless, automatic, 24 hour per day surveillance of a GPS device might.[5]

The implication of GPS technology on American freedoms has long been, and, at least until the Supreme Court's decision in

[5] In a Washington post poll published in the immediate aftermath of the Supreme Court's decision in Jones, 84% of respondents described the Court's decision as "an important victory for privacy." http://www.washingtonpost.com/blogs/post-user-polls/post/what-do-you-think-of-the-supreme-courts-ruling-on-police-use-of-gps-technology/2012/01/23/gIQAOvH6KQ_blog.html. This poll reflects an entrenched sentiment which "reasonable persons" shared regarding warrantless GPS monitoring.

Jones, continued to be the subject of passionate debate and judicial disagreement. See, e.g., Renee McDonald Hutchins, Tied up in Knotts? GPS Technology and the Fourth Amendment, 55 UCLA L. Rev. 409, 414 (2007) (arguing that use of GPS technology requires a warrant); Priscilla J. Smith, When Machines are Watching: How Warrantless Use of GPS Surveillance Technology Violates the Fourth Amendment Right Against Unreasonable Searches, 121 Yale L.J. Online 177 (2011); Sarah Rahter, Online and Locational Privacy: Privacy Implications of GPS Tracking Technology 4 I/S: J. L. & Pol'y for Info. Soc'y 755 (2008).

Both long before and during the expansive GPS surveillance period in this case, a growing number of states passed laws and decided cases outlawing warrantless GPS surveillance.[6] This included the Commonwealth of Massachusetts - the state in which the agents surveilled the Defendant here.

While the Government correctly points out in its brief that several federal courts decided that warrantless GPS monitoring did not violate the Fourth Amendment, their brief ignores the large number of states which forbade warrantless GPS surveillance.

---

[6] See Utah Code Ann. §§77–23a–4, 77–23a–7, 77–23a–15.5; Minn. Stat. §§626A.37, 626A.35; Fla. Stat. §§934.06, 934.42; S.C.Code Ann. §17–30–140; Okla. Stat., tit. 13, §176.6; Haw. Rev. Stat. §§803–42, 803–44.7; 18 Pa. Cons. Stat. §5761; Commonwealth v. Connolly, 454 Mass. 808, 913 N.E.2d 356 (2009) (GPS installation is presumptively unreasonable); People v. Lacey 787 N.Y.S.2d 680, (N.Y. 2004); People v. Weaver, 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195 (N.Y. 2009); State v. Jackson, 150 Wash.2d 251, 76 P.3d 217 (Wash. 2003); State v. Campbell, 306 Or. 157, 759 P.2d 1040 (Penn. 1988); State v. Biddle, Not Reported in A.2d, 2005 WL 3073593 (Del. Com. Pl. 2005).

Additionally, even the cases the Government cited in its brief put the government on notice that their belief that a GPS surveillance should not require a warrant was not on firm footing. See United States v. Cuevas-Perez, 640 F. 3d 272 (2011) (approving 60 hours of surveillance, but suggesting a longer period may require a warrant); United States v. Hernandez, 647 F. 3d 216, 221 (5th Cir. 2011) (noting that defendant "was not subject to continuous, around-the clock electronic surveillance over the extended period of time").

More importantly, even though other federal courts decided that GPS monitoring did not require a warrant, the fact remains that there existed no First Circuit law and no Supreme Court law, which served as "binding precedent" here. Contrast Davis v. United States 131 S.Ct. 2419 (2011).

Clearly, the issue of GPS monitoring was far from settled - much less in the government's favor - a volume of legal battles were erupting across the nation's courthouses regarding the legality of warrantless GPS surveillance during the time period preceding and including the instant warrantless surveillance. This level of uncertainty was a far cry from the black letter law which guided the officer in Davis.

As a result, the good faith exception cannot apply.

The government here analogized the GPS device to the beeper in Knotts. Unproved analogy, however, cannot guide the good

faith exception. It only saves police who rely on settled, direct precedent, which is later overturned.

The Court should not endorse the Government's expansive reading of Davis. By its very nature, the good faith exception applies only where police have acted in good faith. But in this case, the government's decision to proceed without a warrant was a result of presumptuousness not good faith.

In addition to their claim of relying on binding precedent, the Government argues that police should be forgiven for constitutional violations so long as their blunders were endorsed by their own prosecuting attorneys.

In its brief, the Government submits that agents "carefully vetted the use of the GPS device with the United States Attorney's Office before attaching and monitoring it without a warrant ..." Government's Second Supplemental Response to Defendant's Motion to Suppress. At p. 5.

The prosecutor's office apparently advised the agents that they need not bother obtaining a warrant.

The Government claims that there existed "substantial probable cause" to believe that Jose Baez used his Chevy Caprice to set arson fires. Government's Second Supplemental Response to Defendant's Motion to Suppress. At p. 3.

Further, Baez rarely drove the Caprice; it remained stationary in front of his house with few exceptions.

Government's Second Supplemental Response to Defendant's Motion to Suppress at p. 3-4.

The Government felt it had "substantial" probable cause. Likewise, no exigency existed which required them to forego the Constitutional preference for a warrant.

But the Government's advice was that the agents should not bother.[7] The Government then secretly installed a GPS tracker on the car and monitored each of its movements for a year without any judicial approval or oversight.

One of the greatest evils in this case is that there was simply no need to proceed without a warrant. Instead, the Government simply felt that it shouldn't need to obtain a warrant and, as a result, it didn't.

As a result, the Government cannot now blame anyone else but itself for choosing to forego the ancient constitutional preference for a warrant based on its own belief that they shouldn't need one.

No case has ever supported the invocation of the good faith exception to forgive a mistake of law where the mistake was not only needless and cavalier, but also purely executive in nature.

[7] According to the Government's Brief, the United States Attorney's Office here chose not to follow the lead of other prosecutors who elected the more prudent course of obtaining a warrant prior to installing a GPS device. Government's Second Supplemental Response to Defendant's Motion to Suppress, at 8, fn 3.

The government here did not make a mistake in good faith reliance on the legislature, the clerk's office, or even the Supreme Court. The government instead chose to rely on its own selective application of case law and its own strained analogy to justify its decision to proceed without a warrant. The government cavalierly dismissed the Fourth Amendment's preference for a warrant. The government, then, may not cry "good faith" when the error is its own.

The government ignored the basic premise that warrantless searches are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions. Katz v. United States, 389 U. S. 347, 357 (1967).

To act in good faith, the government must always err on the side of caution in seeking a warrant.

When the government chooses to run the risk of proceeding contrary to this preference, it must do so at its peril.

Courts should tailor the exclusionary rule to cases involving police misconduct. However, it is vital that where such misconduct exists, courts rigorously impose the exclusionary rule:

> If [illegally obtained evidence] can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so

> far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established be years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.
> United States v. Weeks, 232 U.S. 383, 393 (1914).

The government here did not proceed under controlling law. It proceeded under its wish of what it wanted the law to be. Because the Government alone is responsible for the constitutional violation it caused, which it could have prevented through obeying constitutional preference for a warrant, this Honorable Court should apply the exclusionary rule.

2. THE SO-CALLED “AUTOMOBILE EXCEPTION” TO THE WARRANT REQUIREMENT IS NOT APPLICABLE TO THE INSTANT MATTER, AND THE WARRANTLESS ATTACHMENT OF GPS TRACKING DEVICES TO DEFENDANT’S VEHICLES WAS THUS UNREASONABLE UNDER THE FOURTH AMENDMENT.

In United States v. Moore, 562 F.2d 106 (1977), government agents installed a beeper device into a cardboard box containing a large quantity of dangerous chemicals that the defendant had ordered, paid for, and picked up because the chemical plant’s manager had alerted them that the defendant had previously done so, and it seemed suspicious. Id. at 109. Agents placed a second beeper on the defendant’s vehicle while they were conducting surveillance of it. Id. Agents also installed a third beeper on a second vehicle which the defendant operated

while under police surveillance. Id. Based upon information obtained during their surveillance of the vehicles and the residences associated with them, police obtained search warrants for the residences. Id.

The defendants sought to suppress the evidence which agents had obtained pursuant to the search warrants because they argued that the police illegally obtained evidence supporting the issuance of the search warrants through their use of the previously described beepers. Id. The government argued, as the government has originally done in the instant matter, that the agents' conduct in installing the beepers did not constitute a search under the United States Constitution. Id.

In United States v. Moore, the First Circuit Court of Appeals ruled that the trespass involved in affixing beepers to the underbody of the vehicles was, standing along, so minimal as to be of little consequence. Id. at 111. The court further ruled that the "intrusion involved in surveillance of a vehicle by beeper is considerably lessened by the fact that one driving on public roads knows that he is subject to public scrutiny." Id. The court reasoned, however, that "the fourth amendment still places clear limits on official behavior in this context." Id. The court held that the police can only use beepers under the circumstances of the Moore case when they have probable cause to do so. Id.

The Government's present effort to dust off the Moore case after thirty-five years of contrary case law is stupendously ill-advised. Several obvious reasons counsel against the vitality of this anomalous case.

A. Jones Directly Contradicts Moore where Moore Considered the Initial Trespass Inconsequential.

First, in United States v. Jones, 565 U.S. __ (2012), the Supreme Court ruled that the police initial placement of a GPS device onto the defendant's vehicle for purposes of gathering information constituted a search within the meaning of the fourth amendment. The Court reasoned:

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted. Id.

As a result, the Court affirmed the decision of the United States Court of Appeals for the District of Columbia reversing the conviction of the defendant because the trial court admitted evidence obtained through warrantless GPS tracking, which it ruled violated the Fourth Amendment. Id.

The Moore court reasoned that the initial trespass to the defendant's vehicle involved only a minimal intrusion upon the defendant's rights. Id. This rationale allowed the Moore court to determine that police only required probable cause to install a beeper upon the defendant's vehicle. In Jones, the Supreme

Court directly rejects this analysis. In Jones, the Supreme Court holds that simply through placement of the GPS onto the defendant's vehicle officers encroached upon a protected area and committed a trespass against the defendant's property. The Supreme Court in Jones rejected such a warrantless encroachment. Jones rejected the "de minimis" trespass distinction asserted by Moore.

B. The Government Interests Supporting the Automobile Exception Are Not Present In The Warrantless Use of GPS Tracking, and the Exception is Therefore Not Applicable.

Second, consistent with the Supreme Court's precedent, the general rule regarding searches conducted outside the judicial process, without prior judicial approval by a judge or magistrate, is that they are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U. S. 347, 357 (1967).

There is no exception to the warrant requirement of any kind regarding secret installation and use of GPS devices.

As the Supreme Court ruled in Jones, "The Fourth Amendment provides in relevant part that '[the] right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Id. In Jones, the Supreme Court ruled that a vehicle is an "effect" as that term is used in the Fourth Amendment. Id.

The Fourth Amendment to the United States Constitution generally requires police to secure a warrant before conducting a search. California v. Carney, 471 U.S. 386, 390-391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Although the text of the Fourth Amendment does not specify when police must obtain a search warrant, the Supreme Court has inferred that police must generally secure a warrant. The warrant requirement, however, is subject to certain carefully limited exceptions. Brigham City v. Stuart, 547 U.S. 398 (2006) (quoting Groh v. Ramirez, 540 U.S. 551 (2004)).

Relying on Moore, the Government tries to fit GPS tracking into the automobile exception. The automobile exception, however, could never apply to the installation and use of GPS devices to track vehicle movements.

The motor vehicle exception to the warrant requirement allows police to search the contents of a motor vehicle without a warrant, if they possess probable cause to search for evidence or contraband. Carroll v. United States, 267 U.S. 132, 153 (1925).

When first announced in Carroll, the motor vehicle exception was justified entirely because the mobility of the vehicle made it impracticable to secure a search warrant.

Later decisions also justified warrantless car searches based on a perceived lesser expectation of privacy in a person's automobile. United States v. Chadwick, 433 U.S. 1, 12-13 (1977).

Neither basis would justify extension of the automobile exception to the GPS tracking in this case.

The exigency justification is concerned with the fact that a car, once detected or engaged by police, can easily be driven off, allowing a suspect to remove evidence from the vehicle. The exigency associated with potential removal or destruction during the pendency of a warrant application historically justified this warrant exception.

None of these exigency considerations apply in the context of a GPS device in general, and especially not in this case.

Here, agents were not concerned with the contents of the vehicle, or any changeable aspect of the vehicle. They were concerned with the vehicle's movements themselves. There was nothing that Baez could do to transform or alter his vehicle, given even an infinite amount of time, that would have thwarted the agents' ability to use the GPS device to track his movements. Therefore, the destruction of evidence / exigency basis of the automobile exception does not apply.

Similarly, this is not a case where police had only a split second opportunity to attach the GPS device to the Defendant's car. Police knew that the Defendant left his car outside his

home virtually always. Far from an exigency, police had complete access to the Defendant's car for purposes of installing the tracker at any time when their leisure permitted. The Government cannot attempt to justify its use of a GPS device in this case based upon an inherent exigency of the vehicle and then wait and surreptitiously follow the Defendant's vehicle for 347 days. The two positions are inherently inconsistent.

As a result, the exigency justification of the automobile exception is wholly inapplicable.

Similarly, the "lesser expectation of privacy" basis does not apply here. The lesser expectation of privacy rationale for the automobile exception is based on the following assumptions: 1) automobiles are exposed to the public where they are driven on the open highway; and 2) cars are subject to regulation and inspection which exposes the contents of the car to others.

First, the fact that a car is exposed to the public view on discrete journeys does not mean that the ensemble of a person's movements on a twenty four hour a day indefinite basis is similarly exposed to the public view. As discussed below, a majority of the Supreme Court considers that the volume and type of data obtained by a GPS tracker are reasonably private in nature.

Second, the regulation justification does not apply to the information gathered by GPS tracking. The regulation

justification is premised on the fact that a person’s belongings are subject to observation during routine inspection. The GPS device does not catalog a vehicle’s contents. The regulation justification then has no bearing on the ensemble movements of a vehicle, which is the type of evidence a GPS device is specially designed to obtain.

Finally, the entire purpose of the automobile exception is to search a vehicle for contraband or evidence.

Here, ATF agents did not use the GPS device that they attached to the Defendant’s vehicle for 347 days to conduct a search of the vehicle for contraband or evidence. They used the GPS device to convert the Defendant’s vehicle to an instrument in their investigation.

The motor vehicle exception to the warrant requirement allows the police to search a motor vehicle, when they possess probable cause to search it, for evidence and/or contraband because the exigency associated with the inherent mobility of the motor vehicle justifies it. Here, ATF agents did not search the Defendant’s vehicle for the entire 347 days during which they had attached the GPS monitor to it. They waited until after the Defendant allegedly lit another fire before they arrested the Defendant and, then, subsequently obtained a search warrant to search his vehicle. The Government, therefore,

cannot rely upon the automobile exception to the warrant requirement to attach a GPS device to a motor vehicle.

Attaching a GPS device to a motor vehicle does not permit government agents to search a motor vehicle. It allows them to convert the motor vehicle to their own use – conducting surveillance without having to physically follow the vehicle or maintain visual contact of it.

The Government's use of a GPS device, further, exceeded the scope of any automobile exception to the warrant requirement. The automobile exception to the warrant rule requires that the government at some point in a time continuum search the vehicle for contraband and/or evidence. It does not allow the government to convert the vehicle to its use through following its movements for twenty four hours a day for 347 days.

The Government, through relying upon the automobile exception to the warrant requirement under the circumstance of this case, is asking the court to contort the automobile exception - wholly independent of the constitutional basis of the automobile exception - to fit the special and unique circumstances that the instant GPS issue involves. Supreme Court jurisprudence does not allow and would not permit the Government to argue or the court to permit transforming an exception to fit where it otherwise is not permitted. The Government is asking this Honorable Court to force a square peg

into a round hole. The United States Constitution does not allow the Court to do so under these circumstances, particularly where to do so would be to erode the preference for a warrant with no justification for the same.

C. A Majority of the Supreme Court Concluded that Extended GPS Tracking, As Occurred Here, Would Require a Warrant - Even Under a Katz Analysis.

Any effort to exhume the Moore rationale is also doomed by careful analysis of the concurring opinions in the Jones case.

A review of the concurring opinions reveals that at least a majority of the Supreme Court would have declared unconstitutional the prolonged, warrantless GPS surveillance as occurred in this case even under a Katz reasonable expectation of privacy analysis.

In Justice Alito's concurring opinion, in which three other justices joined, he observed at least that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." Jones, Alito, J., concurring, at 13. Indeed, Justice Alito noted that the tracking became a search requiring a warrant "surely ... before the 4-week mark." In this case, the search spanned almost a full year.

In her concurring opinion, Justice Sotamoyor revealed her objection to the concept of any type of warrantless GPS tracking even more plainly. She "would ask whether people reasonably expect that their movements will be recorded and aggregated in a

manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on." Jones, Sotamayor, J., concurring, at 4.

Moore held that while the use of beepers to track movements intruded on a reasonable expectation of privacy, the intrusion was minimal where the vehicle was traveling on public roads. Moore, at 111. As a result, Moore reasoned that only probable cause was required.

But at least a majority of the Supreme Court - the Justices represented by Justices Alito and Sotamayor's opinions - rejected the analysis put forth by Moore. The Justices did not believe that the intrusion involved in extended twenty four hour electronic surveillance of a vehicle's movements was minimal. Their opinions foreshadow the inevitability that the Supreme Court would reject the Moore analysis and find that a warrant was required for the type of GPS surveillance which occurred here.

D. The Scope and Duration of Tracking Here, Even Under a Moore Analysis, Was Not Reasonable.

Finally, even if this Court were to conclude that the automobile exception generally supports the warrantless use of GPS tracking devices, the Government's use in the instant matter is unreasonable under the Fourth Amendment. The intrusion characterized in Moore as minimal cannot possibly support

electronic tracking of such an egregious scope and duration as that represented by the instant matter.

A governmental action constituting a "search" or "seizure" may be lawful and reasonable at its inception even without a warrant. However, there comes a point where the permissible scope of the warrantless intrusion is exceeded, thus rendering constitutionally unreasonable an initially reasonable and lawful government action. Simply, a lawful intrusion "can become unlawful if it is prolonged beyond the time reasonably required" to effectuate the purpose of the intrusion. Illinois v. Caballes, 543 U.S. 405, 408 (2005).

In Caballes, the Supreme Court considered whether the use of a drug sniffing dog unreasonably prolonged an initially routine traffic stop. The Court held that while law enforcement in that case stopped the defendant lawfully, "[i]t is nonetheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Id. at 407, citing United States v. Jacobsen, 466 U.S. 109, 124 (1984).

The Supreme Court in Jones settled the issue as to whether the use of GPS tracking devices implicates interests protected by the Constitution, and this Court is being asked now to resurrect Moore and hold that the initial use of the GPS on

Defendant's vehicles was reasonable under the so-called automobile exception. However, even if the installation were reasonable at the start, 347 days of uninterrupted electronic surveillance clearly demonstrates an intrusion "prolonged beyond the time reasonably required" to effectuate the purpose of the installation. Illinois v. Caballes, 543 U.S. 405, 408 (2005).

The instant matter thus requires a determination of at what point in the 347 days of surveillance the continued presence of the GPS tracking device became unreasonable.

In Caballes, the Court determined that the use of the drug sniffing dog did not unreasonably prolong the traffic stop, given that the officer who initiated the stop was still writing the formal warning when the dog arrived on the scene. Illinois v. Caballes, 543 U.S. 405 (2005). In a similar case decided the same term, the Court held that officers' detaining a suspect in handcuffs for several hours was not unreasonable where heightened interests of officer safety supported a longer intrusion. Muehler v. Mena, 544 U.S. 93 (2005)[8].

Unfortunately, neither the Court in Jones nor the First Circuit in Moore (nor for that matter, any of the other Circuit

---

[8] The Court in Muehler considered a § 1983 action alleging a Fourth Amendment violation in the hours-long detention in handcuffs of several occupants of a dwelling being searched for weapons pursuant to a valid warrant. The Court held the detention to be reasonable, in large part due to the overwhelming public interest in maintaining the officers' safety as they searched for dangerous weapons. Muehler v. Mena, 544 U.S. 93 (2005). The instant matter raises no such concerns.

Courts to consider GPS tracking under the Fourth Amendment) provided a functional framework for determining when electronic tracking might become unreasonable. However, Congress in an analogous context provided a flexible and illustrative standard in the statutory scheme regulating the Federal Government's interception of wire, oral, or electronic communications. 18 U.S.C. § 2518 (hereafter "the wiretap statute").

In limiting the permissible scope and duration of governmental wiretaps, Congress adopted the Supreme Court's reasonableness standard prohibiting surveillance "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5). In enacting the wiretap statute, Congress "set out to provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right of individual privacy." Scott v. U.S., 436 U.S. 128 (1978).

The statute requires that "wiretapping or electronic surveillance 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .'" Id. at 130, citing 18 U.S.C. § 2518(5). This standard, embodied in the thirty day durational limit, reflects Congress' understanding that the Constitution prohibits endless and limitless electronic

surveillance, and that an outer limit of thirty days with "the very real potential of earlier extinction" best serves the Government interests while protecting the suspect's Constitutional rights. U.S. v Cafero, 473 F.2d 489, 495 (3rd Cir. 1972).

Thus, Congress and the Supreme Court have recognized that where the Constitutional rights are implicated or infringed upon by electronic surveillance, intrusion beyond thirty days represents an unreasonable invasion of the suspect's Constitutional rights. This is so even where, as in the case of a wiretap under the statutory scheme and as noticeably absent in the instant matter, a warrant has been obtained from a neutral magistrate.

Simply put, even if this Court were to conclude that the warrantless installation of the GPS device on Defendant's vehicles was reasonable and constitutionally permissible under Moore and the automobile exception at the outset, the continued surveillance for 347 days became unreasonable and thus unlawful when it proceeded beyond the time reasonably required to effectuate the purpose of the installation.

The Defendant, then, respectfully requests that this Honorable Court reject the Government's attempts to revive the United States v. Moore case and decide the instant matter

consistent with United States v. Jones because it is directly on point.

3. THE SEARCHES CONDUCTED PURSUANT TO WARRANTS OBTAINED AFTER DEFENDANT'S ARREST WAS NOT SUFFICIENTLY INDEPENDENT OF THE UNLAWFUL WARRANTLESS USE OF GPS TRACKING DEVICES TO JUSTIFY ADMITTING THE EVIDENCE OBTAINED DURING THOSE SEARCHES UNDER THE SO-CALLED "INEVITABLE DISCOVERY" EXCEPTION TO THE EXCLUSIONARY RULE.

Evidence alleged to be the fruits of an unlawful search is admissible under the "inevitable discovery" exception to the exclusionary rule "so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) quoting United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).

The Government suggests in its brief that the "dual tests of 'independence' and 'inevitability' can be satisfied when an alternative investigative approach was being actively pursued prior to a Fourth Amendment violation." First Supplemental Response to Defendant's Motion to Suppress Evidence at 14, citing United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986). The Government relies on Silvestri for the proposition that the mere existence of an ongoing investigation renders the fruits of an unlawful search sufficiently independent of the

unlawful means and the discovery sufficiently inevitable. First Supplemental Response to Defendant's Motion to Suppress Evidence at 14-15.

The Government, however, mischaracterizes the First Circuit's holding in Silvestri. The Court did not hold, as the Government seems to suggest, that law enforcement officers are relieved of the burdens which the Fourth Amendment imposes simply because an ongoing investigation may have eventually resulted in a result similar to an unlawful search.

Such a position too readily dispenses with the solemn requirement that the government obtain a warrant based upon probable cause from an independent, neutral magistrate before entering upon the privacy of one's home or person and seizing one's belongings.

The facts in Silvestri represent a sharp distinction from the facts of the instant matter. In Silvestri, the constitutional violation in question arose from a warrantless entry into a premises. But at the time of entry, other officers were in the process of obtaining a warrant to search the premises. The initial illegal search which police conducted was exactly that which the warrant allowed. Silvestri 787 F.2d 736, 741. Thus, the warrant in Silvestri truly was inevitable, and the evidence discovered as a result of the warrantless search was thus admissible. Here, however, the unlawful search arose

from the GPS installation. A neutral magistrate never sanctioned the search by issuing a warrant (even after the fact), nor was obtaining a warrant for the installation ever attempted. The government's reliance on Silvestri, then, is completely off the mark.

The Silvestri Court differentiated between situations regarding inevitable discovery where a warrant is never sought after a constitutional violation and those where one is sought. In the former, the Court urged caution because it involves a method or argument of allowing evidence into trial through the "back door." It involves a way of ignoring and sidestepping the requirements of the United States Constitution.

The latter situation at least involves a constitutional violation followed by a warrant. There is a closer connection in the latter with the "inevitability" of the inevitable discovery doctrine.

Allowing the government to "end around" the constitution by allowing them to rely upon the "inevitable discovery" doctrine when it never sought a warrant after a constitutional violation "substantially weakens the protection provided by the fourth amendment." Id. at 744.

The Court states:

> In terms of inevitability, it could be argued that allowing the admission of evidence found during a warrantless search merely because the prosecution can

show by a preponderance of the evidence that sufficient probable cause existed to justify the issuance of a warrant fails to prove that a warrant would inevitably have been sought or approved *by a magistrate*." (emphasis added) Id. at 744.

The Silvestri Court reasoned that such a position, as noted above, and upon which the Government presently relies, presumes that a neutral magistrate would have issued a warrant.

Said yet another way, allowing the government to argue the inevitable discovery rule after its constitutional violation substitutes proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the fourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search. That is the danger against which the Court cautions.

The Government in the instant matter is asking this Honorable Court to allow the above described substitution against which the Silvestri Court cautioned.

Thus, the Government's suggestion that the pre-existing investigation of the Defendant here excuses the unlawful search arising from the installation of the GPS device to his cars is without basis, and the instant matter necessitates a separate examination of each of the factors determining admissibility under the "inevitable discovery" doctrine.

The first factor, which Silvestri and its progeny describe, the so-called "independence" test (First Supplemental Response

to Defendant's Motion to Suppress Evidence at 14), is a burden that the government cannot satisfy. The lawful means by which the Government here could have obtained the evidence cannot fairly be said to be "independent." Further, the Government here cannot show that it would necessarily have even employed the means through which it claims it could have obtained the evidence it illegally obtained. United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011).

In Hughes, the First Circuit considered a motion to suppress evidence and statements arising from an alleged Miranda violation. The defendant had voluntarily given a number of incriminating statements during questioning from law enforcement officials in his own living room. United States v. Hughes, 640 F.3d 428 (1st Cir. 2011). The statements led to the officers requesting consent to search the premises, which the defendant granted, eventually culminating in the seizure of evidence. Id.

The defendant in Hughes challenged the voluntariness of the statements and consent to search his home, which the First Circuit rejected, finding that the inevitable discovery doctrine would preclude suppression. Id. at 440. Addressing the independence of the discovery and whether lawful means would necessarily have been employed, the Court explained that voluntary statements had given rise to probable cause to obtain a warrant for the search. Id. Because the officers would and

could easily have obtained a warrant, the Court found that the government satisfied the so-called "independence" prong. Id.

Here, the Government makes much of the fact that agents had been drafting a warrant affidavit at the time of the Defendant's eventual arrest. First Supplemental Response to Defendant's Motion to Suppress Evidence at 15. However, this does not indicate, as the Government suggests, that the lawful means of searching Defendant's home and garages would "necessarily have been employed." Hughes, 640 F.3d 428, 440.

Rather, this suggestion ignores that the agent's "investigative process" had been "actively underway" for nearly a full year before the Defendant's arrest, coupled with the GPS monitoring, and presumes that the agents possessed enough probable cause to obtain warrants.

Further, the Government is asking that this Honorable Court accept Agent Oppedisano's word that he was on the verge of filing his search warrant affidavit. The Government's and Agent Oppedisano's scout's honor notwithstanding, there is simply no credible argument in the instant matter that the Government here would necessarily have employed the means of attempting to obtain a search warrant – the constitutional manner of obtaining the evidence that it did. It only obtained the warrants in question to search the Defendant's vehicle and apartment after the fact because it relied upon the illegally obtained evidence

which the GPS monitor provided. Therefore, the Government simply cannot show that it "necessarily would have employed" the legal means to obtain the evidence which it did because it didn't do so for 347 days.

Further, there is no credible argument that a neutral and detached magistrate even would have or could have issued a search warrant based upon the sparsity of evidence, surmise, and speculation that the Government now lists in its litany of "proposed" warrant affidavits attached to its current court submissions after United States v. Jones summarily struck down the arrogance and hubris of the current government agents in using an illegally attached GPS monitor for almost a whole year.

Surely, if the agents, as the Government suggests, "could have sought warrants based on untainted evidence [and] that they would have in the normal course," they could have and would have done so at some point in the 347 days between the GPS installation and Defendant's ultimate arrest. (First Supplemental Response to Defendant's Motion to Suppress Evidence at 15, emphasis in original). If anything, the egregious duration of uninterrupted electronic surveillance here more starkly represents the fears of the First Circuit in Silvestri, that "where a warrant is only sought after an illegal search reveals evidence of criminal activity," the later warrant may

not be truly inevitable. United States v. Silvestri, 787 F.2d 736, 745.

Similarly, the government cannot satisfy the second prong of the inevitable discovery test. The First Circuit in Hughes held the lawful discovery of the challenged evidence in that case to be inevitable because the defendant had himself voluntarily turned over some of the evidence and had told officers of the existence and whereabouts of further evidence. United States v. Hughes, 640 F.3d 428 (1st Cir. 2011). Because the officers had unquestionably obtained enough evidence to obtain a warrant, the lawful discovery was in fact inevitable. Id.

Here, evidence, which agents obtained through the unlawfully installed GPS tracking device, finally gave law enforcement enough probable cause to obtain a warrant in the first place. Whatever the investigation had revealed until the point that the GPS device led to Defendant's arrest, it had apparently not yielded sufficient probable cause to support a warrant, as the government had never yet sought one. Where in Hughes, the officers' search was contemporaneous with the alleged violation and the warrant would have been obtained the next day, the violation in this case had begun 347 days before and continued uninterrupted until the arrest, when a warrant was only obtained thereafter.

As with the "independence" prong, the passage of nearly a full year between the violation and eventual issuance of a warrant reveals precisely that the lawful discovery of the evidence challenged here was not "inevitable." United States v. Hughes, 640 F.3d 428 (1st Cir. 2011). The Government, thus, cannot satisfy the second prong of the inevitable discovery test.

The final consideration in whether the inevitable discovery rule can admit evidence is whether "application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011), quoting United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).

The instant matter starkly presents a circumstance where the application would "sully the prophylaxis of the Fourth Amendment." Id. The Government here is seeking to introduce evidence obtained as a result of a year-long warrantless intrusion into a constitutionally protected area[9] through means of surreptitiously installed GPS tracking devices. The Government had ample time to pursue a warrant for the installation, which would have precluded any argument as to the illegality of the search, but, rather, chose not to do so. The unparalleled scope and duration of this search, two vehicles for

[9] See United States v. Jones, 565 U.S. ____ (2012).

347 days — one for a shorter period of time — indicates an utter disregard for the Defendant’s property and privacy. Admitting the evidence under the inevitable discovery doctrine would be tantamount to excusing this particularly egregious violation.

The government made a conscious choice not to seek a warrant in instant matter. That it attached the GPS devices in question and then continuously drafted and/or modified affidavits to support the issuance of search warrant(s) only reinforces its active decision not to seek a warrant and rely rather upon the now determined to be illegally installed GPS device. Every time that Agent Oppedisano altered, drafted, or modified the affidavits which the Government now scurries to highlight and attach to its supplemental memoranda, he made a conscious decision to ignore the Constitution of the United States. He affirmatively decided not to submit the affidavits which he was drafting and modifying and rather decided to hope for the best with the legality or lack thereof of the GPS device he had installed. He affirmatively chose not to seek warrants based upon the information which he had available to him at the time. Each time that he did so, he closed the book on the Constitution. Agent Oppedisano didn’t install the GPS in question for a short period of time to buy him some time to apply for and obtain a warrant. Rather, Agent Oppedisano summarily dispensed with the United States Constitution for 347

days. The Government and Agent Oppedisano now want this Honorable Court to think that they were on the “verge” of applying for and obtaining a warrant. If the Government didn’t seek a warrant in the days – even one month as in Jones – after the installation of the GPS device in this case, the Defendant questions why this Honorable Court and the Defendant should now believe that it was on the “verge” of applying for and obtaining after 347 days.

Further, in arguing that it would have inevitably discovered the evidence in question without the illegally installed GPS monitoring device, the Government ignores the issue as to when it would have conducted this search. It completely avoids addressing the issue as to whether the evidence it illegally seized pursuant to the illegally installed GPS device would have even been present had it sought and obtained a warrant as it says it was in the process or on the “verge” of doing.

Arguing that it would have discovered the gas can in the trunk of the Defendant’s vehicle, matches, and smell of gasoline when it “got around” to getting a warrant is completely speculative and misplaced in the instant matter. This line of reasoning begs the question; it assumes the legality of the Defendant’s arrest and thus the search of the vehicle incident

to his arrest even in the absence of the evidence obtained by the unlawful installation of a GPS tracking device.

However, as with the searches of Defendant's residence and garages, his arrest would not have occurred but for the unlawful placement of the GPS tracking device on his vehicles. Where an "arrest ... set[s] in motion the chain of events leading to the discovery" of evidence, the First Circuit has described a separate test for determining whether "[a]n arrest is considered to be independent[.]" United States v. Almeida, 434 F.3d 25, 28 (2006) (Howard, J.).

The First Circuit in Almeida held that an arrest is independent for "inevitable discovery" purposes "if (1) the police, in fact, would have arrested the defendant, even without first having discovered the challenged evidence, and (2) in the absence of the challenged evidence, the officers nevertheless had probable cause to make the arrest without the challenged evidence." Id. (internal citations omitted).

In Almeida, the First Circuit considered challenges to statements made by the defendant to law enforcement agents after his arrest, preceded by physical evidence obtained through a consent search. The defendant argued in that case that statements he and a co-defendant made while in custody led to the discovery of drugs. Because he had not been advised of his Miranda rights prior to making the custodial statements, the

defendant argued that his statements and the drugs discovered as a result should be suppressed. Id.

The Court found the two-prong test described above to be met, first because discovery of the physical evidence, “made as a result of [defendant’s] consent to search the car, preceded (and thus was independent of)” the alleged Miranda violation. Almeida, 434 F.3d 25, 28 (2006). Because a lawful consent search had already revealed the presence of a crack pipe, Officers could simply have arrested the defendants then, and a resulting search incident to arrest would have revealed the presence of drugs. Id.

Second, the Court found that “probable cause existed for the arrest[,] at the time of the arrest[.]” Id. Because federal law criminalizes possession of even a small quantity of crack cocaine, and because the officers retrieved a crack pipe from beneath the seat directly in front of the defendant, officers had ample probable cause to arrest the defendants in that case. Id. at 28, 29.

However, the facts of the instant matter demonstrate a dramatic difference from the facts of Almeida which supported a finding of inevitability and independence in that case. First and most fundamentally, in Almeida the challenged evidence was obtained after a lawful consent search had already revealed enough evidence to make an immediate arrest. In the present

matter, the evidence which led to Defendant's arrest was obtained solely through a wholly unlawful search. Had the officers not installed the GPS device, they would not have had reason to believe the Defendant was in the area of the fire, and there would have been no reason to believe he was involved.

Indeed, but for the Defendant's location near the scene of the fire revealed by the GPS, it is doubtful that police would have ever investigated Baez for the Firth Street fire. The police investigation here was largely based on the modus operandi which Baez allegedly employed. In each of the other fires, the Defendant allegedly burned down businesses using tires and clothes as combustibles.

The Firth Street fire on the other hand was a residential building. The perpetrator did not use tires and clothes as combustibles.

As a result, absent the GPS device, it is doubtful that police would have ever attempted to connect Baez to the Firth Street fire.

Thus, the immediacy and certainty of the impending arrest that excused the police misconduct in Almeida is not present here, and the government cannot fairly say that "the police, in fact, would have arrested the defendant, even without first having discovered the challenged evidence[.]" Almeida, 434 F.3d 25, 28 (2006).

Nor do the facts support the conclusion that "in the absence of the challenged evidence, the officers nevertheless had probable cause to make the arrest without the challenged evidence." Id. In the instant matter, the suspicion that the Defendant may have been involved with the fire preceding his arrest grew entirely out of the GPS device, which informed Agent Oppedisano of the Defendant's whereabouts only minutes before the Firth Road fire was reported. (First Supplemental Response to Defendant's Motion to Suppress Evidence at 6). The government does not suggest that the Defendant was under any other type of surveillance at the time of the arrest, nor that, in the absence of the GPS device, would there have been any reason to believe he have been involved in the fire.

And while the government insists that review of "surveillance footage from traffic cameras" and interviews with the tenants of the building in which the final fire occurred supported the conclusion that the Defendant was involved, (Government brief at 6-7) such after-the-fact investigation does nothing to support the independence of his arrest.

The First Circuit in Almeida cautioned that the arresting officer must have "probable cause… for the arrest[,] at the time of the arrest[.]" Almeida, 434 F.3d 25, 28 (2006). Without the information gleaned by the GPS device, and without consideration of the evidence obtained after the arrest (as Almeida requires),

there simply does not exist “the facts and circumstances within [the officers'] knowledge ... sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.” Almeida, 434 F.3d 25, 28, citing Beck v. Ohio, 379 U.S. 89, 91, (1964).

Without the GPS device, the arresting officer’s only basis for probable cause included information that the Defendant was suspected of past arsons. This simply does not rise to the level of probable cause necessary to support an arrest without the unlawfully obtained evidence, and thus the evidence obtained as a result of the search incident to his arrest is not sufficiently “independent” to render the evidence admissible pursuant to the “inevitable discovery” doctrine. United States v. Almeida, 434 F.3d 25 (2006).

Even if the Government at some point would have arrested the Defendant, and then ultimately conducted a search of his person, his car, his home, and his garages, the Government completely ignores the entirely speculative nature of what in fact police would have found when they finally, if ever, got around to conducting these searches.

No one can determine the timing under the current fact pattern presented before the Court as to what the government would have located in the Defendant’s possession when it could have and would have obtained a warrant. The government created

this ambiguity and allowed it to occur. A crystal ball couldn't even reveal this information. But the Government is asking this Honorable Court to do just that.

The Government arguing that the seizure of the evidence and the timing of its seizure would have inevitably revealed the same set of evidence, in the fact pattern of the instant matter, is completely speculative.

The Silvestri court and others in similar circumstances wrestled with situations where the government was already present in a situation or fact pattern involving the defendant, created the constitutional violation, and then immediately thereafter or contemporaneously therewith seized evidence. Here, the Government was not already present in a situation or fact pattern where it could commit or create a constitutional violation. Rather, the Government's constitutional violation put them in the position of illegally obtaining evidence. It is under this rubric that the Government's reliance upon the inevitable discovery rule is misplaced.

In other words, ATF agents were not already in position to seize evidence from the Defendant in the aftermath of the Firth Road fire when they committed a constitutional violation. Agents were not already following or surveilling the Defendant at the time of his arrest when they violated the constitution and seized evidence, which but for the constitutional violation

they would have discovered anyway. No one was surveilling or following the Defendant in the aftermath of the Firth Road fire, which lead to the Defendant's arrest. Neither agents nor fire investigators nor police would have even begun to investigate that the Defendant set the fire at the Firth Road arrest within the minutes when the Defendant was stopped and arrested.

Rather, here, the GPS in question woke Agent Oppedisano up in the middle of the night to notify him that the Defendant's vehicle had moved from its stationary position and was "on the move." Agent Oppedisano, then, mobilized his investigatory team, and the Defendant was, thus, stopped and arrested moments after the fire in question.

The Government wants to argue that this arrest and subsequent seizure of evidence is "inevitable."

The Defendant, however, suggests that it would be inevitable only if Agent Oppedisano possessed a magic wand. In the instant fact pattern, by the time that the Government got around to getting a warrant, which the Defendant argues it never would have even bothered to obtain, no one knows what evidence would have been located in the Defendant's vehicle or on his person. Maybe he would have moved the matches. Maybe he would have moved the gas can. Maybe he would have washed his clothes or his car to remove the smell of gasoline. The discovery of the evidence, then, is not "inevitable." The Government was

only in the position to obtain the evidence that it did because of its illegal constitutional violation of the Defendant's rights through the GPS monitor it placed on the Defendant's vehicle.

Without the constitutional violation that the Government created, there would arguably be no seizure of evidence in this case.

The Defendant, thus, respectfully requests that this Honorable Court reject the Government's reliance upon the rule of inevitable discovery in the instant fact pattern.

4. THE SEARCHES CONDUCTED PURSUANT TO WARRANTS OBTAINED AFTER DEFENDANT'S ARREST WERE NOT SUFFICIENTLY ATTENUATED FROM THE PRIMARY ILLEGALITY OF THE WARRANTLESS USE OF GPS TRACKING DEVICES TO JUSTIFY ADMISSION OF EVIDENCE OBTAINED DURING THOSE SEARCHES.

In its "First Supplemental Response to the Defendant's Motion to Suppress," the Government argues that the location and seizure of the Whole Foods index card with the notation, "Fresh Pond Cambridge, Whole Foods Market, Jose L. Baez" is too attenuated from the GPS tracking device for the Court to consider it a fruit of the poisonous tree.

The Government, then, suggests that the ATF, which must be judged in light of its collective knowledge, "already had all the facts within its institutional knowledge." As a result, the Government argues that this Honorable Court should not suppress the live testimony of the ATF regarding the Whole Foods fire.

Additionally, the Government relies upon the matter of United States v.Paradis, 351 F.3d 21, 32 (1sr Cir. 2003) to support its position in this regard.

The Defendant responds to the within argument of the Government in three ways.

First, the Defendant is not seeking to suppress the live testimony, based upon individual or collective memory of an alleged fire that occurred at a Whole Foods Market in Cambridge, Massachusetts.

Second, the Defendant seeks to suppress the discovery of evidence from the search of the Defendant's apartment at 156 Columbia Road, Dorchester, Massachusetts, which includes the index card with the notation, "Fresh Pond Cambridge, Whole Foods Market, Jose L. Baez."

Third, the seizure of the index card with the notation, "Fresh Pond Cambridge, Whole Foods Market, Jose L. Baez," which agents seized from the Defendant's apartment is not too attenuated from the Government's constitutional violation in the instant matter. As a result, the Defendant respectfully requests that this Honorable Court suppress the index card in question as a "fruit of the poisonous tree" of the illegally installed and utilized GPS tracking device.

First, the Defendant agrees that suppressing the live testimony of ATF witnesses, based upon their knowledge of the

facts, circumstances, and investigation of the Whole Foods fire in Cambridge, Massachusetts before the seizure of the index card in question because such an approach is indeed too attenuated from the Government's constitutional violation in the instant case. The Defendant does not seek to suppress agents' knowledge and investigation that occurred prior to even the installation and utilization of the GPS tracking device. The Whole Foods fire occurred years before the installation of the device in question. The Defendant does not seek to suppress this information or investigation.

Rather, second, the Defendant seeks to suppress and exclude from Government's evidence at trial, if any, the index card with the notation "Fresh Pond Cambridge, Whole Foods Market, Jose L. Baez" and any other physical evidence, which agents seized from the Defendant's apartment pursuant to the search warrant that they obtained with the illegally obtained GPS tracking evidence. This seizure, despite the Government's warrant for the apartment, directly resulted from the Government's illegal use of a GPS tracking device.

But for the Government's illegal use of the GPS device at issue in the instant case, the Government would not have obtained a warrant to search the Defendant's apartment. The Government, despite its assertions otherwise, did not possess probable cause to obtain a warrant for the same.

The Government simply possessed information that the Defendant had a "dispute" with two of the properties involving the fires and that an individual drove a dark Chevrolet Caprice in the area near the location of the fires when the fires apparently began.

If the Government possessed probable cause from this information to search the Defendant's apartment, then why did it install GPS devices to his cars and watch him for 347 days instead of arresting him? The Government's current position begs the question.

Third, the seizure of the index card is not "attenuated" from the "primary illegality" of the GPS search. Rather, "the evidence to which [the] instant objection is made has been come at by exploitation of that illegality [and not] instead by means sufficiently distinguishable to be purged of the primary taint. Wong Sun v. United States, 371 U.S. 471, 488 (1963).

The First Circuit held in a recent case that "[w]hen determining attenuation, temporal proximity [], the presence of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct are all relevant." United States v. Camacho, 661 F.3d 718, 729 (2011) (Torruella, J.) (internal quotations and citations omitted).

In Camacho, the First Circuit considered a challenge to evidence (a gun) obtained as a result of a search and seizure of

the defendant, allegedly in violation of Terry v. Ohio. Camacho, 661 F.3d 718, 729; see also Terry v. Ohio, 392 U.S. 1 (1968). The officers in Camacho responded to a disturbance that "was not terribly serious" with an inappropriate show of force. The officers then seized the defendant in "a flagrant violation of [defendant's] core Fourth Amendment right against unreasonable seizures," leading immediately to the discovery of a firearm. Camacho, 661 F.3d 718, 729-730.

The Court in Camacho held that the minimal time lapse between the officers' illegal stop of the defendant and the seizure of the gun, coupled with the fact that the seizure of the defendant and the discovery of the gun "were both results of the officers' unconstitutional conduct," obviated a finding of "attenuation." The Court held, "[d]iscovery of the gun flowed directly from the original unlawful seizure of Camacho and was not 'so attenuated as to dissipate the taint' of the initial unlawful stop." Camacho, 661 F.3d 718, 730 (internal citations omitted).

The same result obtains here. The Government's unlawful GPS installation led directly to the search of the Defendant, his vehicle, and his apartment. The Government conducted these searches pursuant to a warrant, which it obtained immediately following the Defendant's arrest and were based on information

gleaned from the unlawful presence of the GPS on the Defendant's vehicle.

No intervening circumstances are present to break the chain of causation from the unlawful GPS installation to the search of the apartment, and the government has not suggested anything to the contrary. (Government's Second Supplemental Response to Defendant's Motion to Suppress at 17-18). Rather, the government simply downplays the connection between the GPS installation and the discovery of evidence (at least pertaining to the Whole Foods fire). The government suggests that the "institutional knowledge" of the ATF that clothing found at the scene of a fire years earlier bore the name "Baez" sufficiently breaks the chain of causation between the unlawful GPS installation and the resulting search of his apartment. However, this suggestion ignores the fact that the apartment search flowed directly from the GPS installation and not from the "institutional knowledge" of the entire Bureau of Alcohol, Tobacco, Firearms, and Explosives. (Government's Second Supplemental Response to Defendant's Motion to Suppress at 17).

Finally, as in Camacho, the flagrancy of the police misconduct in the instant matter suggests that justice precludes a finding of attenuation. The Government is correct in pointing out that Maynard, the only Circuit Court case finding GPS tracking to be a search, was decided only shortly before the

Defendant's arrest. (Government's Second Supplemental Response to Defendant's Motion to Suppress at 10). See also United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010). However, the government neglects to mention that the Massachusetts Supreme Judicial Court held very shortly after the initial installation that GPS tracking does constitute a seizure as a matter of state constitutional law. Commonwealth v. Connolly, 454 Mass. 808, 913 N.E.2d 356 (2009)[10].

A joint task force of the Boston Police Department and the ATF conducted the investigation of the Defendant. While the government seeks to excuse the ATF's actions on the basis that there existed no binding federal precedent suggesting that a warrant would be required, the members of the task force representing the Boston Police Department were on notice for nearly the entirety of the investigation that a warrant would be required, were they alone conducting the search. Thus, by allowing the ATF to install the GPS tracking device, the task force circumvented the protections afforded to Defendant under the Massachusetts Declaration of Rights, in what certainly amounts to a "a flagrant violation of [defendant's] core Fourth Amendment right[s]." Camacho, 661 F.3d 718, 729-730.

---

[10] The decision in Connolly was issued on September 17, 2009, only twenty (20) days after the installation of the GPS tracking device on Defendant's vehicles.

CONCLUSION

WHEREFORE, the Defendant requests that this Honorable Court allow the Defendant's motion to suppress.

Respectfully submitted,
Jose Baez,
By and through his attorney,

/s/ Murat Erkan
Murat Erkan, BBO: 637507
Erkan & Associates, LLC
300 High Street
Andover, MA 01810
(978) 474-0054

Dated: February 28, 2012

CERTIFICATE OF SERVICE

I, Attorney Murat Erkan, counsel for the Defendant, Jose Baez, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 28, 2012.

/s/ Murat Erkan, Esquire

Date: February 28, 2012