1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4   THE UNITED STATES OF AMERICA      )
                                      )
5                                     )
    vs.                               )
6                                     )  No. 1:10-cr-10275-DPW
                                      )
7   JOSE L. BAEZ,                     )
                                      )
8                    Defendant.       )

9

10  BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                  MOTION TO SUPPRESS HEARING

13

14

15          John Joseph Moakley United States Courthouse
                        Courtroom No. 1
16                      One Courthouse Way
                       Boston, MA 02210
17                      March 21, 2012
                          2:30 p.m.

18

19

20

                  Brenda K. Hancock, RMR, CRR
21                   Official Court Reporter
           John Joseph Moakley United States Courthouse
22                      One Courthouse Way
                       Boston, MA 02210
23                       (617)439-3214

24

25

1    APPEARANCES:

2         United States Attorney's Office
          By:  AUSA Stephen P. Heymann
3              AUSA David G. Tobin
          1 Courthouse Way
4         Suite 9200
          Boston, MA 02210
5         On behalf of the United States of America

6

          ERKAN & ASSOCIATES
7         By: Murat Erkan, Esq.
          300 High Street
8         Andover, MA 01810
          On behalf of the Defendant.

9

10        LAW OFFICES OF MICHAEL RUANE, LLC
          By:  Michael P. Ruane, Esq.
11        300 High Street
          Andover, MA 01810
12        On behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2      before the Honorable Douglas P. Woodlock, United States

3      District Judge, United States District Court, District of

4      Massachusetts, at the John J. Moakley United States Courthouse,

5      One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6      March 21, 2012):

7          THE CLERK:  All rise.

8          (The Honorable Court entered the courtroom at 2:30 p.m.)

9          THE CLERK:  This Honorable Court is now in session.

10     You may be seated.

11         This is Criminal Action 10-10275, United States versus

12     Jose Baez.

13         Will the interpreter please rise and raise your right

14     hand.

15              (Interpreter duly sworn by the Clerk)

16         THE COURT:  Well, I want to start with Davis here.  I

17     do not know who is going to address Davis from the defendant's

18     point of view.

19         MR. ERKAN:  I will, your Honor.

20         THE COURT:  So, let me see if I can narrow this a bit.

21     Let us assume that this case were in the Ninth Circuit, or the

22     Seventh Circuit or the Eighth Circuit.  Is there any question

23     that the Motion to Suppress would have to be denied?

24         MR. ERKAN:  Yes, Judge, I think there would still be a

25     question.

1          THE COURT:  Why?

2          MR. ERKAN:  In light of the fact that this was an

3   issue that was bubbling through the system in terms of legal

4   battles in various states and perhaps at least creating the

5   circumstance for a split in the Circuits or at least it not yet

6   having been resolved.

7          THE COURT:  That is not the holding of Jones, and, in

8   fact, the issue was one of which there was a little bit of

9   uncertainty, but it says "binding precedent in the circuit."

10  It is binding precedent in the Ninth Circuit, binding precedent

11  in the Eight Circuit, binding precedent in the Seventh Circuit.

12  Now, it seems to me that that is directly on point.  Your

13  answer, of course, is, we are not in San Francisco, we are not

14  in Minneapolis, I guess?

15         MR. ERKAN:  Sure.  Then, I guess if we were to

16  construe it narrowly to that situation of the binding precedent

17  in the Circuit, then, yes, Judge we would be --

18         THE COURT:  Well, isn't that what is said by Jones?

19         MR. ERKAN:  I think that if I were going to be arguing

20  this case, I would attempt to distinguish Davis by suggesting

21  that this was an issue that had not yet been decided by the

22  court of the highest --

23         THE COURT:  But what does "binding precedent in the

24  circuit" mean if not that?

25         MR. ERKAN:  Yes, understood, Judge, but I would simply

1  attempt to distinguish it on those grounds.

2        THE COURT:  And I am sure you would make every effort

3  to do so.  The question is whether or not it would be

4  persuasive, and why would it be persuasive?

5        MR. ERKAN:  Why would it be persuasive, your Honor?

6        THE COURT:  I just do not see a way to get out of the

7  core holding of Jones if I were sitting in the Ninth Circuit,

8  or the Eighth Circuit or the Seventh Circuit.

9        MR. ERKAN:  Understood, your Honor.

10        THE COURT:  So, now let me do it a little bit

11  differently from a different perspective.  If you were before

12  Judge Young here on this motion, what do you think would happen

13  and what under these circumstances would happen?

14        MR. ERKAN:  I think I would be talking to the First

15  Circuit right now, Judge.

16        THE COURT:  So, you would be looking to go to the

17  Court of Appeals on it, but the recognition is that it would be

18  an expectation that a Judge who had previously imposed this

19  rule would apply it.

20        Now, let us just assume that this case went faster

21  than it did.  I am not suggesting it should have gone faster,

22  but it went faster than it did, and so you get before Judge

23  Young two months after Maynard comes down, and Judge Young

24  said, "Gee, I had a case like this just the other day, and I am

25  going to deny your Motion to Suppress because I hold that there

1    is no Fourth Amendment issue here, and, by the way, I have

2    thought about Maynard, and I do not agree with Maynard."

3            MR. ERKAN:  It seems that that would be his reaction.

4            THE COURT:  Now, you say you will go to the Court of

5    Appeals on that, and let us assume that you get to the Court of

6    Appeals faster than cert is even granted in Maynard, and the

7    Court of Appeals here is pretty much up to speed, and they rule

8    and they say Judge Young is right.  We are in the same position

9    as we would be in the Ninth and the Seventh and the Eighth,

10   right?

11           MR. ERKAN:  Yes, your Honor.  May I just make one

12   distinguishing point with respect to Sparks, Judge?

13           THE COURT:  With respect to?

14           MR. ERKAN:  Sparks and Judge Young's decision.

15           THE COURT:  Yes.

16           MR. ERKAN:  That case involved a much less significant

17   duration of intrusion than has occurred here in the instant

18   case, and so that might be some grounds to distinguish.

19           THE COURT:  Maybe, maybe not.  It does not appear that

20   that was what was animating the Court in Jones.  Any

21   intrusion -- we are back to Blackstone, frankly, on this, at

22   least the majority opinion.

23           So, what we have, I think, is a circumstance in which

24   the issue was not really even open until Maynard.  There were

25   three Court of Appeals decisions, no Court in favor of the

1    proposition that there is a Fourth Amendment violation, and

2    none that said otherwise.

3              MR. ERKAN:  I wouldn't agree.

4              THE COURT:  What Circuit held otherwise?

5              MR. ERKAN:  As far as the Circuit Courts are

6    concerned, there was no precedent supporting.

7              THE COURT:  And that is the kind of linchpin of Jones,

8    Circuit decisions, that is binding precedent.

9              MR. ERKAN:  Davis, Judge.  I think you mean Davis.

10             THE COURT:  Excuse me, Davis.  And the only binding

11   precedent underneath the Supreme Court in the Federal Courts is

12   the Circuit Courts.  Even Judge Young did not have to follow

13   himself.  He might have said, "I think I think differently

14   now."

15             MR. ERKAN:  And maybe if I had a chance to be in front

16   of him, he would have.

17             THE COURT:  Maybe, maybe.  But the question is whether

18   or not suppression is available as a remedy.  So, what I have

19   is, because I do not -- the three days does not really make

20   very much difference.  When I think of how long it takes me to

21   figure out what the D.C. Circuit has done, if I ever do, it

22   generally is longer than three days.  I am not sure that ATF

23   is -- well, maybe they are faster on the mark, but in a

24   securities case I would probably say that the information had

25   not been absorbed properly by the relevant market.

1          So, in any event, what you are arguing for is that

2    there should be different law with respect to suppression in

3    the Ninth and the Seventh and the Eighth Circuits than there is

4    in other Circuits who have not ruled on this issue.

5          MR. ERKAN:  Judge, again, I don't wish to belabor this

6    point, but I think that to some extent the Court is looking at

7    the Davis case simply in terms of the holding without reviewing

8    in toto the fact pattern that was before the Davis Court.  In

9    Davis we were dealing with a case that all parties agreed, *all*

10   parties agreed, was following to the letter in its strict

11   compliance with binding appellate precedent that had been

12   settled and undisturbed for a very long period of time.

13         THE COURT:  That was true here.

14         MR. ERKAN:  No, Judge, not at all.

15         THE COURT:  It was not the First Circuit.  There was

16   no Circuit that had ruled otherwise.

17         MR. ERKAN:  Except for the Constitutional preference

18   for search warrants, particularly in cases where the issue --

19         THE COURT:  Are you suggesting that the Ninth and the

20   Eighth and the Seventh had different rules, that they had not

21   said that the GPS was not a Fourth Amendment violation?

22         MR. ERKAN:  No.  I'm suggesting that that is the way

23   they decided the cases.  However, I think that, and

24   particularly as we can now see, at least in hindsight in light

25   of the Supreme Court's ruling in Jones, that those cases were

1    wrongly decided, Judge.

2         THE COURT:  And, similarly, with respect to Davis.

3    You can say that there was no unsettled quality to it, but when

4    we get to Gant, we get to a five-to-four decision?  If we are

5    talking about what is unsettled, what is not unsettled, it

6    seems to me that the underlying issue in Davis is similar to

7    the underlying issue here.  There was case law.  It was, until

8    the last three days of the GPS, uniform in the Circuits.

9    Maynard becomes a kind of straw in the wind but not visible to

10   most human eyes for a little bit of time, anyway.  So, I just

11   do not quite understand functionally what the difference is.

12        I do understand this, I think, that if we were to say

13   in this Circuit that suppression for actions prior to Jones is

14   available, that we would have a split in the Circuits, because

15   that would not be the case for the Ninth, the Seventh and the

16   Eighth, and that seems to me to be peculiar under these

17   circumstances.

18        And then we go back to the functional purpose of the

19   exclusionary rule, which is to suppress probative evidence.  We

20   do that because we want to encourage deterrence.  How does that

21   do that here?  It says to any agent, first, you have got to

22   read the F.3d more carefully than District Judges do in a more

23   timely fashion.  Second, even if there is a uniform decision of

24   the Circuits, three, you have got to be afraid that there is

25   going to be some change somewhere, lest you subject yourself to

1     exclusion.

2          MR. ERKAN:  Let me turn back, for a moment, Judge.

3     What the Court began with was a statement of the black-letter

4     law associated with the Davis opinion, which was that where the

5     police are acting in strict obedience to binding appellate

6     precedent, then the good-faith exception would apply, the

7     rationale behind the exclusionary rule would not.  There was no

8     binding First Circuit precedent of any kind.

9          THE COURT:  I understand that.  I am dealing with a

10    circumstance that is not directly covered by Davis.  I agree

11    with that.  And, of course, that distinction was teased out by

12    Justice Sotomayer in her concurrence.

13         But even the longest journey begins with the first

14    step, and so I look at this and say, is this a first step for

15    something else?  Why would it not be the first step for a way

16    of dealing with at least those cases in which there was

17    substantial appellate weight for a particular proposition upon

18    which the agents relied?

19         MR. ERKAN:  It's a slippery slope, Judge, because

20    then, when we talk about a standard of application of

21    substantial weight within the Circuits, the question then

22    becomes what is substantial, and then we would be quibbling

23    over perhaps what might be a majority or maybe a supermajority

24    of the Courts having a particular opinion, and that becomes,

25    then, more substantial.

1          THE COURT:  Judgment is always difficult unless you

2     have a bright and unwavering line, but it seems to me that here

3     we are presented with a conundrum of continuing a split in the

4     Circuits even after the new rule has been issued over the

5     question of remedy, because that is why I started with the

6     Ninth and the Eighth and the Seventh, because there I think you

7     would be dead in the water.

8          MR. ERKAN:  In the Eighth Circuit, sure, I understand.

9          THE COURT:  And in the Seventh and in the Ninth.

10         MR. ERKAN:  Yeah.

11         THE COURT:  So, then, why is it that the other

12    Circuits should not recognize or the Courts should not

13    recognize at least when -- I will say substantial weight -- I

14    can say good faith -- good faith could encompass any colorable

15    basis for pursuing it.  That may take it a little bit far.

16    That is the next case, maybe.  I could use the grounds for

17    immunity, or I could use -- I say "I" could, but the rule of

18    decision could be the rule for *habeas corpus* for 2254 purposes,

19    whether or not there is a Supreme Court case law to the

20    contrary at the time that they deal with it.

21         But this much is clear, we are going to have to draw

22    the line.  You say the line is to be drawn at the point at

23    which the matter is being heard.  That is, now I know what the

24    Supreme -- well, I have an idea of what the Supreme Court has

25    in mind.  The larger implications of Jones, I think, will be a

1    generation in working out, including whether or not it requires

2    a warrant at all, and there may be alternative grounds for at

3    least some of the evidence in this case getting in in

4    inevitable discovery and those kinds of things.

5           But I think at the outset I have to figure out what

6    the proper standard would be for exclusion in circumstances in

7    which the appellate case law was uniform up until the last

8    minute.

9           MR. ERKAN:  Again, Judge, you are describing the case

10   law as "uniform."  How many Circuits are there, Judge?  I mean,

11   there were three that had ruled.

12          THE COURT:  Right.  Well, there was nobody to the

13   contrary.  I used to remember an Assistant U.S. Attorney who

14   would always argue, when things seemed a little grim for his

15   legal position, that he knew of no law to the contrary, which

16   generally was an indication of his knowledge of the law and

17   less about the state of the law.  But the state of the law we

18   know here is that there is no case to the contrary, and there

19   are three reasoned decisions, not throwaway decisions, reasoned

20   decisions by -- I am not ranking appellate judges -- but

21   scholarly and thoughtful judges on this across something of a

22   spectrum.

23          MR. ERKAN:  So, the standard that the Court would

24   create, then, is if it looks like it is going that way amongst

25   the Circuits, as this issue is emerging -- and clearly it was

1    an emerging issue, Judge.

2         THE COURT:  Well, I think it was *in utero* at this

3    point in terms of the Circuits.  It did not emerge, actually,

4    as a Circuit matter until three days before the GPS was taken

5    down here.

6         MR. ERKAN:  Yes.  So, the issue is, as the Court

7    describes, it's *in utero*, other Courts had not passed on the

8    subject, and so the Court's standard would be, if so far it

9    looks like the Government's winning the race, then just go

10   ahead and do it, go ahead and ignore the warrant requirement.

11        THE COURT:  Well, no.  I pause because I think this is

12   a fruitful area for discussion.  I think it is more along the

13   lines of does someone have a substantial basis for their

14   position?  I say "substantial."  Somebody could say "good-faith

15   basis," someone could say "colorable basis," somebody could

16   say, "Until three days before, I knew of no law to the

17   contrary."  But I think the standard would be substantial

18   basis, or at least the one I am toying with on this, and I do

19   not know why that would not be a useful one.

20        If I thought that people were looking for a straw in

21   the wind or they found, not to depend too much on the hierarchy

22   of the Federal Courts, but a one-line order from a Magistrate

23   Judge in a report and recommendation and said, "That is enough

24   for me to slap that GPS on," I would feel differently.  But

25   that is not this.  This is one in which the issue was teed up

1    to a fairly substantial degree, and, frankly, but for the

2    accident of timing this would have been unanimous all the way

3    through, the accident of timing being three days before Maynard

4    comes down out of the D.C. Circuit.

5            MR. ERKAN:  I understand what you're saying.

6            THE COURT:  To focus this some more -- I will

7    obviously hear what else you want to say about this -- but your

8    rule is the Supreme Court has spoken, this case was under

9    advisement -- or this case was proceeding during the time in

10   which the Supreme Court spoke, and so you have to follow the

11   Supreme Court law; you do not follow the Ninth Circuit law or

12   defer to Ninth Circuit law or Eighth Circuit law or Seventh

13   Circuit law.  That is the crux of what you have to say, isn't

14   it?

15           MR. ERKAN:  No.  My job is much more than that, Judge,

16   I would say.  It's not just to say that the Supreme Court

17   decided this, so we win.  My job is to say what should have

18   been done to begin with.  Putting aside the issue of the fact

19   that there was no binding precedent in the First Circuit, none

20   at all, the question then becomes is the purpose of the

21   exclusionary rule furthered by suppression in this case?  And

22   my answer to that question is absolutely, Judge, because at the

23   end of the day we haven't talked about one important thing:

24   Why didn't they get a warrant?  Why?  What was the reason?

25           THE COURT:  But that is always a question, and the

1    answer to that can be, "Because we did not need to," or one can

2    say, "We are entitled to make our own judgments about what is

3    practical and worth the exercise of resources."

4         Now, it should not be a game.  It should not be, "I

5    will see if I can get away with it until I cannot get away with

6    it anymore," but if there is case law out there that people

7    could rely on and their colleagues in other Circuits reasonably

8    do rely on it and can continue to, at least prior to Jones, for

9    any actions prior to Jones, then I do not know why the rather

10   extreme remedy of exclusion should be deployed.

11        We are talking about the transition period, really.

12   If they are doing GPS now, God help them, but we are talking

13   about this case in which they were doing it in at least the

14   shadow of three Court of Appeals decisions, and I just do not

15   know what gets served for applying the exclusionary rule in

16   this circumstance.

17        MR. ERKAN:  The lesson learned here is that if there

18   is ever a question we should always follow the Constitutional

19   preference for a warrant, if we are able to.  That is the

20   lesson that needs to be taught to the Government.

21        THE COURT:  Well, you say it is the "Constitutional

22   preference."  I do want to say it is not a Constitutional

23   preference.  We have developed more than a little bit of case

24   law which has said that reasonable searches and seizures depend

25   upon warrants, unless they do not, and then we have lengthy

1    numbers of exclusions from that requirement.  I do not know

2    what the sequence will be of issues arising out of Jones, but

3    it is likely to include is it unreasonable not to have a

4    warrant here?  It is a Fourth Amendment violation, but it is

5    unreasonable, or can you get away with reasonable cause,

6    probable cause, even if you do not have a warrant?  And I think

7    that it is likely to end up with a warrant requirement, myself.

8              MR. ERKAN:  I didn't hear the Court.

9              THE COURT:  It is likely to end up with a warrant

10   requirement, myself.  But it is still an open question.  It is

11   not warrant or not.

12             MR. ERKAN:  I understand it's an open -- I do agree

13   that it's an open question, but I think that your Honor, and

14   myself and people who are reflective on the law are going to

15   understand that a warrant is probably going to be required

16   by --

17             THE COURT:  So, then let us assume that we do, let us

18   assume you have got me on that one in the next case.  Now the

19   question is why for these narrow groups, this narrow group of

20   cases, of which Baez is one, which are before Jones and were at

21   least initiated, and for all intents and purposes completed,

22   when the case law was uniform in the Circuits, we should

23   exclude?

24             MR. ERKAN:  Judge, with respect to this group of cases

25   that are occurring before Jones and after some Circuits had

1    said that this was legal, the question still becomes, and I

2    think the Court needs to focus on whether or not we should take

3    another chunk out of the exclusionary rule, which remains the

4    last stand for the Fourth Amendment in America.

5         THE COURT:  Well, maybe.  It is certainly the only

6    remedy that seems to have much in the way of teeth.  On the

7    other hand, it is one of those remedies that makes people

8    queasy to say that the defendant must go free because the

9    constable stumbled.

10        MR. ERKAN:  Or maybe because the constable was

11   arrogant, or maybe because the constable thinks that he didn't

12   need it.

13        THE COURT:  Whatever, but the focus becomes the

14   constable, not the criminal.

15        MR. ERKAN:  Right.

16        THE COURT:  For example, that is why we have qualified

17   immunity rules for the civil version of this.  People would try

18   to say with a straight face that you could enforce the Fourth

19   Amendment by civil 1983 or Bivens actions.  They should be

20   embarrassed to say that nowadays, because you cannot, and the

21   reason that you cannot is that you have got immunity, and what

22   does immunity mean if this person has got some grounds there we

23   are going to say no harm, no fowl.

24        Why shouldn't we do that in the criminal case, in the

25   criminal setting?  You say it takes a chunk out of the

1    exclusionary rule.  It does.  A bite, a morsel, but it takes a

2    chunk.  Why not?  Because if we step back and say what are we

3    doing in a criminal case, well we are trying to determine

4    whether or not somebody is guilty, and we are trying to use

5    probative evidence.  This is not beating up a suspect to get a

6    confession.  This is evidence that is out there that was

7    obtained by a technique that was considered to be legal up

8    until a relatively short time ago.

9            MR. ERKAN:  But we want to do so, we want to arrive at

10   the truth in an orderly fashion in a country that holds dear

11   our freedoms --

12           THE COURT:  No question.

13           MR. ERKAN:  -- and I think nobody would contest that.

14           THE COURT:  We do not contest it.  So, now we are

15   talking about the balance, and I want to understand, other than

16   that the exclusionary rule gives a balanced advantage to a

17   defendant, what other justification is there here for

18   maintaining the exclusionary rule for this narrow band of

19   cases?

20           MR. ERKAN:  To understand the Court's question, is the

21   Court asking me why suppression would be justified in this fact

22   pattern or this case?

23           THE COURT:  Yes, in this fact pattern and in this

24   context for this duration, that is, the cases that were in the

25   system at the time that Jones came down.  No question that

1    after Jones came down if they were engaged in this kind of

2    activity it would be a Fourth Amendment violation.  What that

3    means in terms of remedy is still to be developed, but I think

4    it is likely to be as you suggest, that there probably has to

5    be some sort of a warrant, or there should be.  There is no

6    real overwhelming difficulty to go get a warrant under these

7    circumstances.  But now we are talking about that band of

8    cases.

9             MR. ERKAN:  Right, right.  If I might just speak on

10   that point, Judge, in our opinion, with respect to this narrow

11   band of cases, we are dealing with a situation where -- I know

12   that the Court thinks or perhaps is viewing this in some way

13   that there was substantial precedent for this, but what I think

14   that the Court is overlooking, and maybe you and I are going to

15   just disagree on this point, and that's okay, but the fact that

16   the issue of GPS surveillance is something that was very much

17   in flux and was very much touching upon the hearts and minds of

18   Americans was something that was a subject of disagreement, if

19   not in those first three Circuits it is certainly in the states

20   in the form of the legislatures of the states, certainly in the

21   form of the decision law that was handed down in various states

22   for years suggesting that there was an expectation of privacy,

23   at least, in the --

24            THE COURT:  That may be so.  I am not throwing the

25   states out entirely, but even if the states had held that, even

1    if Massachusetts had held that, ATF agents pursuing federal

2    criminal charges do not have to observe that law.  Maybe you

3    say it is part of the mix, I ought to look at this and say

4    there were jurists of reason who were taking this position,

5    there were legislators who were taking this position, there

6    were obviously constituents who were agitated about all of

7    this, do not just rest on three middle-aged guys from the

8    Midwest and the Far West.  Nine middle-aged guys.

9         MR. ERKAN:  That's exactly the point.  It is the

10   failure to recognize the boiling pot that this was.  I am not

11   saying that they had to say, We are bound by Connolly.  I'm not

12   saying that the ATF agents here have to say they are bound by

13   Connolly, but they at least need to know and the prosecutors

14   who are advising the agents at least need to know of the

15   existence of Connolly, they need to know of the existence of

16   other state laws which are rapidly being passed to dismantle

17   the Government's ability to secretly surveil and record this

18   type of information using GPS devices by the legislature and by

19   the judiciary of various states and the public opinion on this

20   point.  Because even then, Judge, even during these times, we

21   were all talking Katz, that's what we were talking about, and

22   the reasonable expectation of privacy.

23        THE COURT:  I do not mean to diminish it, but talk is

24   cheap, even by me.  What counts under Jones is what the Circuit

25   Courts are saying.  That is the core.  Because otherwise we

1    would all be looking at stirring pots or boiling kettles or

2    chitchat in the law reviews.  That is not a useful way, I

3    think, to find something reliable for purposes of making these

4    determinations.

5         MR. ERKAN:  But the chatter, particularly when we are

6    talking about reasonable expectation of privacy under a Katz

7    analysis, we need to look at what society is viewing as

8    reasonable when we are determining whether or not putting a GPS

9    device in a car is lawful.

10        THE COURT:  You look at Justice Alito's approach, both

11   in his opinion and also in the oral argument, and I think among

12   the boiling pots is the continued durability of Katz itself as

13   a way of dealing with issues like this in a society in which

14   there is a wide range of expectation concerning privacy.  So,

15   rule-making here becomes a pretty demanding kind of thing.

16        MR. ERKAN:  Right.  And I guess then, Judge, what I

17   ask the Court to do is to return to the basics.  Even if all

18   the Judges were wrong, even if everybody in those three

19   Circuits that decided this case were wrong, even if all the

20   Judges that were deciding or that maybe in the future were

21   going to decide according to Maynard were wrong, you still

22   can't ignore the fact that Justice Scalia, using a scholarly

23   approach, reviewed this and turned back to what has always been

24   a vital but perhaps forgotten part of Fourth Amendment law, and

25   that still governs here.  So, if we are going to allow the

1    Government to take their chances, they must accept the

2    consequences.

3         THE COURT:  But a way of testing that is to say could

4    Jones successfully bring a trespass action against the agent

5    who put the device on his car, I guess in Maryland, even

6    against the low standard of by a fair preponderance?  And I

7    think not.  So, now we are talking about whether or not the

8    remedy that you choose or you prefer for this purpose is one

9    tailored to these kinds of concerns, and that is where I have

10   the issue.

11        I understand fully that the exclusionary rule may well

12   be the last best chance for enforcement.  On the other hand,

13   there are countervailing interests when there are matters in

14   dispute, and drawing that line is, it seems to me, a fairly

15   important issue.

16        So, I guess I understand you, and you can tell me

17   otherwise, but you would draw the line of whether it is a

18   binding precedent in this Circuit, and, if not, what the

19   Supreme Court says goes in a case like this that is ongoing.

20   This is not Stone versus Powell, this is not Mr. Baez coming

21   back and saying, "I want the benefit of Jones, even though I

22   have got a final conviction."  He is in the middle of arguing

23   this; he teed it up well before Jones was decided.  But that

24   seems to be your rule, unless you tell me there is another rule

25   you are asking for.

1          MR. ERKAN:  Again, Judge, only the future can tell,

2     but I question how far anybody is going to expand Davis.  I

3     personally question how far anybody is going to expand Davis

4     beyond the fact pattern of a very established, well-established

5     rule of law.  But, at a minimum, I would say and stand by no

6     binding precedent in the First Circuit, no binding precedent by

7     the Supreme Court of the United States of America, take your

8     chances at your peril.  And, in particular, Judge, where the

9     Government is concerned about making sure that they are

10    obtaining solid convictions by lawful searches and seizures of

11    evidence, that they will take every precaution to make sure

12    that they are not going to have a lawyer like me standing here

13    one day saying that they were wrong.

14          THE COURT:  Well, no.  People have their own calculus

15    of risk and return, and I am not certain that there was even

16    uniformity, I am pretty certain that there was not uniformity

17    within the Federal Government and its agencies about doing

18    this.

19          MR. ERKAN:  This is true.  Another point which

20    counsels toward the defendant's argument, Judge, is the fact

21    that perhaps other agencies within the Executive were more

22    prudent, and so by suppressing the evidence here, what your

23    Honor does is encourages prudence on behalf of the police to

24    obey the Constitution.

25          THE COURT:  Well, also you can say it encourages lack

1    of vigor or a kind of mealy approach.  But, in any event, I am

2    not sure one way or the other about that.

3              MR. ERKAN:  May I make a suggestion, Judge?

4              THE COURT:  Sure.

5              MR. ERKAN:  Craft your ruling along the lines of order

6    suppression because the Government did not act in good faith at

7    least because there was no need to obviate the search warrant

8    requirement in this case.

9              THE COURT:  But that says that you make the

10   determination in terms of whether or not there was a need.  Let

11   us assume that they said, "We need this for one night and there

12   is no Magistrate around," or, "it is hard to get to one.  We

13   will slap a GPS device on it."  That, then, becomes the factual

14   that challenges that rule.  It cannot be a rule, an

15   individualized rule, that says they could have gotten it, so

16   they should have, I mean if it was physically possible for them

17   to get it they should have, because then there will be

18   occasions on which it was not.

19             MR. ERKAN:  What I am saying, Judge, is it was

20   possible.  It certainly wasn't black-letter law that they could

21   put a GPS on a car.  It was possible.  There was no exigency.

22   Exclusion has vitality in that circumstance.

23             THE COURT:  I understand your position.

24             MR. ERKAN:  Thank you, Judge.

25             THE COURT:  So, Mr. Heymann, are you going to argue

1    this one?

2           MR. HEYMANN:  Yes.

3           THE COURT:  I mean this aspect of it.

4           So, what do I do with retroactivity?

5           MR. HEYMANN:  I'm sorry?

6           THE COURT:  What do I do with retroactivity under

7    these circumstances?  There is a whole body of retroactivity

8    law out there.  Do I just throw it out the window as a result

9    of Jones?  Jones is carefully limited to binding precedent

10   within the Circuit.

11          MR. HEYMANN:  Davis, you mean.

12          THE COURT:  Whenever there is a new rule there are a

13   number of different ways of dealing with retroactivity here,

14   and Jones, if it is read broadly, seems to cut across all of

15   that and just say, "All that stuff we worried about

16   retroactivity does not apply."

17          MR. HEYMANN:  Your Honor, I think your standard of a

18   substantial basis addresses and deals with that problem.  The

19   question here is one of good faith and one of deterrence.

20   Retroactivity is intended to be a deterrent response, and

21   deterrence here doesn't take place.

22          In the course of your discussion you were talking

23   about the consequences of mealy activity, but when you have

24   substantial basis as the standard, what you are doing is

25   saying, look, we are going to make this retroactive, we are

1    going to apply it to everybody who just wasn't acting in good

2    faith, which is the standard of Davis and Herring, that it

3    didn't have really solid ground.

4         THE COURT:  Well, perhaps with characterizing it as a

5    slippery slope, where does it end?  Is it one good opinion from

6    one good Circuit Court?  All Circuit Courts are above average,

7    so I am not going to be making those distinctions.  So, what is

8    substantial under these circumstances?

9         MR. HEYMANN:  Your Honor, I am not concerned by -- I

10   am, frankly, not concerned by the issue of the slippery slope.

11   The slippery slope is one that says, look, if I am going to do

12   one, I am going to do them all.  The Courts do have the

13   capacity to decide when there is enough, and it is a fair

14   question to ask.  If I may just continue?

15        THE COURT:  Of course you can, but let me just frame

16   this just a little bit more --

17        MR. HEYMANN:  Please.

18        THE COURT:  -- which is that the Courts make that

19   determination *ex post* and the agents are making it *ex ante* and

20   the importance of rules made *ex post* to guide agents *ex ante* is

21   considerable, and so if there is softness, or ambiguity, or

22   even rough edges in the rule that is announced, like

23   substantial, then the agents have a problem.  Maybe not one

24   that can ultimately lead to them being held personally

25   responsible, but they have got a problem in doing this, and it

1    provides no real support for the development of a system of

2    notice to the agents.

3            MR. HEYMANN:  This is a problem with which we

4    obviously have lived for decades in exculpatory evidence and

5    Brady and Giglio.  Up until very recently it's always been

6    looked at frequently retroactively, and the question has been

7    what do you do.  When there is not a bright-line rule, there is

8    an area in which everybody has to recognize there is a risk.

9    In fact, there is something of a spectrum.  It goes from

10   shouldn't do it because there is no guiding precedent to risky

11   area to substantial law, and you have got to be working at your

12   peril with the guidance, good, bad or indifferent, of the U.S.

13   Attorney's Offices and the various justice components in the

14   middle area.  But here -- and this is the one part that, as I

15   was listening to the discussion, doesn't quite come through.

16   Here there was a Supreme Court opinion.  It was Knotts.  It was

17   viewed consistently in the same way.

18           THE COURT:  Some of these Supreme Court decisions,

19   they choose the name to --

20           MR. HEYMANN:  To decide the conundrum that is going to

21   exist.  But there is a single case that is interpreted

22   uniformly by each of the Courts that are looking at it as

23   saying this kind of activity is okay.  That is different in how

24   substantial it is, how much you can rely on it, how much you

25   should be able to rely on it from a situation where not just

1    you have a question of whether lower courts or higher courts

2    but also whether what is going on is a weaving of ideas that

3    may be coming from different areas, maybe is a -- everybody is

4    trying to deal with the problem in a very different way.  That

5    makes the reliability much less substantial.

6           THE COURT:  Let us test it a little bit.  Let us

7    assume that you have got a majority of District Courts ruling

8    in favor of this but some ruling against.  Is that substantial?

9    You will take whatever you can get, I understand, but the

10   question --

11          MR. HEYMANN:  No, no. I was just going to describe it.

12   If an agent came into my office and said, "Can I do

13   something?", and I said, "Well, there are five District Court

14   cases from a variety of Districts around the country but no

15   Appeals Court cases, the answer is I would put that into the

16   concerned area.  I would say, "Look, we have not gotten this up

17   to the Court of Appeals," and the way that our common law

18   system works, the Court of Appeals have much greater weight

19   than the District Court opinions, and I would be saying, "Look,

20   it looks as if it's moving our way, the analysis looks right."

21   But if you ask me, I always put it with respect to lawyers.

22   Would I put my Bar ticket on it?  The answer is no, I would

23   not.  It's in that area where you have to be cautious.

24          THE COURT:  The agent is put in a position a little

25   bit like Harry Truman and economists.  He kept looking for a

1   one-armed economist, because whatever he got from the economist

2   he has was on the one hand, on the other hand.

3                          (Laughter)

4        THE COURT:  So, they are put in this awkward position

5   of should you go forward or not, and what that does is it says

6   how much do you want the defendant, is it worth it to you to

7   take this chance?  And that may be something that the

8   exclusionary rule is supposed to get, that is to say, we have

9   got these rules, they ought to be observed, and they should not

10  be inflected by the desire to get a particular defendant.  I do

11  not mean that in a selective-prosecution way, I just simply

12  mean, "We are hot on this guy now, we have done a whole series

13  of things and we think we have got him."  Now, under those

14  circumstances I do not know why he would not come in and get a

15  warrant anyway.  When you say it is risky, yes, it is risky.

16  It is not risky if you go in to one of the Magistrates or one

17  of the District Judges, and then you get -- it is not an

18  advisory opinion, you are asking for judicial action -- "here

19  is what we have got.  We think it is probable cause."

20       MR. HEYMANN:  Your Honor, I can't speak for 3,500

21  Assistant U.S. Attorneys across the country, but I can say that

22  in the situation that you posit, what happened in my office, my

23  physical office as well as my broader office, would be, no, if

24  it's a warrant situation you would get a warrant.  The

25  situation, though, comes up in three different contexts.  One

1    is the course of a standard investigation.  That is, you go get

2    a warrant.  Another is a crisis situation, there's somebody

3    held hostage, there's somebody -- you know, an extreme

4    situation.  Do you take a risk because you are trying to save a

5    life?  Frankly, that happens once every couple of years.  The

6    third situation, though, is one where the agent has already

7    done it and then you find out about it, and the question is

8    would you defend it under that circumstance?  And the answer

9    is, if there were five District Court opinions that seemed well

10   reasoned, if it had already been done we might defend it.  But

11   that is different from would we tell the agent do it, if the

12   agent came for advice, would we support it, would we give him

13   the cover of having another aspect of good faith, have you

14   checked with a lawyer to see whether it's good?  The answer is

15   we would tell him, "No, you need a warrant."

16           THE COURT:  Right.  So, why don't we do it here?

17   Mr. Murat makes the point I think --

18           MR. ERKAN:  It's Erkan, Judge.

19           THE COURT:  I am sorry.  Did I use your first name, is

20   that it?

21           MR. ERKAN:  That's all right.  It happened yesterday

22   too, Judge, so it is not infrequent.

23           THE COURT:  I have trouble with my own name, I should

24   tell you.

25                         (Laughter)

1          MR. HEYMANN:  Just to put it on an even balance, you

2     can call me "Mr. Steve."

3          THE COURT:  I was going to call you "David," but that

4     is a different thing.

5          MR. HEYMANN:  That is a different thing, yeah.

6                         (Laughter)

7          THE COURT:  If you go back to the fundamental, which

8     is, why not get a warrant on almost every one of these things,

9     I do not know a reason why you could not get a warrant.  This

10    is not so difficult or unusual.  You have got bits and pieces,

11    which may even be probable cause, probably are.  If I were to

12    look at it, I might say it is probable cause.  That is enough

13    for me to let you slap a GPS device on him.  Why not?  And if

14    the answer is, "We do not have to," I understand it, but it

15    does not address the larger issue of encouraging the use of a

16    neutral and detached Magistrate in the evaluation of various

17    kinds of highly intrusive -- they were highly intrusive before.

18    Now that the Supreme Court knows that you can actually put it

19    on top of their car too, it is viewed as "overwhelmingly

20    intrusive" -- form of investigation.  I just do not understand

21    why you would not be saying, why one would not say that is a

22    sufficient deterrent, that if it is close, get a warrant.

23         MR. HEYMANN:  Your Honor, investigatively we operate

24    within a series of rules that we understand the Supreme Court

25    and often the state or federal legislatures, in our case, have

1   established.  The same thing that the Court is now suggesting

2   could be said about automobile searches.  The Supreme Court has

3   said, no, you do not need a warrant for an automobile search.

4          THE COURT:  But they have been drawing the lines in

5   various ways.  So, what you want to deter, it seems to me,

6   among the things you want to deter, is the reflexive "I am not

7   going to need a warrant here" kind of approach.

8          MR. HEYMANN:  As the Court suggested earlier, I know

9   this Court is suggesting it differently now, but this was not

10  reflexive.  This was throughout this based on a very solid line

11  of cases by appellate courts following exactly the same

12  reasoning that seemed to have been established by an earlier

13  Supreme Court case.  So, it was not a reflexive action, it was

14  trying to act within the rules as they were understood.  In

15  fact, these particular officers, as I pointed out in our brief,

16  were bending over backwards.  When they got Baez's car they

17  didn't do an inventory search, they didn't do a search based

18  solely on probable cause.  They went and got a warrant.  So,

19  when they thought they needed a warrant they got a warrant, but

20  here the rules seem to be something different.

21         THE COURT:  Maybe it is not a fair way to say, when

22  they did a good job on 90 percent of the searches that they

23  did.  But they did not need a warrant to do an inventory

24  search, did they?

25         MR. HEYMANN:  They didn't need a warrant.

1          THE COURT:  That is going to be your inevitable

2     discovery suggestion at some point.

3          MR. HEYMANN:  That's right.

4          THE COURT:  So, going for things you do not need seems

5     to me to be the Fourth Amendment equivalent of Judge Selya's

6     line about the supererogatory.

7          MR. HEYMANN:  You certainly should not be punished for

8     going for things you don't need in this case.

9          THE COURT:  Nor, frankly, should you necessarily be

10    acclaimed for it.  The question is what do I do for this kind

11    of investigative initiative, and where do I draw a line for the

12    small group of cases?  I say "small group of cases."  It is the

13    cases that are already in the pipeline and have not reached

14    finality yet.  That is the role of retroactivity.  That is why

15    I get back to that.  Justice Breyer's dissent has not a little

16    force in this context, and one could say that the --

17         MR. HEYMANN:  Your Honor, the dissent in Davis?

18         THE COURT:  Yes.  One could say that the bright line

19    should be if there was binding precedent it would have been

20    binding on -- even the District Court had thought otherwise in

21    the Seventh Circuit or the Eighth Circuit or the Ninth

22    Circuit -- that is okay.  But when you get into the gray area,

23    then we are going to use the law of retroactivity.  That is a

24    way of dealing with that.

25         Now, there is no real indication, except Justice

1    Sotomayor's reservation emphasizing that this was binding

2    precedent in the Circuit to say that is where the line could be

3    drawn, but it is possible to say, it seems to me, that we

4    should not be nibbling away at the law of retroactivity unless

5    we have firm ground, and firm ground here is binding precedent

6    in the circuit or the Supreme Court.

7              MR. HEYMANN:  If you adopt that rule you are moving

8    away from the standard of Herring, away from the standard of

9    Davis that say if you have objective good faith that there

10   should not be suppression, and even a stronger standard, unless

11   there is a deliberate reckless or grossly negligent activity

12   you shouldn't have suppression.

13             THE COURT:  If, for instance, they did a standard,

14   garden-variety search of a house, good faith would not be

15   enough.  In fact, I suppose you could say, well, there is no

16   good faith in doing it without it.

17             MR. HEYMANN:  But there would be no good faith there,

18   because the law is very clear.  At the risk of sounding

19   sycophantish, which I do not want to do under these particular

20   circumstances --

21             THE COURT:  Well, if it is about me, I cannot wait to

22   hear.

23                        (Laughter)

24             MR. HEYMANN:  What was appealing about the Court's

25   substantial-basis standard is that somebody who -- because it

1    works so closely with the good-faith standard of Herring and

2    Davis.  If you have substantial basis you do have good faith;

3    if you do not have a substantial basis you are not acting in

4    good faith.

5            THE COURT:  Well, but I do not think that is

6    necessarily true, that is the coincidence of good faith and

7    substantial basis.  If we are doing Venn diagrams, I suppose

8    that there would be a big circle for good faith and then there

9    would be a portion of that that would be substantial basis.

10           MR. HEYMANN:  That's correct.

11           THE COURT:  But maybe not.  And certainly the case law

12   has not suggested that you need substantial basis before you

13   can have --

14           MR. HEYMANN:  A substantial basis would be a subset of

15   good faith that would -- where the nonoverlapping sections

16   would be those where, in effect, there was not the case law,

17   where the agent wasn't consulting.  I don't think that the

18   agent consulting -- I may be saying heresy here, but I don't

19   think the agent consulting with the U.S. Attorney's Office

20   alone establishes good faith.  I think that the agent also has

21   to understand that what the U.S. Attorney's Office is saying is

22   consistent with what she or he understands the law to be more

23   broadly.  I don't think we can simply say, "Oh, yeah, yeah, do

24   it," and then that's good faith.

25           THE COURT:  You cannot do it even with a Magistrate,

1    because if you have got some grounds for believing that the

2    Magistrate got it wrong that is good faith.

3              MR. HEYMANN:  That's correct.  It is a subset, it is a

4    narrowing subset, but it recognizes the tension between the

5    goal of the suppression remedy being deterrence of activity

6    versus what is simply a random benefit to the defendant.

7              THE COURT:  Well, I think it is overstating it to call

8    it "random benefit to the defendant."  It is a benefit to the

9    defendant, it is not random, and the reason for it is to

10   vindicate Constitutional rights for everybody.  As Frankfurter

11   said, "The development of our Constitutional rights in criminal

12   cases is the story of benefiting some not very nice people."  I

13   do not think that is going to deal with it for me, anyway.

14   What deals with it is what are we buying for this?  We are

15   buying this disappearance of probative evidence.  Is it worth

16   it to do that to vindicate Constitutional rights in this

17   circumstance?  That is the issue, and we recognize that it is

18   different after the Supreme Court rules than it is before.

19             MR. HEYMANN:  Your Honor, may I just change the second

20   part of that equation slightly?  The question is, is the

21   suppression of evidence worth buying the deterrence of activity

22   that should have been perceived as risky, wrongful or --

23   "wrongful" is overly strong, but I am trying to slide the

24   perspective -- and that is where the established case law in

25   the Seventh, Eighth and Ninth Circuits, the series of District

1    Court cases that are unanimous along the way, comes in.

2            THE COURT:  Right.  But you have contrary views

3    expressed outside of the federal system.

4            MR. HEYMANN:  But the contrary views -- contrary views

5    establish based on legislative and Constitutional differences

6    of smaller subsets of people deciding -- simply that there was

7    a differing view as to whether it was a good idea is different

8    from does not control in the Federal Circuit.

9            THE COURT:  Well, but you would not say that -- maybe

10   you would, but Knotts is your fallback.  On this one, maybe you

11   would say otherwise, but they did not reverse Knotts in this

12   setting because it was not directly on point.  There are

13   radiations out there, but it is not directly on point.  What

14   they did do is say that the Ninth, Seventh and Eighth were

15   wrong, and that, it seems to me, is a little bit different from

16   them trying to interpret the radiations from --

17           MR. HEYMANN:  In doing so, though, in moving away from

18   where the Seventh, Eighth and Ninth Circuits decided, there is,

19   as the Court recognized, unquestionably a ground shift in

20   theory.  It is abandoning Katz as a standard, which has been

21   around for 50 years and Judge Scalia's majority.  Even in Judge

22   Alito's minority, or not minority but concurring opinion, it's

23   a ground shift towards looking at Fourth Amendment law as

24   protecting volumes of information as well as locations which

25   have been the center of Fourth Amendment analysis forever.

1          As you ask whether or not there should be a deterrent

2     purpose here, there cannot be an expectation by the agents or

3     even the attorneys who they turn to for guidance as to whether

4     or not a particular activity has been approved sufficiently

5     well to anticipate such a radical shift in the form of

6     analysis.  Again, to whatever extent there was, at some point

7     Maynard comes down, at some point you have to decide, and at

8     the risk of talking out of school, we obviously had a meeting

9     around the office what are we going to do about this, but you

10    have to decide whether this case is an outlier or whether this

11    case is an indication of we need to reconsider whether the law

12    is as substantial, as solid as we think it is or thought it

13    was, to put it in the right tense.  But as the Court points

14    out, that happens substantially instantaneously with the end of

15    this particular case.

16         THE COURT:  All right.  Well, let me say this.  I am

17    going to resolve this before I go any further on the Motion to

18    Suppress, because it is the linchpin of the Motion to Suppress.

19    I hope not to take too much time, but I want to take this under

20    advisement for this purpose, and we will schedule further

21    hearings as becomes necessary here.

22         MR. ERKAN:  Thank you, Judge.

23         MR. HEYMANN:  Thank you, Judge.

24         THE COURT:  We will be in recess.

25         (The Honorable Court exited the courtroom at 3:40 p.m.)

1      (WHEREUPON, the proceedings adjourned at 3:40 p.m.)

2

3                      C E R T I F I C A T E

4

5           I, Brenda K. Hancock, RMR, CRR and Official Reporter

6      of the United States District Court, do hereby certify that the

7      foregoing transcript constitutes, to the best of my skill and

8      ability, a true and accurate transcription of my stenotype

9      notes taken in the matter of *United States v Jose Baez*,

10     No. 1:10-cr-10275-DPW.

11

12

13

14

15

16     Date:   March 24, 2013        /s/ *Brenda K. Hancock*

17                                   Brenda K. Hancock, RMR, CRR

18                                   Official Court Reporter

19

20

21

22

23

24

25