<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4    THE UNITED STATES OF AMERICA      )
                                        )
 5                                      )
      vs.                               )
 6                                      )  No. 1:10-cr-10275-DPW
                                        )
 7    JOSE L. BAEZ,                     )
                                        )
 8                        Defendant.    )

 9

10    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                      RULE 11/PLEA HEARING

13

14

15            John Joseph Moakley United States Courthouse
                          Courtroom No. 1
16                        One Courthouse Way
                          Boston, MA 02210
17                   Tuesday, August 28, 2012
                             2:25 p.m.
18

19

20
                      Brenda K. Hancock, RMR, CRR
21                       Official Court Reporter
              John Joseph Moakley United States Courthouse
22                        One Courthouse Way
                          Boston, MA 02210
23                         (617)439-3214

24

25
</pre>

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA David G. Tobin
3              AUSA Robert E. Richardson
          1 Courthouse Way
4         Suite 9200
          Boston, MA 02210
5         On behalf of the United States of America

6

          GORDON W. SPENCER, ESQ.
7         945 Concord Street
          Framingham, MA 01701
8         On behalf of the Defendant

9

          LAW OFFICES OF MICHAEL RUANE, LLC
10        By:  Michael P. Ruane, Esq.
          300 High Street
11        Andover, MA 01810
          On behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Tuesday, August 28, 2012):

7          THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 2:25 p.m.)

9          THE CLERK:  This is Criminal Action 10-10275,

10    The United States versus Jose Baez.

11         Will the interpreter please rise and raise your right

12    hand.

13              (Interpreter duly sworn by the Clerk)

14         THE COURT:  You may be seated.  Because of the

15    uncertainty in particular about representation, I did not want

16    to presume to decide whether to accept a plea in this case.

17         But perhaps, Mr. Spencer, you could give me a sense of

18    what the representational issues are.

19         MR. SPENCER:  Yes, Judge.  On behalf of the defendant,

20    Mr. Gordon Spencer.

21         I have been recently retained as a result, I believe,

22    of the adverse ruling in the Motion to Suppress.  My primary

23    function would be to assist Mr. Baez in representing him on any

24    appeal.  There has been some discussion with the Government.  I

25    believe that Mr. Baez seeks to tender a plea under Rule 11,

1    Section (a) Subsection (2), which makes his plea conditional.

2           I believe Mr. Baez has no objection and I don't

3    believe Mr. Ruane has any objection to me handling the plea for

4    the purposes of going forward and then for the purposes of

5    representing him on appeal.

6           THE COURT:  Well, I am not indisposed to doing

7    conditional appeals.  That is not the issue.  But there are

8    some things that I want to get straightened away.  One of them

9    was focused by the withdrawal or the dismissal of that part of

10   Count Four that alleges injury.

11          I guess a question for the Government is, is injury

12   going to come in through the backdoor now through the question

13   of relevant conduct?

14          MR. TOBIN:  No, your Honor.

15          THE COURT:  Then, how is injury charged?  Why was it

16   charged if it didn't exist?

17          MR. TOBIN:  Of course.  The four-count Superseding

18   Indictment alleges injury in two of the counts, 11 Firth Road,

19   which is Count One, and at the Whole Foods Market in Count

20   Four.

21          In preparing for the Rule 11 today, I reviewed the

22   indictment and I saw that Count Four, Whole Foods Market,

23   alleged personal injury.  That was placed in that count, Count

24   Four of the Superseding Indictment, in error.  There were no

25   personal injuries in the Cambridge fire at Whole Foods Market,

1    so there's nothing to get in through the backdoor, if you will.

2    There were no injures.  If your question is how did it get

3    there, I wish I could say simply a scrivener's error, but I

4    suspect it was a Dave Tobin error.  I don't know how it got

5    there, but I drafted it so I put it there.  It may have been

6    that I was cutting and pasting from Count One and it didn't get

7    taken out.

8         But there were no injuries at Whole Foods.  There were

9    a number of injuries at 11 Firth Road, and so, of course, that

10   count stays as it was.

11        THE COURT:  All right.  Thank you.  And I understand

12   that, apart from the conditional quality of the plea, there is

13   no plea agreement in this case; is that right?

14        MR. TOBIN:  That is correct, there are no agreements

15   whatsoever; and, of course, as the Court knows, the Government

16   has filed a consent to reservation of right of appeal.

17        THE COURT:  Well, I am prepared to go forward with the

18   plea at this point, and I will ask Mr. Baez some questions.

19        THE CLERK:  Please rise and raise your right hand.

20             DEFENDANT JOSE L. BAEZ DULY SWORN BY THE CLERK

21        THE COURT:  You may be seated, Mr. Baez.

22        Mr. Baez, the purpose of this hearing is to satisfy me

23   that what appears to be your intention to plead guilty, subject

24   to reservation of your right of appeal with respect to one

25   aspect of this case, is a knowing and voluntary act.  In order

1     for me to make that kind of determination, I have to ask you

2     some questions, and some of those questions are personal in

3     nature.  You will understand I am not trying to delve into your

4     personal life except as it makes it possible for me to decide

5     whether or not you know you are doing and what you are doing is

6     voluntary.

7               Do you understand?

8               THE DEFENDANT:  Yes.

9               THE COURT:  Do you understand that as things now stand

10     you are going to be pleading guilty to a Superseding Indictment

11     that alleges four counts of arson?  There is a carveout that

12     the Government is apparently prepared to make of one part of

13     Count Four that alleges personal injury in connection with one

14     of the fires.

15               But apart from that, I am told that there is no

16     agreement between you and the Government; is that right?

17               THE DEFENDANT:  Yes.

18               THE COURT:  Did anybody threaten you in any way to get

19     you to plead guilty?

20               THE DEFENDANT:  Did what?

21               THE COURT:  Did anybody threaten you in any way to get

22     you to plead guilty?

23               THE DEFENDANT:  No.

24               THE COURT:  Did anybody promise you something other

25     than that you get the right to appeal with respect to that one

1    issue, that is, the issue of suppression, and you know that the

2    Government is going to be dismissing -- has dismissed a part of

3    Count Four.

4           Did anybody promise you anything else in connection

5    with this plea?

6           THE DEFENDANT:  No.

7           THE COURT:  Can you tell me how old a man you are?

8           THE DEFENDANT:  How old I am?

9           THE COURT:  Yes.

10          THE DEFENDANT:  Forty.

11          THE COURT:  How far did you get in school?

12          THE DEFENDANT:  Eleventh grade.

13          THE COURT:  Where was that?

14          THE DEFENDANT:  JP High School.

15          THE COURT:  What have you been doing for a living for

16   the past 10 years or so?

17          THE DEFENDANT:  I used to work for Stop & Shop

18   Supermarket.

19          THE COURT:  Doing what?

20          THE CLERK:  A cashier for 13 years.

21          THE COURT:  Do you have any problem understanding what

22   the Government is accusing you of here?

23          THE DEFENDANT:  If I have any problems?

24          THE COURT:  Yes.  Do you have any problem

25   understanding what it is that the Government is accusing you

1    of?

2              THE DEFENDANT:  No.

3              THE COURT:  You understand --

4              THE DEFENDANT:  Yes, I understand.

5              THE COURT:  -- that this is arson?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Now, I am going to ask Mr. Tobin to tell

8    us briefly what the sentence could be in this case, that is,

9    the maximum sentences for each of the counts of this

10   indictment, so that you fully understand that.

11             MR. TOBIN:  Your Honor, pursuant to 18 United States

12   Code, Section 844(i), Arson carries a mandatory minimum term of

13   imprisonment of 5 years, 60 months -- excuse me -- a minimum

14   term of imprisonment of 5 years or 60 months and a maximum term

15   of imprisonment of 20 years.  There is a maximum fine potential

16   of $250,000 and a maximum --

17             THE COURT:  On each of the counts?

18             MR. TOBIN:  On each of the counts.  This would be for

19   each of the four counts.  And a maximize term of supervised

20   release of 3 years and a mandatory Special Assessment of $100.

21             I can say also as well, your Honor, that because Count

22   One alleges personal injury resulting from the arson, that

23   there is an additional 2-year minimum mandatory sentence that

24   would run from the 5-year mandatory minimum.  In essence, then,

25   the mandatory minimum sentence is 7 years, and I suppose the

1    maximum sentence would be 40 years for the count where there is

2    injury, and then, as I said earlier, 20 years for the other

3    three counts.

4         THE COURT:  So, Mr. Baez, you understand how serious

5    this is.  We are talking about, in any case, a minimum

6    mandatory sentence of 7 years and the potential on Count One of

7    as much as 40 years in prison.

8         Do you understand that?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Now, one of the things that happened

11   during the course of the proceedings here is that I ruled on

12   the question of the Motion to Suppress, and I decided that I

13   would not suppress the evidence, and that is the issue that you

14   want to take up on appeal.  But after I did that, you brought

15   in new counsel.

16        Do you feel that you know enough about what is

17   involved in pleading under these circumstances and have had

18   enough opportunity to consult with all the counsel that you

19   have had to make a decision to plead guilty here?

20        THE DEFENDANT:  Yes, I have.

21        THE COURT:  And do you feel that you have received all

22   the legal advice that you need to make your own decision about

23   pleading guilty?

24        THE DEFENDANT:  Yes.

25        THE COURT:  Have you ever had any problem with

1    substance abuse, either drugs or alcohol?

2           THE DEFENDANT:  No.

3           THE COURT:  Are you taking any prescription drugs at

4    this point?

5           THE DEFENDANT:  No, I don't.

6           THE COURT:  Are you under the care of a physician for

7    any kind of physical problem?

8           THE DEFENDANT:  No.

9           THE COURT:  Have you ever had an occasion to consult

10   with a mental health professional, by which I mean a

11   psychiatrist, a psychologist, a psychiatric social worker or

12   anyone who deals with mental health concerns?

13          THE DEFENDANT:  With a psychiatrist in the months

14   where I'm detained.

15          THE COURT:  I'm sorry.  I didn't understand what you

16   said.  You have had some occasion to consult with a mental

17   health professional?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Just tell me briefly when that was and

20   what kind of issues you were dealing with.

21          THE DEFENDANT:  It was, like, three months ago.

22          THE COURT:  And what was the general issue that you

23   were concerned with?

24          THE DEFENDANT:  Oh, it was like anxiety, things like

25   that.

1      THE COURT:  Arising from this case?

2      THE DEFENDANT:  I'm not sure if it was from this.

3      THE COURT:  Did you have occasion before that to

4  consult with any mental health professionals or feel that you

5  should?

6      THE DEFENDANT:  No.  That was the first time in my

7  life.

8      THE COURT:  Now, you understand from all of this that

9  this is a very serious matter that you are pleading guilty to,

10  and it has important consequences in terms of the sentence that

11  could be imposed, and you are leaving it to me to decide what

12  the sentence should be within the maximums, and the maximums

13  are pretty high in this case.

14      Do you understand that?  You are leaving it to me?

15      THE DEFENDANT:  Yes.

16      THE COURT:  And I am going to do that in light of what

17  are called the *Sentencing Guidelines*.  They are a series of

18  directives to me that tell me what the range of sentences could

19  be for someone with your background who has committed these

20  kinds of offenses and I will make various calculations about

21  them, and I suspect that your lawyers have done that already

22  and given you some sense of what they think the *Sentencing*

23  *Guidelines* are going to be.  Is that right?

24      THE DEFENDANT:  Yes.

25      THE COURT:  But I am not bound by the *Sentencing*

1    *Guidelines*.  I will make my own decision about what the

2    sentence is going to be within the limits of the statute.  In

3    order to do that, I am going to look as well to the principles

4    of sentencing, and I will make a judgment about what I think

5    the proper sentence should be in this case.  I want to be clear

6    about this, that once I impose a sentence, if I accept your

7    plea you do not get to withdraw it, you are stuck with it.

8              Do you understand that?

9          (The defendant conferred with counsel off the record)

10             THE DEFENDANT:  Yes.

11             THE COURT:  So, what I am going to be doing is

12   listening to see whether or not you can properly plead in this

13   case.  I will accept a plea, presumably, in this case.  You

14   have the right to appeal in connection with that plea, but if

15   you are unsuccessful on the appeal, or you do not like the

16   sentence I impose, you do not get a right to withdraw your

17   plea.

18             Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Now, you do not have to plead guilty at

21   all.  In our system of justice, a person who is accused of a

22   crime is presumed innocent unless and until the Government

23   proves beyond a reasonable doubt each essential element of the

24   offense charged against that individual.  What that means is

25   you do not have to do anything at all.  You can sit back, you

1     can look Mr. Tobin straight in the eye and say, "Prove it," and

2     unless and until he does you cannot be found guilty.

3            Do you understand that?

4            THE DEFENDANT:  Yes.

5            THE COURT:  You are giving up the right to force the

6     Government to its proof against a very high standard, proof

7     beyond a reasonable doubt, under circumstances in which you are

8     clothed with the presumption of innocence.

9            You are giving all of that up.  Do you understand

10     that?

11            THE DEFENDANT:  Yes, yes.

12            THE COURT:  And you have the right to challenge the

13     Government's case.  You or your lawyers could cross-examine the

14     Government's witnesses.  You could bring in witnesses on your

15     own behalf.  If they would not come in here voluntarily, I

16     would give your lawyers court process to force them to come in

17     here.

18            And you could take the witness stand yourself and tell

19     your side of the story, or you could choose not to, and if you

20     chose not to I would tell the jury, and I would observe this

21     principle myself, that we cannot hold that against you.  That

22     is another very valuable Constitutional right that you have,

23     the right to remain silent in the face of criminal accusation.

24     You are giving all of that up by pleading guilty.

25            Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And you understand that it is going to

3    affect other aspects of your life and the problem of going to

4    prison for a period time.  It may mean that you lose your civil

5    rights, the right to vote, the right to hold public offices,

6    the right to serve on a jury, the right to have a firearm.  All

7    of those things could be affected by your plea of guilty.

8          Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And it may affect other things as well.  I

11   do not know what your immigration status is, but I am required

12   to tell you that, based on an offense like this, if you are

13   vulnerable for immigration purposes you could be deported or

14   excluded from the United States as a result of this conviction.

15          Do you understand that you are facing that as well,

16   the prospect of that under certain circumstances?

17        (The defendant conferred with counsel off the record)

18          THE DEFENDANT:  Yes.

19          THE COURT:  Now, you have reserved the right to appeal

20   on the Motion to Suppress, and the Motion to Suppress would

21   have affected the admissibility of evidence that could be

22   submitted in this case.  But the Government indicated that they

23   would go forward even if some of the evidence was suppressed in

24   this case.

25          But I want to be sure that you have explored all of

1   the potential strategies that you might have, initiatives that

2   you might pursue, defenses that you might undertake in

3   connection with this case.  Have you had an adequate

4   opportunity to talk to your several lawyers about the various

5   kinds of defenses that you might have, various ways that you

6   might have of challenging the Government's case?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Do you feel that you know enough about

9   what is available to you to decide to plead guilty under these

10  circumstances?

11          THE DEFENDANT:  Yes.

12          THE COURT:  One of the things I have to satisfy myself

13  about is whether or not the Government has proved beyond a

14  reasonable doubt, or is capable of doing so, each of the

15  essential elements of the offense charged.  The offense

16  charged, as we have been indicating, is one of arson, although

17  in the case of at least Count One there is an allegation that

18  the arson included personal injury to certain individuals,

19  including one of whom was a public service officer.

20          But the Government has to prove that you damaged or

21  destroyed or attempted to damage or destroy a building

22  described in the count of the indictment; that you acted

23  intentionally or with deliberate disregard of the likelihood of

24  damage or injury as a result of your acts; and that the

25  building that you destroyed or damaged or attempted to damage

1   was used in an activity affecting foreign or interstate

2   commerce.

3          Do you understand that those are the basic things the

4   Government has to prove beyond a reasonable doubt as to each of

5   the four counts here?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you have any questions of me of what

8   the elements are that the Government has to prove?

9      (The defendant conferred with counsel off the record)

10          THE DEFENDANT:  No.

11          THE COURT:  What I am going to do now is ask

12   Mr. Tobin to tell us, briefly, what the evidence would be in

13   this case if it went to trial.  I want you to listen very

14   carefully, because when he is through I am going to turn to you

15   and say, "Is that what happened?"

16          Do you understand?

17          THE DEFENDANT:  Yes.

18          MR. TOBIN:  Your Honor, if this case had gone to

19   trial, the Government's evidence would prove the following

20   beyond a reasonable doubt:

21          On April 29th, 2009, at approximately 3:52 a.m., the

22   Boston Fire Department responded to a fire at Jamaica Plain

23   Auto Body located at 12 to 18 Rock Hill Road in Jamaica Plain,

24   Massachusetts.  The Boston Fire Department Fire Investigative

25   Unit conducted an origin-and-cause investigation, which

1    revealed that the fire was incendiary or arson in nature.

2          The fire caused heavy smoke and water damage as well

3    as fire damage.  Remnants of numerous burnt tires and clothing

4    were discovered in front of each of the three garage bay doors.

5    The Boston Fire Department Fire Investigative Unit determined

6    that the fire had three points of origin, one in front of each

7    of the bay doors.  A review of surveillance cameras or camera

8    from a nearby business revealed that just prior to the fire a

9    four-door, dark-colored, older model Chevrolet Caprice with

10   silver accent trim drove down Paul Gore Street and turned onto

11   Rock Hill Road, the location of JP Auto Body.

12         The video further revealed that the vehicle had a

13   silver or light-colored steering wheel cover, silver spoke

14   wheel covers and a silver-colored emblem located on the left

15   side petition between the left rear door and rear windshield.

16         The video also revealed that prior to the Fire

17   Department arriving at the scene the vehicle's taillights

18   exited or *a* vehicle's taillights existed from Rock Hill Road,

19   driving down Paul Gore Street and out of view of the

20   surveillance camera.

21         Now, your Honor, the evidence would further show that

22   on July 31st, 2009, at approximately 3:58 a.m. the Boston Fire

23   Department responded to a fire at 21 Bay State Road in the

24   Kenmore Square area of Boston, Massachusetts.  The building, a

25   brownstone condominium complex, housed Back Bay Dental Care on

1    the first or basement level and residential units above.  The

2    Boston Fire Department Fire Investigative Unit conducted an

3    origin-and-cause investigation, which revealed that the fire

4    was incendiary or arson in nature.  The Boston Fire Department

5    determined that the fire originated inside of the front

6    vestibule of the building.  The fire caused extensive fire

7    damage.  Remnants of burnt tires and clothing were discovered

8    in the front vestibule area of the building, and ultimately

9    samples were taken from the rubble and the debris, and gasoline

10   was found -- the laboratory determined or found gasoline in

11   those remnants.

12          Now, also at that fire a nearby surveillance camera

13   revealed that just prior to the report of the fire on Bay State

14   Road a four-door, dark-colored, older model Chevrolet Caprice

15   with silver accent trim traveled down the rear alley behind

16   21 Bay State Road, the location of the fire, and a second

17   camera with a limited field of view captured the same vehicle

18   traveling on Bay State Road away from No. 21.  Additionally at

19   that fire an eyewitness observed a light-skinned or Caucasian

20   male about 6 feet tall in his early to mid-30s, according to

21   the witness, running from the location of the fire.  The

22   eyewitness observed the suspect enter a dark-colored mid-size

23   sedan and depart from the Bay State Road heading outbound at a

24   high rate of speed.

25          Now, your Honor, based on the body style and the

1    taillight configuration and the other characteristics of the

2    vehicles spotted on the surveillance film at the time of both

3    the JP Auto Body Fire and the Back Bay Dental fire, Boston Fire

4    Department investigators working with a special agent from the

5    Bureau of Alcohol, Tobacco, Firearms and Explosives went to the

6    Department or the Registry of Motor Vehicles in Massachusetts,

7    and they asked the Registry for a list of all cars that were

8    all Chevy Caprices from 1986 to 1989 that were registered in

9    and around Boston, with surrounding cities and towns included.

10        The Registry of Motor Vehicles provided information on

11   38 such vehicles.  The investigators and the special agent then

12   essentially looked at each and every one of the 38 vehicles in

13   question, the late model Caprice, dark-colored, and virtually

14   all of them were ruled out because they had distinguishing

15   characteristics, they didn't have the silver trim package, it

16   was a two-door versus a four-door, some of them were station

17   wagons, some had bumper stickers, and the ones in the videos

18   did not.  There may have been two, actually, but one of the

19   vehicles that matched identically, according to the agents, the

20   two seen in the surveillance films, belonged to this defendant,

21   Mr. Jose L. Baez, of Columbia Road in Dorchester.

22        At that point the investigators placed a GPS tracking

23   device on the exterior underneath a portion of the defendant's

24   vehicle as it was parked out in front of his home on Columbia

25   Road in Dorchester, and then for months and months, almost a

1   year, they essentially sat on that vehicle.  When I say that, I

2   mean they were able to monitor every time that vehicle was

3   activated and moved any appreciable distance.

4        That leads us to the third fire.  If I may have just a

5   moment.

6                              (Pause)

7        MR. TOBIN:  That leads us to the third fire, which was

8   on August 9th, 2010 at approximately 3:21 in the morning.  At

9   that time, Special Agent Oppedisano from the ATF was home and

10  off duty.  He was alerted, however, by his cell phone that the

11  defendant's car was moving.  There was a hookup from the GPS in

12  the computer to his cell phone, and Special Agent Oppedisano

13  was able to log into a special site on his laptop at his home

14  and actually see the progress being made by the defendant's car

15  that early morning on August 9th.

16       The computer revealed that the defendant's Caprice

17  traveled from Mr. Baez's residence in Dorchester directly t.

18  5 Bexley Road in Roslindale, Massachusetts, and the GPS records

19  indicated, and the jury would see this, that it was stationary

20  on Bexley Road from 3:27 a.m. to approximately 3:44 a.m.

21  Bexley Road runs parallel and is very close to Firth Road in

22  Roslindale.

23       Now, at that time a police officer from the City of

24  Boston who was working with the Boston Fire Department and ATF

25  was dispatched to Bexley Road to determine the purpose of the

1    defendant and his automobile's trip to that area of the city in

2    that early morning.  As that Boston Police Officer arrived at

3    Bexley Road, he saw a home on Firth Street fully engulfed -- or

4    engulfed in flames.  At that point, when he radioed that not

5    only to the Fire Department but he radioed it back to the

6    investigators at Boston Fire Department and to the special

7    agent with ATF, he was directed to go from the Bexley Road area

8    back to Columbia Road, and he was directed to do that because

9    at the time that he arrived at Bexley Road the GPS indicated

10   that the defendant's vehicle was leaving its stationary

11   position and was heading back in the general direction of his

12   home in Dorchester.

13         The officer then actually made it back to Columbia

14   Road, made it back to the defendant's residence before the

15   defendant and his vehicle did, or they actually, essentially,

16   got there at the same time.  The police officer from the City

17   of Boston saw the defendant's Caprice, saw it park, and before

18   the defendant could get out of the Caprice the officer went up

19   and engaged the defendant in conversation while the defendant

20   sat in his car.  The defendant rolled down his window, and the

21   officer could smell the smell of gasoline emanating from the

22   interior of the vehicle.  The officer talked with the

23   defendant, and the defendant had claimed he had gone to a

24   Dunkin' Donuts.

25         Given the information from the GPS, given that his car

1   matched the car in the other two fires, and given the smell of

2   gasoline, at that time the defendant was placed under arrest.

3          Now, shortly thereafter, your Honor, within a day, the

4   agents and the officers, with the assistance of the United

5   States Attorney's Office obtained search warrants for the

6   defendant's car and the defendant's house.  When those searches

7   were executed, your Honor, the evidence would be that the

8   defendant's trunk, the trunk of the Caprice, was filled with

9   full gasoline -- water bottles, if you will, that had gasoline

10   in them, a large red gasoline tank that had gasoline in it, and

11   then other water-tight bottles or Poland Spring bottles that

12   smelled of gasoline but were empty.

13          Now, most or many of these were ultimately sent to a

14   laboratory.  The fluid tested to be gasoline, and I believe

15   that there was also gasoline found in some of the empty

16   containers, if you will.

17          Additionally, there was a K9 dog who was brought in to

18   sort of detect or to look for gasoline smell or odor or

19   accelerant smell or odor in the car.  Alerted samples were

20   taken from the front passenger carpet and from the front

21   driver's area, the actual cushion.  Those would ultimately also

22   test positive for the presence of gasoline.

23          In the defendant's house, among other things that were

24   found was a slip of paper that mentioned Whole Foods Market in

25   Cambridge.

1          Now, after the two searches, the one in the car and

2     the one in the house, Special Agent Oppedisano went back and

3     looked at some of the GPS data, and he determined that on

4     numerous occasions, and some before this recent fire at Firth

5     Street, the defendant's vehicle had traveled to Ivory Street in

6     West Roxbury.  At that point, Special Agent Oppedisano and

7     another or additional numbers of investigators went to the area

8     where the GPS had reflected the defendant had traveled on more

9     than one occasion in the Ivory Street area of West Roxbury.

10          When they got to that location they detected or they

11     saw a two-family residence with a three-car garage behind it.

12     They actually saw an individual in front of that house, and

13     they went up and introduced themselves, and it turned out that

14     man was the landlord for that property, to include the garage,

15     and they asked the landlord, "Do you rent out any of these

16     bays?"  He responded, "Yes."  When they asked who was renting

17     it, he said, "A gentleman by the name of Jose Louie Baez."

18          At that point, the agents and the Boston Fire

19     Department personnel sought and received a search warrant for

20     the Ivory Street garage.

21          Now, in the Ivory Street garage, your Honor, they

22     found evidence to suggest that Mr. Baez had worked at Whole

23     Foods Market in Cambridge.  They specifically found his smock

24     from working there and his name tag.  They also found many,

25     many empty Poland Spring bottles.  They also found a stack of

1    tires.  They found various T-shirts and other clothing as well.

2         Now, one of the ATF, Alcohol, Tobacco and Firearms,

3    special agents who was privy to what was found in the Ivory

4    Street garage had formerly been a City of Cambridge Fire

5    Lieutenant, and when he heard that the defendant apparently had

6    worked at Whole Foods Market in Cambridge, he recalled that

7    there had been an arson fire there, and that fire, the arson

8    fire at Whole Foods, had taken place on December 26th, 2008 at

9    2:00 a.m.  When the Cambridge Fire Department responded, they

10   found that a display in front of the store had been lit on fire

11   and a 30-foot trailer.  If you will, almost like a wick had

12   been used made up of men's clothing spun into a long, rope-like

13   thing, and that was lit, and the fire damaged most of the

14   outside display, but there was also damage to the building

15   itself.

16        Now, with regard to what the jury would hear about the

17   defendant's connection to these fires, the evidence would be as

18   follows, your Honor:

19        With regard to the first fire that I have discussed,

20   with regard to the JP Auto Body fire in Jamaica Plain, the

21   defendant had work done on a car there.  He was displeased with

22   the work, wanted his money back.  They wouldn't return his

23   money.  The defendant sued them in small claims court and lost.

24        THE COURT:  That is Count Three, that fire?

25        MR. TOBIN:  Yes, yes.  I'm sorry.  Yes.

1          With regard to the Back Bay Dental and the brownstone

2     on Bay State Road in the Back Bay, it was later determined that

3     the defendant had been a patient at that dental practice.  He

4     had had some veneers that he had had put on I believe in Texas.

5     They were falling off and needed to be recemented.  He went to

6     the dentist, he had them recemented, he paid, he left.  He went

7     back once or twice thereafter.

8          But the evidence would be that he was very

9     dissatisfied because he went back to Back Bay Dental after they

10    had recemented his veneers and he wanted to have them fixed,

11    and they fixed them, but then they gave him a bill of more than

12    $100.  And we would call one of the office personnel there who

13    specifically remembers this defendant and specifically

14    remembers that he became agitated and upset because he had to

15    pay.  He ultimately paid, but the fire happened thereafter.

16         Now, with regard to Whole Foods, the evidence would be

17    that the defendant had been employed --

18         THE COURT:  The Back Bay Dental is Count Two?

19         MR. TOBIN:  Yes, your Honor.  With regard to Whole

20    Foods, which is Count Four, the evidence would be that the

21    defendant had been employed as a cashier at Whole Foods Market

22    in Cambridge, and that he was quite disgruntled and voiced his

23    unhappiness on more than one occasion.  Apparently, the object

24    of his frustration and anger was that he was forced not only to

25    be -- not forced, I'm sorry -- he was hired essentially as a

1    cashier, but most, though not all, of the cashiers also had to

2    pull an occasional shift bagging groceries.  And the defendant

3    brought it to his supervisors' attentions on more than one

4    occasion that there were some cashiers that were not required

5    to bag groceries.  He was upset about that.  Ultimately, he

6    called the store, he spoke to two different employees, and he

7    said he was quitting and referenced his dissatisfaction over

8    this issue.

9         That leaves us, I believe, with the evidence the jury

10   would get about the defendant's connection to 11 Firth Road.

11        THE COURT:  And the Whole Foods is Count Four?

12        MR. TOBIN:  Count Four is Whole Foods.  11 Firth Road

13   is Count One.

14        The connection that the defendant has to that

15   residence -- and that's a three-story wood frame building with

16   apartment rentals on the first, second and third floor -- this

17   defendant actually knew folks on the first floor and on the

18   third floor, and the evidence would be as follows:

19        The individual who rented the first-floor apartment

20   owned a small market, a bodega or variety-type store, and this

21   defendant used to be involved in something that's

22   euphemistically called, I think, the "Dominican Lottery," and

23   the person in the first floor at his store would take bets for

24   the defendant, he would get a cut of 10 percent of whatever he

25   brought in, and the rest of the proceeds would go to the

1   defendant, of course.  That relationship ended, in part because

2   there was a raid and in many of these places people were being

3   arrested, and the first-floor individual along with his market

4   essentially stopped doing it for him; and that the defendant

5   also apparently was not happy with him or may not have been

6   happy with him because one day he called late with the bet

7   money.  He also knew people on the third floor who previously

8   had taken bets from him.

9          Now, your Honor, with regard to interstate commerce,

10  of course, the evidence would be that JP Auto Body is a

11  business and, as such, it affects interstate commerce.  The

12  dental practice at Back Bay Dental is a business.  It affects

13  interstate commerce.  It also has rental units there, which I

14  believe case law would show also affects interstate commerce,

15  the renting of units from owners to tenants.  Firth Road,

16  similarly, there are two rental units.  The landlord lived on

17  the second floor, he rented the first and he rented the third.

18  That is how that specifically would affect interstate commerce,

19  because it was a rental venture, if you will.

20         With regard to injuries, as I have noted previously,

21  Count One on Firth Road alleges that there were injuries as a

22  result of this arson fire.  The evidence would be, essentially,

23  as follows:

24         The owner of the building who resided on the second

25  floor was forced to jump or leap from the second floor back

1    porch because of the fire and I think in this case most

2    specifically the smoke.  He sustained injuries to one of his

3    legs.  Additionally, three or four firefighters who were

4    battling the blaze sustained injuries, two of whom actually

5    missed work.  The others, I believe, were able to return to

6    work.

7            So, I would say in a summary fashion, though that was

8    not perhaps quite as summary as the Court might have liked, but

9    that, essentially, would be the evidence that the Government

10   would put forward to prove all four of these counts.

11           THE COURT:  All right.

12           So, Mr. Baez, you have heard what Mr. Tobin told us

13   not so briefly would be the evidence in this case.  Do you

14   dispute any of that?

15       (The defendant conferred with counsel off the record)

16           THE DEFENDANT:  I plead guilty with the evidence.

17           THE COURT:  Well, do you dispute anything that he

18   said?  Do you say it is not true?

19           Yes, talk to him.

20           MR. SPENCER:  Judge, and I do believe that Mr. Tobin

21   gave a lot of information that there is just no way conceivably

22   that Mr. Baez could accept knowledge of, most specifically

23   whether or not an officer smelled gasoline at the time that he

24   approached the vehicle.

25           THE COURT:  Well, but the question I asked was does he

1   dispute any of it?

2              (The defendant conferred with counsel off the record)

3              THE DEFENDANT:  I don't dispute it.

4              THE COURT:  Well, let me be more specific.  Did you

5   start the fire in Roslindale on August 9th at 11 Firth Road?

6              THE DEFENDANT:  I plead guilty.

7              THE COURT:  Did you do it?

8              THE DEFENDANT:  Yes.

9              THE COURT:  And did you start the fire on July 31st,

10  2009 at Back Bay Dental Care?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And did you start the fire on April 29th

13  at 12 through 18 Rock Hill Road in Jamaica Plain?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And did you start the fire on December

16  26th, 2008 at the Whole Foods in Cambridge?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Mr. Tobin, do you know of any reason I

19  should not accept a plea?

20             MR. TOBIN:  I do not, your Honor.

21             THE COURT:  Mr. Spencer, do you know?

22             MR. SPENCER:  No, your Honor.

23             THE COURT:  So, I am going to ask Mr. Lovett to

24  inquire of the defendant.

25             THE CLERK:  Would you please rise.

1          Mr. Baez, on Criminal No. 10-10275, Counts One, Two,

2     Three and Four of the Superseding Indictment charge you with

3     Arson in violation of Title 18, United States Code 844(i).  You

4     have previously pled "Not guilty."  Do you now wish to change

5     your plea?

6               (Defendant conferred with counsel off the record)

7               THE DEFENDANT:  Yes.

8               THE CLERK:  What say you as to Counts One, Two, Three

9     and Four, guilty or not guilty?

10              THE DEFENDANT:  Guilty with conditional.  I plead

11    guilty, conditional --

12              THE COURT:  And the condition, so it is clear, is that

13    you have the right to appeal my denial of your Motion to

14    Suppress the evidence.

15              THE DEFENDANT:  Yes, your Honor.

16              THE COURT:  You may be seated.  Based on the

17    discussion we have had this afternoon, I am satisfied that your

18    decision to plead guilty is a knowing and voluntary one, and it

19    is supported by substantial evidence from which a finder of

20    fact could find you guilty of the four counts of the Indictment

21    as modified by the dismissal of that part of Count Four that

22    alleges injury.

23              As a consequence, you are now adjudged guilty of those

24    offenses.

25              You have the right, as we have discussed, to appeal

1    the judgment in this case, but the judgment will not enter

2    until we have the sentencing hearing.

3            The sentencing hearing will take place on November

4    29th at 11:00 a.m.  What is going to happen is that the

5    Probation Office of this Court will prepare a Presentence

6    Report.  It is a document I rely on very heavily in making my

7    own judgment about what the proper sentence should be.

8            You and your attorneys will have an opportunity to

9    review the Presentence Report.  You will have an opportunity to

10   bring to the attention of the Probation Office things you think

11   I should know.  They will ask you things that they think I

12   should know.

13           You will get a chance to see the Presentence Report in

14   its draft form.  If you are not satisfied with the draft, you

15   can ask Probation to make changes or corrections, and if they

16   will not make those changes and corrections to your

17   satisfaction, you can bring the matter up to me at the time of

18   sentencing.  At the time of sentencing both you and your

19   attorneys will have an opportunity to address me orally in open

20   court about the sentence and the various factors that I should

21   have in mind before I impose it.

22           Now, do you have any questions regarding these

23   proceedings any further?

24           THE DEFENDANT:  No, your Honor.

25           THE COURT:  Anything else that we need to take up

1    before we break?

2              MR. SPENCER:  No, your Honor.

3              MR. TOBIN:  No, your Honor.

4              THE COURT:  Does the question of withdrawal still

5    remain?

6              MR. RUANE:  Yes, your Honor, and that's something I

7    spoke with Attorney Spencer about prior to the Court

8    undertaking the defendant's guilty plea, and I believe that he

9    and the defendant would be assenting to at least that renewed

10   request on behalf of Michael Ruane, me, and Attorney Erkan, who

11   also represents the defendant.  We would ask to renew the

12   Motion to Withdraw.

13             THE COURT:  So, you understand your attorneys other

14   than Mr. Spencer have asked to withdraw from the case.  Do you

15   have any objection to that?

16             (Defendant conferred with counsel off the record)

17             THE DEFENDANT:  No.

18             THE COURT:  So, Mr. Spencer will proceed as your

19   attorney in connection with this.

20             THE DEFENDANT:  Okay.

21             THE COURT:  All right.  If there is nothing further,

22   then we will be in recess.

23             THE CLERK:  All rise.

24        (The Honorable Court exited the courtroom at 3:05 p.m.)

25             (WHEREUPON, the proceedings adjourned at 3:05 p.m.)

1

2                    C E R T I F I C A T E

3

4           I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of *United States v Jose Baez*,

9    No. 1:10-cr-10275-DPW.

10

11

12

13

14

     Date:September 30, 2013       /s/ *Brenda K. Hancock*
15                                 Brenda K. Hancock, RMR, CRR
                                   Official Court Reporter
16

17

18

19

20

21

22

23

24

25