# United States Court of Appeals
## For the First Circuit

No. 13-1025

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE L. BAEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Gordon W. Spencer for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

February 28, 2014

**STAHL, Circuit Judge**. In United States v. Sparks, 711 F.3d 58 (1st Cir. 2013), we held that the warrantless installation of a global positioning system (GPS) device on a defendant's automobile and the use of that device to monitor his and a co-defendant's movements for eleven days fell within the good-faith exception to the exclusionary rule, because the monitoring had occurred before the Supreme Court decided that the installation and use of a GPS tracker on a car constitutes a Fourth Amendment search. See United States v. Jones, 132 S. Ct. 945 (2012). Today, we are faced with another instance of pre-Jones warrantless GPS tracking, but of a significantly longer duration. We nonetheless conclude that this case falls within the rule laid out in Sparks, and we therefore affirm.

## I. Facts & Background

Defendant-appellant Jose Baez was charged with, and ultimately pled guilty to, four counts of arson. He challenges the district court's denial of his motion to suppress evidence that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) obtained by monitoring his black 1989 Chevrolet Caprice using a GPS device. The GPS tracking began in August 2009 and continued for 347 days.[1]

---

[1] We take this number from the district court's opinion. See United States v. Baez, 878 F. Supp. 2d 288, 292 (D. Mass. 2012). Baez has described the monitoring as having lasted for 346 days, "from August 27, 2009 to August 8, 2010," but because the GPS device was apparently still on his car on August 9, 2010 (the date of the final fire that led to his arrest), we will use the district court's calculation.

The ATF decided to track Baez's car as a result of two fires that occurred earlier that year: the first on April 29, 2009, at Jamaica Plain Auto Body in Jamaica Plain, Massachusetts, and the second on July 31, 2009, in a brownstone building in Boston that housed both condominium units and a dentist's office known as Back Bay Dental.

At the scenes of both fires, surveillance cameras captured and recorded the image of an older-model, dark-colored Chevrolet Caprice with silver trim, a light-colored steering wheel cover, and a silver emblem located on the driver's side C-pillar of the car. Using the surveillance footage, ATF agents concluded that the car had been manufactured sometime between 1986 and 1989. They then obtained, from the Massachusetts Registry of Motor Vehicles (RMV), a list of all of the dark-colored Chevrolet Caprices manufactured during that time period and registered to addresses in the Boston area. The agents located and observed each of the thirty-eight vehicles on that list and, according to the district court, determined "that a Chevrolet Caprice belonging to Baez, unlike most of the other vehicles reviewed, matched the distinguishing characteristics of the vehicle in the surveillance tapes." United States v. Baez, 878 F. Supp. 2d 288, 290 (D. Mass. 2012).

The ATF also discovered that Baez was the only owner of a Chevrolet Caprice on the RMV list who had been a patient at Back Bay Dental. The office manager at Back Bay Dental reported that

-3-

Baez had become angry in June 2009 when he had to have his veneers re-cemented and had threatened not to pay for the procedure. In addition, the ATF investigation revealed that Baez had been a customer at Jamaica Plain Auto Body, had been dissatisfied with the shop's work on a Chevrolet Impala in the summer of 2008, and had filed an unsuccessful claim against the shop in small claims court.

Thus, on August 27, 2009, acting without a warrant, ATF Agent Brian Oppedisano attached a GPS device to Baez's Caprice while it was parked on a public road in front of Baez's home. The ATF set up a "virtual perimeter" around Baez's residence and programmed the GPS device to send a text message to Agent Oppedisano whenever the Caprice traveled outside that perimeter; Agent Oppedisano would then determine whether physical surveillance of the Caprice was necessary. Agent Oppedisano testified that he looked at the GPS location logs once every day or two, and that agents conducted periodic physical surveillance of the Caprice (even when it did not travel outside the perimeter) to ensure that it was actually located where the GPS device said it was.

As it turned out, Baez drove the Caprice relatively infrequently; he appears to have used another car (an Acura MDX) as his primary vehicle.[2] During the nearly year-long monitoring

---

[2] Agent Oppedisano also installed a GPS device on the Acura in January 2010 but removed that device in April 2010 after concluding that Baez was not using the car "to scout out locations for arsons." Baez, 878 F. Supp. 2d at 291 n.3.

-4-

period, the Caprice traveled outside the perimeter on just twenty-six days, six of which were during the week before the final fire that led to Baez's arrest.

That fire occurred on August 9, 2010, at 11 Firth Road in Roslindale, Massachusetts. At 3:21 a.m. that day, Agent Oppedisano received a text message alerting him that the Caprice had left the perimeter. From a website available to him, Agent Oppedisano determined that the car was stopped near 5 Bexley Road in Roslindale, which runs parallel to Firth Road. Because this was an unusual travel pattern for Baez, and given that the April 2009 and July 2009 fires had occurred at a similar time of day, Agent Oppedisano alerted law enforcement and directed officers to the area. At around the same time, a fire was reported at 11 Firth Road, a multi-unit home. After being shown a photo array, two of the residents of 11 Firth Road identified Baez as a man who had sold them Dominican lottery tickets.

Shortly after the fire was reported, an officer from the Boston Police Department located Baez in his vehicle in front of his residence and arrested him. Footage from surveillance cameras near Baez's home confirmed his travel in the direction of Firth Road that night, and searches of his person, his car, his residence, and two garages that he had rented revealed various materials associated with arson. The searches of Baez's residence

and one of the garages also tied him to a December 2008 fire at a Whole Foods grocery store in Cambridge, Massachusetts.

In September 2011, following his indictment, Baez moved to suppress all of the evidence obtained as a result of the GPS monitoring of his vehicle. With the consent of both parties, the district court decided to hold the motion until the Supreme Court reached its decision in Jones. In January 2012, the Court announced that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for Fourth Amendment purposes. Jones, 132 S. Ct. at 949 (footnote omitted). The district court convened a motion hearing and ordered supplemental briefing. In July 2012, the district court denied Baez's motion to suppress, concluding that, under Davis v. United States, 131 S. Ct. 2419 (2011), suppression would not serve the purposes of the exclusionary rule, because, when he installed the GPS device and engaged in the monitoring, Agent Oppedisano had "a good faith basis to rely upon a substantial consensus among precedential courts." Baez, 878 F. Supp. 2d at 289.

After Baez filed his notice of appeal but before the parties briefed the case, we decided Sparks, in which federal agents had tracked a defendant's car for eleven days using a GPS device, without a warrant and before Jones was decided. 711 F.3d at 60-61. We concluded that the good-faith exception to the

exclusionary rule applied because, at the time that the GPS surveillance occurred, settled, binding precedent in the form of United States v. Knotts, 460 U.S. 276 (1983), and United States v. Moore, 562 F.2d 106 (1st Cir. 1977), authorized the agents' conduct. Sparks, 711 F.3d at 67. The question before us today is whether those same cases authorized the use of the GPS device on Baez's car.

## II. Analysis

Because Baez challenges the district court's legal conclusion that suppression was not warranted under the exclusionary rule, our review is de novo. See United States v. Ryan, 731 F.3d 66, 68 (1st Cir. 2013). We begin by briefly sketching the relevant legal landscape; for a more detailed exposition of the case law, we refer the reader to Sparks. See 711 F.3d at 65-67.

"The purpose of the exclusionary rule 'is to deter future Fourth Amendment violations.'" Id. at 63 (quoting Davis, 131 S. Ct. at 2426); see also United States v. Thomas, 736 F.3d 54, 60 (1st Cir. 2013) (noting that, under Herring v. United States, 555 U.S. 135 (2009), the exclusionary rule is only available "where the benefits of deterring the police misconduct that produced the [Fourth Amendment] violation outweigh the costs of excluding relevant evidence"). When the police engage in conduct that complies with existing precedent, and the law later changes, "there

-7-

is nothing to deter; the police cannot modify their conduct to accord with cases not yet decided." Sparks, 711 F.3d at 63. Thus, in Davis, the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 131 S. Ct. at 2423-24.

In Sparks, we interpreted that language as requiring "precedent that is 'clear and well-settled.'" 711 F.3d at 64 (quoting United States v. Davis, 598 F.3d 1259, 1266 (11th Cir. 2010), aff'd, 131 S. Ct. 2419). We went on to examine whether clear and well-settled precedent authorized the GPS monitoring at issue in Sparks. That monitoring occurred a little over two years before the Supreme Court decided, in Jones, that installing a GPS device on a vehicle and using that device to track the vehicle constitutes a Fourth Amendment search. We concluded that, before Jones was decided, two cases governed the installation and use of a GPS device on a vehicle in this circuit: Knotts, 460 U.S. 276, and Moore, 562 F.2d 106. Moore addressed the initial "trespass involved in installing a tracking device on a car," concluding that it "was, by itself, immaterial for Fourth Amendment purposes." Sparks, 711 F.3d at 67. As for the subsequent monitoring, we found that Knotts laid out an "apparent bright-line rule that the Fourth Amendment is unconcerned with police surveillance of public automotive movements." Id.

-8-

We paused to address the fact that the monitoring in Sparks had gone on for eleven days, whereas Knotts involved less than a day of monitoring. "Knotts did note that abusive 'dragnet type' surveillance might be governed by 'different constitutional principles,'" id. (quoting Knotts, 460 U.S. at 284), but we concluded that "there was no suggestion in the Knotts opinion that this rather brusque dismissal of the defendant's Orwellian warnings imposed a concrete temporal limitation on the case's apparently unqualified holding." Id.

Today, we are asked to reexamine the Knotts "dragnet" language. The crux of Baez's claim is that the GPS monitoring to which he was subjected was the very kind of abusive surveillance anticipated in Knotts, rendering that case inapplicable and placing the ATF's conduct outside the protection of the good-faith exception. As he describes it, Agent Oppedisano put the GPS device on Baez's car "indefinitely, or until further notice, to see if he could get lucky," without any evidence of an ongoing crime or a reasonable basis to believe that Baez might engage in further arson. That, he claims, sets his case apart from Sparks, in which the monitoring period was much shorter and there was reason to think that the defendant might commit additional robberies.

Baez relies upon the following passage from Knotts:

> Respondent . . . expresses the generalized view that the result of the holding sought by the government would be that "twenty-four hour surveillance of any citizen

-9-

> of this country will be possible, without judicial knowledge or supervision." Br. for Resp., at 9 (footnote omitted). But the fact is that the "reality hardly suggests abuse," Zurcher v. Stanford Daily, 436 U.S. 547, 566 (1978); if such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.

460 U.S. at 283-84. At the time of the GPS installation and monitoring at issue here, the Supreme Court had not provided any further explanation of that language, and lower courts had offered varying assessments of its meaning. See, e.g., United States v. Maynard, 615 F.3d 544, 556-57 (D.C. Cir. 2010) (interpreting Knotts as having reserved the issue of prolonged surveillance), aff'd sub nom. Jones, 132 S. Ct. 945;[3] United States v. Garcia, 474 F.3d 994, 998 (7th Cir. 2007) (suggesting that Knotts reserved the issue of mass surveillance).

In the government's view, Sparks's conclusion that the Supreme Court imposed no "concrete temporal limitation" on its "apparently unqualified holding" in Knotts forecloses a pre-Jones Fourth Amendment claim based on the duration of the GPS tracking. Sparks, 711 F.3d at 67. It is true that Sparks found "scant reason to think that the duration of the tracking" in Knotts (less than a

---

[3] The D.C. Circuit decided Maynard just three days before the ATF removed the GPS device from Baez's car. Baez, 878 F. Supp. 2d at 293. We mention the opinion here not because we believe that it should necessarily have informed the ATF's conduct, but simply to point out that the meaning of Knotts's "dragnet" passage was unclear.

-10-

day) "was material to the Court's reasoning." Id. Sparks also concluded that the length of the monitoring in that case (eleven days) was not enough to render Knotts inapplicable for purposes of the good-faith exception. Id. But Sparks did not say that the duration of the GPS surveillance could never be relevant for Fourth Amendment purposes. Nor did Sparks rule out the possibility that tracking conducted in the pre-Jones era could otherwise be so abusive in nature as to fall outside the scope of Knotts.[4] After all, Davis requires that a particular police practice be clearly authorized by judicial precedent, Sparks, 711 F.3d at 64, and perhaps one could imagine a warrantless GPS investigation so extensive or indiscriminate that the officers who conducted it could not fairly be said to have been complying with Knotts. See, e.g., Garcia, 474 F.3d at 998 (describing the possibility of a program of "wholesale" or "mass" surveillance).

This, however, is not that case. Contrary to Baez's claims, Agent Oppedisano was not taking a shot in the dark when he installed the GPS device on Baez's Chevrolet Caprice; the ATF had ample reason to suspect that Baez had set the 2009 fires at Jamaica Plain Auto Body and Back Bay Dental. Specifically, the ATF knew that: (1) Baez had been a customer at, and had had disputes with,

---

[4] But cf. United States v. Cuevas-Perez, 640 F.3d 272, 279 (7th Cir. 2011) (Flaum, J., concurring) ("Regardless of the precise contours of Knotts's reservation, . . . I do not believe it invests lower courts with the authority to depart from the case's holding."), vacated and remanded, 132 S. Ct. 1534 (2012).

-11-

both businesses; (2) he owned a Caprice with the same distinguishing features as the one seen on the surveillance tapes at the scenes of both fires; and (3) he was the only individual the ATF had identified who fit both of those characteristics. The ATF also had reason to believe that Baez might engage in further arson. Given his altercations with both Jamaica Plain Auto Body and Back Bay Dental in the time period before the fires, Baez exhibited some of the traits of a serial arsonist, defined (according to an expert affidavit that is part of the record in this case) as a person who commits "three or more arsons at separate locations, with a cooling-off period in between," to relieve stress or exact revenge. Though the tracking went on for nearly a year, apparently without any evidence of criminal activity on Baez's part, the record in this case also establishes that it is not uncommon for a significant amount of time (often months, but sometimes years) to pass between a serial arsonist's fires. The particularly lethal nature of Baez's July 2009 fire provided further cause for concern: that fire was set in the front vestibule of a residential building in the middle of the night. In short, as in Knotts, the reality here "hardly suggests abuse." 460 U.S. at 283 (quoting Zurcher, 436 U.S. at 566).

We need not decide whether the ATF had probable cause, or reasonable suspicion, to track Baez's car, or whether the existence of either would excuse Agent Oppedisano's failure to obtain a

warrant.[5]  See Jones, 132 S. Ct. at 954 (leaving that question open). Nor need we determine what type of law enforcement conduct, if any, might have implicated the Knotts "dragnet" passage in the pre-Jones era. It is enough for us to say that what occurred in this case was not the indiscriminate monitoring that Baez describes. This was relatively targeted (if lengthy) surveillance of a person suspected, with good reason, of being a serial arsonist.

Under these circumstances, it was objectively reasonable for the ATF to believe that its conduct fell within the rule laid out in Knotts that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. at 281. We therefore conclude that the good-faith exception applies. See Davis, 131 S. Ct. at 2423-24.

There is, of course, a postscript: after Baez was monitored and arrested, Jones came along and taught us that the majority of circuit courts had misunderstood Knotts and that GPS tracking does in fact constitute a Fourth Amendment search. See 132 S. Ct. 945.[6]  Jones also shed some new light on the Supreme

---

[5] Baez argues that probable cause was required under Moore, but as we clearly stated in Sparks, Knotts abrogated Moore's probable-cause requirement. Sparks, 711 F.3d at 65.

[6] It remains to be seen, at least in this circuit, whether a warrant is required for such tracking. See Sparks, 711 F.3d at 62.

Court's understanding of a "dragnet," suggesting that the twenty-eight days of GPS monitoring at issue in that case, which generated more than 2,000 pages of data about the defendant's movements, id. at 948, constituted a "dragnet" within the meaning of Knotts. See id. at 952 n.6 (describing Knotts as having "reserved the question whether 'different constitutional principles may be applicable' to 'dragnet-type law enforcement practices' of the type that GPS tracking made possible here"); see also id. at 956 n.* (Sotomayor, J., concurring) ("Knotts reserved the question whether 'different constitutional principles may be applicable' to invasive law enforcement practices such as GPS tracking."). But Agent Oppedisano, who placed the GPS device on Baez's car in August 2009, did not have the benefit of Jones, which was decided almost two and a half years later.

### III. Conclusion

Our conclusion today certainly should not be read as an endorsement of prolonged warrantless electronic surveillance. We share the concerns that the respondent articulated in Knotts and that the Supreme Court later acted upon in Jones. Moving forward, new rules will apply, and perhaps congressional action will follow. See Jones, 132 S. Ct. at 962-63 (Alito, J., concurring in the judgment). But in this case, as in Sparks, the agents were acting in objectively reasonable reliance on then-binding precedent. We therefore find that the good-faith exception to the exclusionary

-14-

rule applies, and we <u>affirm</u> the district court's denial of Baez's motion to suppress.